**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | | |
|---|---|---|
| FRIENDS OF GEORGES, INC., | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | No. 2:23-cv-02163-TLP-tmp |
| v. | ) | |
| | ) | |
| STEVEN J. MULROY, in his official and | ) | |
| individual capacity as District Attorney | ) | |
| General of Shelby County, TN, | ) | |
| | ) | |
|     Defendant. | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Freedom of speech is not just about speech.  It is also about the right to debate with fellow citizens on self-government,[1] to discover the truth in the marketplace of ideas,[2] to express one's identity,[3] and to realize self-fulfillment in a free society.[4]  That freedom is of first importance to many Americans such that the United States Supreme Court has relaxed procedural requirements for citizens to vindicate their right to freedom of speech,[5] while making it harder[6] for the government to regulate it.  This case is about one such regulation.

---

[1] *See N.Y. Times v. Sullivan*, 376 U.S. 254 (1964) (establishing a heightened standard to find defamation because the government may not chill criticism of public figures).

[2] *See Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting) ("[T]hat the best test of truth is the power of the thought to get itself accepted in the competition of the market.").

[3] *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) (holding that refusing to salute the American flag is a protected right to express dissent as a form of autonomy and self-expression).

[4] *Procunier v. Martinez*, 416 U.S. 396, 427 (Marshall, J., concurring).

[5] *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973).

[6] *Reno v. ACLU*, 521 U.S. 844, 874 (1997); *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002); *see also Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794 (2011).

1

The Tennessee General Assembly enacted a statute criminalizing the performance of "adult cabaret entertainment" in "any location where the adult cabaret entertainment could be viewed by a person who is not an adult." (ECF No. 19-1 at PageID 93.) Plaintiff Friends of George's, Inc. sued under 42 U.S.C. § 1983 to enjoin enforcement[7] of that statute, alleging that it is an unconstitutional restriction on free speech under the First Amendment, as incorporated to the states by the Fourteenth Amendment of the United States Constitution. After a hearing, the Court issued a temporary restraining order that enjoined enforcement of the statute in Tennessee. (ECF No. 26.) The Court and Parties later agreed to consolidate the preliminary injunction hearing and the trial on the merits under Federal Rule of Civil Procedure 65(a)(2). (ECF No. 30.) The Parties exchanged briefs and the Court held a bench trial on May 22–23, 2023.

After considering the briefs and evidence presented at trial, the Court finds that—despite Tennessee's compelling interest in protecting the psychological and physical wellbeing of children—the Adult Entertainment Act ("AEA") is an **UNCONSTITUTIONAL** restriction on the freedom of speech and **PERMANENTLY ENJOINS** Defendant Steven Mulroy from enforcing the unconstitutional statute.[8]

---

[7] Plaintiff first sued the State of Tennessee, Governor Bill Lee in his official and individual capacity, Attorney General Jonathan Skrmetti in his official and individual capacity, and Shelby County District Attorney General Steven Mulroy in his official and individual capacity. (ECF No. 1, 31.) Plaintiff, after conferring with Defendants, voluntarily moved to dismiss the parties other than Defendant Shelby County District Attorney General Steven J. Mulroy in his official and individual capacities. (ECF No. 60.)

[8] The Court took Defendant's motion to dismiss under advisement. (ECF No. 41.) In light of this ruling, the Court DENIES Defendant's motion as moot.

## RULE 52(A) FINDINGS OF FACT

When parties try an action without a jury, the Court must "find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(1)(1). What follows are the Court's findings of fact.

## Undisputed Facts

The Parties do not dispute that in early 2023, the Tennessee General Assembly enacted the AEA. 2023 Tenn. Pub. Acts, ch. 2 (codified at Tenn. Code. Ann. §§ 7-51-1401, -1407, and § 39-17-901). Governor Bill Lee signed the AEA into law on March 2, 2023. (ECF No. 19-1.)

## I.    The Adult Entertainment Act

The text of the adult entertainment act reads as follows:

SECTION 1. Tennessee Code Annotated, Section 7-51-1401, is amended by adding the following language as new subdivisions:

( ) "Adult cabaret entertainment":

(A) Means adult-oriented performances that are harmful to minors, as that term is defined in § 39-17-901, and that feature topless dancers, go-go dancers, exotic dancers, strippers, male or female impersonators, or similar entertainers; and

(B) Includes a single performance or multiple performances by an entertainer;

( ) "Entertainer" means a person who provides:

(A) Entertainment within an adult-oriented establishment, regardless of whether a fee is charged or accepted for entertainment and regardless of whether entertainment is provided as an employee, escort as defined in § 7-51-1102, or an independent contractor; or

(B) A performance of actual or simulated specified sexual activities, including removal of articles of clothing or appearing unclothed, regardless of whether a fee is charged or accepted for the performance and regardless of whether the performance is provided as an employee or an independent contractor;

3

SECTION 2. Tennessee Code Annotated, Section 7-51-1407, is amended by adding the following language as a new subsection:

(c)(1) It is an offense for a person to perform adult cabaret entertainment:

(A) On public property; or

(B) In a location where the adult cabaret entertainment could be viewed by a person who is not an adult.

(2) Notwithstanding§ 7-51-1406, this subsection (c) expressly:

(A) Preempts an ordinance, regulation, restriction, or license that was lawfully adopted or issued by a political subdivision prior to the effective date of this act that is in conflict with this subsection (c); and

(B) Prevents or preempts a political subdivision from enacting and enforcing in the future other ordinances, regulations, restrictions, or licenses that are in conflict with this subsection (c).

(3) A first offense for a violation of subdivision (c)(1) is a Class A misdemeanor, and a second or subsequent such offense is a Class E felony.

SECTION 3. This act takes effect April 1, 2023, the public welfare requiring it, and applies to prohibited conduct occurring on or after that date.

(ECF 19-1.)

## A.     "Harmful to Minors" Standard

The AEA incorporates the "harmful to minors" (*id.* at PageID 93) standard from

Tennessee Code Annotated § 39-17-901:

(6) "Harmful to minors" means that quality of any description or representation, in whatever form, of nudity, sexual excitement, sexual conduct, excess violence or sadomasochistic abuse when the matter or performance:

(A) Would be found by the average person applying contemporary community standards to appeal predominantly to the prurient, shameful or morbid interests of minors;

(B) Is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable for minors; and

4

(C) Taken as whole lacks serious literary, artistic, political or scientific values for minors;

Tenn. Code Ann. § 39-17-901.

**B.   Intended Enforcement**

The Parties stipulate that Shelby County District Attorney General Steven J. Mulroy intends to enforce "all State of Tennessee laws that fall within his jurisdiction, including the felony and misdemeanor crimes recently codified at [the AEA]."  (ECF No. 69 at PageID 955.)

**II.   Procedural Posture**

Plaintiff Friends of George's, Inc. is a registered 501(c)(3) nonprofit organization based in Memphis, Tennessee, that produces "drag-centric performances, comedy sketches, and plays." (ECF No. 69 at PageID 955.)  On March 27, 2023, after the AEA's enactment but before its effective date (April 1, 2023), Plaintiff sued here for an injunction.  Asserting that the new law violated their First Amendment rights to free expression, Plaintiff sought to "prevent this unconstitutional statute from taking [] effect."  (ECF No. 1 at PageID 13.)  Plaintiff named the State of Tennessee as the lone Defendant in the action.  (*Id.* at PageID 2.)  Plaintiff later amended its complaint to add Defendants Bill Lee in his official and individual capacities, and Attorney General Jonathan Skrmetti in his official and individual capacities.  (ECF No. 10 at PageID 52.)  Defendants moved to dismiss Plaintiff's complaint and to deny its request for a temporary restraining order, arguing that sovereign immunity barred Plaintiff's claims.  (ECF No. 19.)

In response, Plaintiff sued Shelby County District Attorney General Steven J. Mulroy in his official and individual capacities.  (*See* ECF No. 26 (referencing Case No. 23-2176).)  The Court held a hearing in both cases and issued a TRO as to all Defendants on March 31, 2023—

5

one day before AEA was to take effect.  (ECF No. 26.)  With the Parties' consent, the Court

consolidated the cases and scheduled a brief period for the Parties to conduct discovery.  (ECF

No. 30.)  The Court also consolidated the preliminary injunction hearing with the trial on the

merits.  (ECF No. 31.)  A few weeks later, Plaintiff moved to dismiss all Defendants other than

District Attorney General Steven J. Mulroy in his official and individual capacities, which the

Court also granted.  (ECF No. 60.)

      The Court held a consolidated preliminary injunction hearing and trial on the merits on

May 22–23, 2023.  The Parties then sent proposed findings of fact and conclusions of law.  (ECF

No. 81, 82.)

### The Court's Findings of Fact

      The Court makes the next findings of fact from the case's record and evidence presented

at the consolidated preliminary injunction hearing and trial.

**I.**    **Ms. Vanessa Rodley's Testimony**

      Ms. Vanessa Rodley testified as Plaintiff's board member and Rule 30(b)(6)

representative.[9]  Based on her uncontroverted testimony,[10] the Court finds the following:

    **A.**    **Plaintiff's Mission and Operation**

      Plaintiff's mission is to "raise money for LGBTQ non-profits," and to "provide a space

outside of bars and clubs where people can enjoy" drag shows.  (ECF No. 81 at PageID 1064.)

Even though Plaintiff's members believe there is "nothing wrong" with drag shows in age-

---

[9] Under the Federal Rules of Civil Procedure, an organization may designate a person who represents the organization and testifies on its behalf.  Fed. R. Civ. P. 30(b)(6).  The individual "must testify about information known or reasonably available to the organization."  *Id.*

[10] The Court observed Ms. Rodley's testimony at trial.  Ms. Rodley seemed to testify honestly and without exaggeration.  Nor did she give the Court any reason to otherwise question her credibility.  For these reasons, the Court finds Ms. Rodley's testimony credible.

restricted venues like bars, Plaintiff seeks to provide a space for some non-adults to enjoy drag outside of stigmatized, age-restricted venues. (*Id.* at PageID 1067–68.)  Drag features "male and female" impersonators, but also "nonbinary person[s]." (*Id.* at 1068–69.)  Drag performers in Plaintiff's shows could be males impersonating females or even female actors impersonating female characters. (*Id.* at PageID 1069.)  Plaintiff produces its own original work. (*Id.* at PageID 1065.)  Its members write, produce, act, and direct. (*Id.*)  They also serve as production crew members. (*Id.*)  Not all members are performers.  In fact, Ms. Rodley is not a performer. (*Id.* at PageID 1064–65.)

Almost all of Plaintiff's performances are in the Evergreen Theater within Shelby County in Memphis with no age-restrictions. (*Id.* at PageID 1069.)  Plaintiff also produces performances at other venues, but it has no control over age-restrictions there. (*Id.* at PageID 1070.)  Plaintiff's performances can be sexual, but the performers try not to get "too risqué." (ECF No. 81 at PageID 1071.)  Rather, they "try to stick around the PG-13 area." (*Id.*)

B.    **Plaintiff's Exhibits at Trial**

At trial, Plaintiff played videos of three of its productions and described, through Ms. Rodley, others as well.  The Court viewed the videos in Plaintiff's exhibit after the trial. Defendant also submitted video clips of Plaintiff's 2022 holiday program, which the Court viewed before trial.

The first production Plaintiff showed is entitled "The Tea with Sister Myotis." (*See* ECF No. 80 (found at Exhibit Number 2).)  Because the character describes sexual acts including intercourse and masturbation, the Court finds that the conduct of performers in this production could be interpreted by a law enforcement officer as violating the AEA.

7

The second production is entitled "Paradise by Dashboard Light." (*See* ECF No. 80 (found at Exhibit Number 2).) Because the characters portrayed sexual acts in this skit, the Court finds that the conduct of performers in this production could be interpreted by a law enforcement officer as violating the AEA.

Finally, the Court finds the following:

These videos are typical of Plaintiff's productions since 2011. Plaintiff intends to continue producing these types of shows in pursuit of its mission. Plaintiff is concerned that the AEA could subject Plaintiff and its members to felony charges. A law enforcement officer could view Plaintiff's productions and reasonably think that they violate the AEA. The threat of prosecution has forced Plaintiff to alter the content of their productions, and to spend more on security at the Evergreen Theater.

Ms. Rodley is also President and Festival Director of Mid-South Pride Foundation, Inc., a nonprofit that hosts the "annual pride festival" in Memphis. She testified that since the AEA's enactment, she witnessed a "noticeable decline in sponsorship for the 2023 festival." (ECF No. 23-3 at PageID 141.) The 2022 Mid-South Pride festival had a total of 43 sponsors while on March 30, 2023—a day before this Court issued an Temporary Restraining Order enjoining the AEA's enforcement—the 2023 festival had only 23 sponsors. (*Id.* at PageID 142.) Also, while the festival secured 90% of its annual budget from sponsors 60 days before the event in 2022, it secured only 60% of its annual budget 63 days before the event this year. (*Id.*)

## II.    The AEA's Legislative History

The Parties both cite the Tennessee General Assembly's legislative transcript comprising four sessions—three from the Senate and one from the House. (ECF No. 35-1.) The Court summarizes the 100-page legislative history as follows:

8

The co-sponsors of the bill were Senator Johnson and Representative Todd.  (*Id.* at PageID 521–22, 573.)  Senator Johnson proposed the AEA to "clarify current law by requiring that adult-oriented performances may only be held in age-restricted venues and may never be held on public [] property."  (*Id.* at PageID 515–16.)  Senator Johnson observed that "[u]nder current law, [] businesses that provide predominantly adult-oriented entertainment must be licensed and age-restricted to prevent children from entering that venue. . . .  With this bill, [] only the entertainer who acts in violation of this law would be subject to the criminal penalty, not the business where the performance took place."  (*Id.* at PageID 544–45.)

Senator Johnson also said that the co-sponsors "received hundreds of calls, emails from outraged parents" about performances that "any reasonable person, upon watching [the performance], would say that's in violation of the obscenity statute that we already have in current code."  (*Id.* at PageID 520–21.)  Speaking to law enforcement officers, the co-sponsors discovered a "loophole" in the statute that "would allow that type of entertainment to take place in public settings," so they are "just simply trying to apply the same standards to this adult-themed sexually explicit entertainment that can take place in these heavily regulated establishments."  (*Id.* at PageID 521.)  The co-sponsors stressed the need for age-restrictions at least six other times from the legislative transcript.  (*Id.* at PageID 521, 544, 547, 575, 576, 579.)

Senator Johnson stressed that the AEA only applies to "performances that are considered harmful to minors" as already defined by language that "exists currently in our code, and it's in the obscenity statute."  (*Id.* at 516–17.)  He then mentioned that the AEA "doesn't ban that type of entertainment.  It simply says it can't be done on public property, and if it's going to be done in a private venue, then you have to ensure that children are not present."  (*Id.* at 517.)

Representative Bulso, another member of the House, observed that the AEA pulled its language from "the three-part *Miller* test coming from our U.S. Supreme Court in 1973." (*See id.* at PageID 605.)

Supporters of the AEA expressed their concern for children from these "sexually-explicit performances." (*Id.* at PageID 520–21, 547, 549, 567–68, 599, 602, 606.) Two witnesses spoke to the Senate at the AEA's introduction. (*Id.* at PageID 524.) Ms. Landon Starbuck, whose credentials include being "an advocate for children harmed by child sexualization and exploitation," spoke first. (*Id.* at PageID 525.) She told the Senate how "early sexualization and exposure to explicit adult entertainment harms children" because it grooms them into "accepting adult sexual behavior as normal, healthy, and even celebrated while it encourages them to simulate and participate in high-risk sexual behaviors." (*Id.*) In her opinion, "normalizing the sexualization of children empowers child predators and increases the demand to exploit and sexually abuse children." (*Id.* at PageID 526.) In response to a question about parental responsibility, Ms. Starbuck said "the responsibility is on parents when they see [indecent sexual acts], that's where their parental rights end and that's where a crime is committed." (*Id.* at PageID 529.) She then gave the examples of "sexually charged entertainment" performed in front of children in shows marketed as "family friendly" and concluded that "[w]e don't need a PhD to tell us that children mimic the behaviors they are exposed to." (*Id.* at PageID 527.) When asked to cite an example of a performance she found harmful to minors, Ms. Starbuck mentioned that "Boro Pride recently happened in Murfreesboro, Tennessee, where an adult performer was talking about their tits and rubbing their genitalia, grinding on the ground and spreading their legs in front of children." (*Id.* at PageID 530.)

Speaking against the bill was Mr. David Taylor, a "co-owner of four businesses in Nashville" that "cater predominantly to the LGBTQ+ community" and which employ "13 full-time and more than 60 guest drag performers with a total annual payroll of $3 million." (*Id.* at PageID 533.)  He explained how his businesses are heavily regulated by the "Alcoholic Beverage Commission," yet he "has not received a citation for one of [his] drag performers" in "more than 20 years" of operation.  (*Id.* at PageID 534.)  Mr. Taylor is concerned about how the AEA "places male and female impersonation in the category of strippers, go-go dancers, and exotic dancers[.]"  (*Id.*)  He noted that their drag performers "ha[ve] never shown any more skin than a Titans cheerleader on a Sunday afternoon."  (*Id.*)

Beyond the witnesses, several legislators expressed their concerns about the AEA's constitutionality, with specific reference to "drag" as an expressive art form.  (*See id.* at PageID 551–53, 555–56, 561–62, 581, 590, 593, 596.)  Some questioned the legitimacy of the AEA's purpose since the state "already ha[s] obscenity laws on the books if [overly-sexualized performers] are being seen in front of children[.]"  (*Id.* at PageID 576, 599–600.)  For example, Senator Yarboro mentioned that the AEA's language applies the state's adult-oriented entertainment regulations to public places or "anywhere where any child could view, and not just views, like anywhere where a child could view a performance.  So one out of four or five people is a child in Tennessee—basically everywhere."  (*Id.* at PageID 559.)

In the House, Representative Harris asked the AEA's co-sponsor, Representative Todd, if there were any times when adult cabaret in public has harmed his constituents.  (*Id.* at PageID 584.)  Representative Todd responded:

> [I]n my community, we had a local group decide to a quote "family-friendly pride"
> – or a "family friendly" drag show.  And when they listed this as family friendly,
> my community rose up.  We filed an injunction against this group, actually against
> the City of Jackson because our city mayor was endorsing this and refusing to use

local ordinances to prevent it that were very clearly set there to prevent this type of activity in front of children.

(*Id.* at PageID 584–85.)  He then described how "his community" succeeded in their suit and the "drag show" was "forced to be indoors and 18 and up only." (*Id.*)  After that he "was asked to come up with legislation that would make this much more clear," and so the AEA defines the word "cabaret." (*Id.*)  Representative Todd stressed that the AEA does not "prevent those performances.  It certainly says that they must not be held in front of minors[.]" (*Id.* at PageID 586.)  He described the AEA as a "very simple common sense bill . . . protecting children first and foremost." (*Id.* at PageID 599–600.)

Representative Clemmons observed that "[n]obody wants a minor in an establishment with a stripper.  There are laws prohibiting that." (*Id.* at PageID 599–600.)  He concluded by saying "you cannot exclude individual classes of people because you subjectively disagree with them . . . [the AEA's] language is vague and it's overly broad.  This will not stand up in court . . . I would ask that you at least make the effort as an attorney to clean this up to bring it within constitutional muster[.]" (*Id.* at PageID 601.)  Representative Todd responded, saying "I think the language is extremely clear.  We've had multiple attorneys look over this.  They think it's extremely solid.  I'm very confident, very confident our Attorney General can stand behind this and defend this without question." (*Id.*)

For reasons it will explain later, the Court finds that the legislative transcript strongly suggests that the AEA was passed for an impermissible purpose.

### RULE 52(A) CONCLUSIONS OF LAW

These are the Court's Conclusions of Law.  There are several issues in this case with overlapping questions of fact and law.  The Court will take the issues one at a time—reiterating some of its factual findings when appropriate and stating its legal conclusions for each issue in

turn.  This section will proceed in this sequence: summary of legal conclusions, appropriate party defendant, standing, standard of review, application of standard, vagueness, substantial overbreadth, remedy, and conclusion.

### Summary of Legal Conclusions

After Article III standing, the central legal question in this case arises from the Parties' clashing constructions of the AEA.  Plaintiff argues that the AEA is constitutionally vague in that it applies to expressive conduct that is "harmful to minors" of all ages, it is both a content- and viewpoint-based restriction, and that it is substantially overbroad because it applies to anywhere a minor could be present.  Defendant makes many arguments to save the statute including that the AEA is not unconstitutionally vague because it applies only to expressive conduct that is harmful to a reasonable 17-year-old, it is content-neutral or is to be treated as such because it is predominantly concerned with the secondary effects of expressive conduct, and that it is not substantially overbroad because it applies only to public property and private venues without an age restriction.

The Court concludes that Plaintiff has proven Article III standing for a facial challenge of the AEA.  Plaintiff has organizational standing to sue for declaratory and injunctive relief, because the certainly impending threat of the AEA's enforcement on Plaintiff caused an injury that a favorable ruling would redress.  Plaintiff can assert the interests of parties not before this Court to launch a facial attack on the AEA under the First Amendment's substantial overbreadth doctrine.

Defendant Steven J. Mulroy in his official capacity as District Attorney General of Shelby County is the only appropriate Defendant in this case.

The Court concludes that strict scrutiny review applies to the AEA.  As a matter of text alone, the AEA is a content-, and viewpoint-based restriction on speech.  The AEA was passed for the impermissible purpose of chilling constitutionally-protected speech, and the secondary-effects doctrine does not save it from strict scrutiny review.

The Court concludes that the AEA fails strict scrutiny review.  Tennessee has a compelling state interest in protecting the physical and psychological well-being of minors, but Defendant has not met his burden of proving that the AEA is both narrowly tailored and the least restrictive means to advance Tennessee's interest.

The Court concludes that the AEA is both unconstitutionally vague and substantially overbroad.  The AEA's "harmful to minors" standard applies to minors of all ages, so it fails to provide fair notice of what is prohibited, and it encourages discriminatory enforcement.  The AEA is substantially overbroad because it applies to public property or "anywhere" a minor could be present.

Finally, the Court concludes that the constitutional-avoidance canon does not apply to the AEA's constitutional defects.  Defendant's proposed narrowing constructions are unmoored from the text and unsupported—if not contravened—by legislative history, which Defendant asked the Court to consider.  Acceptance of Defendant's proposed narrowing construction under the guise of the constitutional-avoidance would require the Court to rewrite the statute, and to violate the principle of separation-of-powers.

### Appropriate Party

At this point, the only Defendant is Steven J. Mulroy in his official capacity as District Attorney General of Shelby County and in his individual capacity.  These capacities are particularly relevant in this case because the Office of the Tennessee Attorney General represents

Mulroy in his official capacity, while Mulroy in his individual capacity has his own counsel. (ECF No. 34.)  As an individual, Mulroy takes a different position than he does in his official capacity.  Defendant argues that the Court should dismiss Mulroy in his individual capacity because Plaintiff's § 1983 action seeks equitable relief, not monetary damages.  So only Mulroy in his official capacity is the appropriate party.  Plaintiff disagrees based on its understanding of *Ex parte Young*, 209 U.S. 123 (1908).

Only the government, and not individuals, can violate the United States Constitution.  *See Virginia v. Rives*, 100 U.S. 313, 318 (1879) ("The provisions of the Fourteenth Amendment . . . have reference to State action exclusively, and not to any action of private individuals.")  But the government is also "immune from suit" under the Eleventh Amendment's doctrine of sovereign immunity.  *See Alden v. Maine*, 527 U.S. 706, 754 (1999) ("Our sovereign immunity precedents establish that suits against nonconsenting States are not 'properly susceptible of litigation in courts[.]'").  *Ex parte Young* reconciles a tension between these two principles: the Fourteenth Amendment's requirement of a state action and the Eleventh Amendment's shield of state sovereign immunity.  The *Ex parte Young* "fiction" has been "accepted as 'necessary to 'permit federal courts to vindicate federal rights.'"  *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 254–55 (2011).  This fiction creates a "narrow exception allowing an action to prevent state officials from enforcing state laws that are contrary to federal law[.]"  *Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 532 (2021).

The Court concludes that Mulroy in his official capacity is the only appropriate Defendant here.  Plaintiff insists that this question is resolved by *Ex parte Young*'s holding that a state official who violates federal law is "stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct."  209 U.S. at 159–60.

Plaintiff's observation is, at best, outdated. The Supreme Court has since held that § 1983 actions for injunctive relief allow for suits against state officers in their official capacity. *Will v. Mich. State Police*, 491 U.S. 58, 71 n.10 (1989) ("[O]fficial-capacity actions for prospective relief are not treated as actions against the State.") (citing *Ex parte Young*, 209 U.S. at 159–60). The Sixth Circuit has also held in *Kanuszewski v. Michigan Department of Health* that in declaratory and injunctive relief actions, the *Ex parte Young* exception only applies to individual officers in their official capacities. 927 F.3d 396, 417 (6th Cir. 2019).

As an individual citizen, Mr. Steven J. Mulroy has no more power to enforce the AEA than any other private citizen. But as the elected District Attorney General of Shelby County, Steven J. Mulroy is sworn to enforce state criminal laws, including the AEA. The only Defendant in this suit who can enforce the AEA within this Court's jurisdiction in Shelby County is District Attorney General Steven J. Mulroy. Since Plaintiff's § 1983 action seeks only declaratory and injunctive relief, the *Ex parte Young* doctrine and the Fourteenth Amendment's requirement of state action preclude Plaintiff from suing Steven J. Mulroy in his individual capacity in this suit. The Court therefore **DISMISSES** Steven J. Mulroy in his individual capacity.

### Standing

Federal courts have limited jurisdiction. Article III of the United States Constitution cabins federal jurisdiction to "Cases" or "Controversies." Without this limitation, the judiciary runs the risk of reaching responsibilities that the Constitution commits to the states, or federal executive and legislative branches. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (quoting *Raines v. Byrd*, 521 U.S. 811, 820 (1997)) ("The 'law of Art. III standing is built on a single basic idea—the idea of separation of powers.'"). Federal courts have an

"independent obligation to examine their own jurisdiction," chief among them is the doctrine of standing. *See FW/PBS, Inc. v. Dallas*, 492 U.S. 215, 231 (1990).

Courts have interpreted Article III's case-or-controversy "requirement" as demanding plaintiffs to show that they have standing to sue. The standing doctrine limits the category of federal court litigants to those whose disputes are appropriately resolved through the judicial process—preventing courts from "being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). To establish standing, Plaintiffs must show that (1) they suffered an injury in fact—a legally-protected interest that is concrete, particularized, and actual or imminent, (2) that Defendant likely caused the injury, and (3) that judicial relief would likely redress the injury. *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560–61 (1992). The party invoking federal jurisdiction has the burden of establishing these elements. *Id.* at 561 (internal citations omitted). And standing is determined at the time of the complaint's filing. *Ohio Citizen Action v. Englewood*, 671 F.3d 564, 580 (6th Cir. 2012).

The United States Supreme Court has "altered its traditional rules of standing" for overbreadth challenges to legislative acts on First Amendment grounds—like this one. *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973). This departure stems from the Supreme Court's recognition that "statutes attempting to restrict or burden the exercise of First Amendment rights must be narrowly drawn and represent a considered legislative judgment that a particular mode of expression has to give way to other compelling needs of society." *Id.* at 611–12. The Sixth Circuit clarified that "this exception applies only to the prudential standing doctrines, such as the prohibition on third-party standing, and not to those mandated by Article III itself, such as the injury-in-fact requirement." *Phillips v. Dewine*, 841 F.3d 405, 417 (6th Cir. 2016); *see also Birmingham v. Nessel*, No. 21-1297, 2021 WL 5712150, at *3 (6th Cir. Dec. 2,

17

2021) ("[A]lthough the overbreadth doctrine permits plaintiffs to bring suit even if their First Amendment rights have not been violated, they may bring suit only when they have suffered an injury or face an imminent threat that they will suffer an injury.").

The upshot is that a pre-enforcement review of a statute based on substantial overbreadth—also known as a facial attack—allows a Plaintiff to challenge an entire statute's constitutionality based on its "application to other individuals not before the court." *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 335–36 (6th Cir. 2008).

This case is a pre-enforcement review of a legislative act under the First Amendment—so the Court must first determine whether the threatened enforcement of a purported law creates an Article III injury. The Supreme Court has held that when an individual is subject to a threat of enforcement, that is enough for standing. *See Steffel v. Thompson*, 415 U.S. 452, 459 (1974). In other words, actual enforcement is not required for a court to find standing. (*Id.*) But a plaintiff still needs to prove such a threat inflicts a concrete harm because fears of prosecution cannot be merely "imaginative or speculative." *Morrison v. Bd. of Educ. of Boyd Cnty.*, 521 F.3d 602, 609 (6th Cir. 2008) (citing *Younger v. Harris*, 401 U.S. 37, 42 (1971). The Sixth Circuit summed up the standard for pre-enforcement review in *Crawford v. United States Department of Treasury*:

> To have standing to bring a pre-enforcement challenge to a federal statute, there must be a *substantial probability* that the plaintiff actually will engage in conduct that is *arguably affected* with a constitutional interest, and there must be a *certain* threat of prosecution if the plaintiff does indeed engage in that conduct.

868 F.3d 438, 454–55 (6th Cir. 2017) (combining standards from *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014), *Warth v. Seldin*, 422 U.S. 490, 498 (1975), and *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402 (2013)).

Plaintiff's overlapping grounds for standing to challenge the AEA's constitutionality fall into two main categories. First, Plaintiff argues that it has associational standing, meaning it has

standing to bring claims on behalf of its members.  Second, Plaintiff argues that it has organizational standing, meaning that as an organization, it has standing to bring its own claims. Since this is a facial challenge arguing that that the AEA is substantially overbroad, Plaintiff claims that it can assert the interest of parties not before this court.  The Court will discuss these theories in turn.

## I.    Associational Standing

An entity has standing to sue on its members' behalf when it can prove these three things: (1) its members would otherwise have standing to sue in their own right, (2) the interests at stake are germane to the entity's purpose, and (3) neither the claim nor the relief requested requires the participation of the individual members in the suit.  *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 254–55 (6th Cir. 2018) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 181 (2000)).  Under the first element, Plaintiff must establish that at least one of its members would have standing to sue on her own.  *Id.* at 255 (citing *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 554–55 (1996)). Thus, Plaintiff must show that at least one of its members (1) suffered an injury in fact (2) that is fairly traceable to the defendant's challenged conduct, and (3) that is likely to be redressed by a favorable judicial decision.  *Lujan*, 504 U.S. at 560–61.

Plaintiff argues that it can claim associational standing because its member-performers, who are "male or female impersonators" that perform drag shows, could be prosecuted under a plain reading of the AEA.  Particularly, Plaintiff is concerned that its members' drag show performances could be seen by a law enforcement officer as violating the AEA's "harmful to minors" standards under Tennessee Code Annotated § 39-17-901.  According to Plaintiff, this standard regulates not just physical portrayals of drag, but even a "description or representation,

in whatever form" of sexual content that a law enforcement officer could see as rising to the level of "harmful to minors."

Defendant argues Plaintiff has not established associational standing because it has not named a single individual member. Defendant cites *Summers v. Earth Land Institute* for the proposition that a plaintiff organization must name a single individual member to establish associational standing. 555 U.S. 488, 498–499 (2009) ("This requirement of naming the affected members has never been dispensed with in light of statistical probabilities, but only where *all* the members of the organization are affected by the challenged activity."); *see also Ass'n of Am. Physicians & Surgeons v. FDA*, 13 F.4th 531, 543 (6th Cir. 2021) ("To satisfy [the Article III injury] element, an organization must do more than identify a likelihood that the defendant's conduct will harm an unknown member in light of the organization's extensive size or membership base. The organization must instead identify a member who has suffered (or is about to suffer) a concrete and particularized injury from the defendant's conduct. And the organization must show that its requested relief will redress this injury.") (internal citations omitted).

The Court agrees with Defendant and finds that Plaintiff failed to meet its burden of naming at least one member to establish associational standing. Plaintiff did not identify a single member in its original complaint (ECF No. 1), amended complaint (ECF No. 10), and its complaint against Defendant Mulroy in both capacities (ECF No. 32-1). At trial, Plaintiff called only one Friends of George's, Inc. member, Vanessa Rodley, who is both Plaintiff's board member and Rule 30(b)(6) representative. Ms. Rodley testified about several topics: Plaintiff's mission, the AEA's effect on Plaintiff, the AEA's effect on another LGBTQ organization in Shelby County, among other issues. While she testified about several unnamed member-

20

performers' fear of prosecution from the AEA, Ms. Rodley did not testify about being a performer herself and about her own fear of prosecution from the AEA. Plaintiff's failure to identify a single injured member dooms its associational standing claim.

Plaintiff invites the Court to find associational standing from the fact that all its members are harmed by the AEA. In *N.A.A.C.P. v. Alabama*, the Supreme Court held that an organization established associational standing when it asserted the rights of all its members on First Amendment Freedom of Association grounds. 357 U.S. 449 (1958). *N.A.A.C.P.* involved the organization's noncompliance with a court order requiring it to furnish a list identifying its members in the state. *Id.* at 451. The Supreme Court held that *N.A.A.C.P.* is the appropriate party to assert all its members rights "because it and its members are in every practical sense identical." *Id.* at 460.

The *N.A.A.C.P.* holding does not favor Plaintiff. It is a Freedom of Association case in which the compelled disclosure of members' affiliation with the plaintiff organization is the injury itself. It follows that the Supreme Court found the organization could properly assert its members' interests—who were not parties to the suit—as there is no need for identifying a member when disclosure of her affiliation with the entity is her injury. The same is not true in this case as Ms. Rodley testified that not all of Plaintiff's members are performers and the AEA regulates—even at its broadest reading—participation in a performance, not membership in an organization. Some members are production crew members, producers, and writers. And Plaintiff's counsel conceded at trial that their interpretation of the AEA is that it applies to all the performers on stage. Plaintiff's counsel did not argue that writers, producers, or crew members may be affected by the AEA.

The bottom line is that Plaintiff failed to identify a single member who sustained an Article III injury.[11]  It also failed to substantiate its claim that all its members would be injured by the AEA.  Because the Court finds that Plaintiff cannot meet the first element of associational standing, the Court will not consider Plaintiff's arguments under the remaining elements.  Therefore, Plaintiff failed to meet its burden to establish associational standing.

## II.    Organizational Standing

Plaintiff also claims organizational standing "because it [the organization itself] has suffered a palpable injury as result of the defendants' actions."  *MX Grp., Inc. v. Covington,* 293 F.3d 326, 332–33 (6th Cir. 2002).  To establish organizational standing, a plaintiff must also meet the three standing elements: injury-in-fact, causation, and redressability.  *See Fair Elections Ohio v. Husted,* 770 F.3d 456, 459 (6th Cir. 2014).  But an organization's "mere interest in a problem" cannot confer standing.  *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972).  It must show instead that its "ability to further its goals has been 'perceptively impaired' so as to constitute far more than simply a setback to the organization's abstract social interests."  *Greater Cincinnati Coal. for the Homeless v. Cincinnati*, 56 F.3d 710 (6th Cir. 1995) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).  And Plaintiff "cannot manufacture standing by choosing to make expenditures based on hypothetical future harm that is not certainly impending."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402 (2013).

---

[11] Plaintiff identified some of its members who are also performers at trial.  (ECF No. 81 at PageID 1065.)  But none of them testified or submitted declarations alleging injury to themselves.  (*Id.*)  Plaintiff argued that it initially disclosed to Defendant that it would identify and make available its members for depositions subject to a protective order, but Defendant never made such request.  (ECF No. 81 at PageID 1140.)  The Court reminds Plaintiff that it bears the burden of proving standing—not Defendant.

22

Plaintiff argues that it has organizational standing for this pre-enforcement challenge because the AEA "perceptively impairs" its mission of raising money for LGBTQ nonprofits and taking drag into the mainstream.  In other words, it would have cancelled or restricted its productions involving "male or female impersonators"—had it not been for this Court's issuance of a temporary restraining order.  And that the AEA's vagueness and overbreadth chills not only its members' speech, but also the speech of other drag performers in Tennessee.

Defendant argues that Plaintiff cannot establish that the AEA will cause it to suffer an Article III injury because it disclaims any intent to engage in conduct that even arguably violates the Act.  (ECF No. 64.)  Defendant next retorts that Plaintiff's past performances do not violate the AEA because they could not meet the "harmful to minors" standard.  Defendant also contends that Plaintiff's subjective fears of prosecution do not rise to the standard required to meet the Article III injury standard for pre-enforcement facial challenges.  Finally, Defendant argues that Plaintiff has failed to identify the requisite number of substantial overbreadth applications of the AEA.

Before discussing these organizational standing arguments, the Court begins with a clarification.

### A.    Defendant's Objection to Franklin Pride Evidence

When the Court issued a temporary restraining order in this case, the Defendants included the State of Tennessee, Governor Lee, and Attorney General Skrmetti.  Therefore, in resolving Plaintiff's claims, the Court considered Plaintiff's pleadings and declarations that referenced the AEA's impact on the entire state—to include cities outside Shelby County like Nashville, Franklin, and Knoxville.  (ECF No. 23-1.)  Plaintiff has since moved to voluntarily dismiss the other Defendants, leaving only District Attorney General Mulroy as the lone Defendant here.  At

trial, Plaintiff called Mr. Clayton Klutts, President of a Franklin-based LGBTQ organization who testified about events that occurred in Franklin.  Defendant objected on relevance grounds.

The Court disregarded Mr. Klutts's testimony and any other evidence about the AEA's impact outside of Shelby County.  Judicial review of the AEA's constitutionality is distinct from the Court's equitable power to issue an injunction prohibiting the AEA's enforcement.  Because District Attorney General Mulroy only has enforcement powers within Shelby County, Plaintiff's standing to bring this suit could arise only from Article III injuries it could (1) fairly trace to Defendant and (2) that could be redressed with a favorable ruling concerning Defendant. Therefore, the only evidence relevant to standing in this case is limited to the AEA's potential enforcement in Shelby County.

**B.    Evidence at Trial on Plaintiff's Mission and Performances**

Ms. Rodley testified during trial that Plaintiff is a "drag-centric theatre group" that puts on three productions a year for two purposes: to raise money for LGBTQ nonprofits, and to provide a space outside of clubs where people can enjoy drag shows.  (ECF No. 81 at PageID 1064.)  She testified that Plaintiff's members fear criminal prosecution under the AEA because— as a drag-centric theatre group that features "male or female impersonators"—its performances can be sexual in nature.  (*See id.* at PageID 1065–66.)  Speaking in terms of movie ratings, she testified that Plaintiff tries to "stick around the PG-13 area and not be too risqué so as to merit an R rating."  (*Id.* at PageID 1071.)  She testified that Plaintiff does not place age restrictions on its shows.  (*Id.*)  Still, she admits that she does not think they would be appropriate for a five-year-

old but could be appropriate for a fifteen-year-old.  (*Id.* at PageID 1114.)  As part of its proof, Plaintiff played three video productions during the trial.[12]

The first video is from a production entitled "The Tea with Sister Myotis" that Ms. Rodley claimed to be a satire of the show "The View."  (*Id.* at PageID 1081–82.)  The video showed four individuals, whom Ms. Rodley characterized as "female impersonators."  (ECF No. 80 (found at Exhibit Number 2).)  The sixteen-minute video centered on one character's discussion of various issues, punctuated by several jokes and innuendos about sexual intercourse and masturbation.  (*Id.*)  Plaintiff claims this exhibit could fall under § 39-17-901's "description or representation" of "masturbation" and "simulated ultimate sexual acts."  (*Id.*)  Ms. Rodley testified that Plaintiff held this production in the Evergreen Theater with no age restrictions.

The second video is from a production entitled "Paradise by the Dashboard Light," in which six individuals—half of whom were characterized by Ms. Rodley as "female impersonators"—pretended to sing while acting out the lyrics to the song.  (ECF No. 81 at PageID 1083.)  During the four-minute song, the performers made sexual gestures with each other behind a translucent curtain.  (ECF No. 80 (found at Exhibit Number 2).)  Plaintiff claims this performance could fall under § 39-17-901's description of "simulated ultimate sexual acts" clause.  Ms. Rodley testified that Plaintiff held this production in the Evergreen Theater with no age restrictions.

The third video is entitled "Trixie Thunderpussy—Pussycat Song," which featured one performer whom Ms. Rodley characterized as a "female impersonator."  (ECF No. 80 (found at

---

[12] In his Proposed Findings of Fact and Conclusions of Law, Defendant implies that the Court could not "evaluate the work's artistic merit as a whole," because Plaintiff played only clips, instead of full shows, at trial.  (ECF 85 at PageID 1332.)  Defendant did not object to this evidence at trial—but the issue is moot as the Court watched the full videos for the first and second performances.

Exhibit Number 2).)  This clip showed the performer pretending to sing the lyrics to a song while making gestures toward the pubic area.  Plaintiff claims this performance could fall under § 39-17-901's "description or representation" of "female genitals in state of sexual arousal" clause.  Ms. Rodley testified that this production was held in an age-restricted venue and before the Plaintiff's formation as a nonprofit.

Ms. Rodley also testified about three of Plaintiff's past productions without playing the videos at trial.  (ECF No. 81 at PageID 1074.)  The first one is a "skit from Drag Rocks involving Rod Stewart."  Ms. Rodley testified that the skit involved a portrayal of sexual acts between two performers, one of whom was "wearing tight, tight black pants and he is . . . wearing a penis that is over exaggerated so the audience can see it's there."  The second is a performance entitled "Bitch, You Stole My Purse," which is about a "lot lizard," and involved "blow jobs and possibly having sex as well as pooping in somebody's purse."  And the third is a skit entitled "Dick in a Box," which involved "two people presenting gift packages where their penises would be . . . penis is in a box, it's got tissue around it.  It's really hard to see if it is [erect] or not."  Plaintiff claims these performances could fall under § 39-17-901's under various clauses to include "Representation of Excretory Function," and "Depiction of male genitals in discernibly turgid state."

### C.    Plaintiff Has Organizational Standing to Bring this Substantial Overbreadth Challenge

The Court finds that Plaintiff met its burden of proving organizational standing to facially challenge the AEA's constitutionality in a pre-enforcement action for three main reasons.  First, Plaintiff met the Sixth Circuit's standard for pre-enforcement review under *Crawford* because it proved a "substantial probability" of engaging in conduct that is "arguably affected with a constitutional interest" and it faces a "certain threat of prosecution."  868 F.3d at 454–55.

26

Second, Plaintiff's own injury allows it to assert the interests of parties not before this Court under the Supreme Court's relaxed prudential standing for First Amendment substantial overbreadth challenges. *See id.; Speech First, Inc. v. Schlissel*, 939 F.3d 756, 764 (6th Cir. 2019).

### 1. Plaintiff Met the *Crawford* Pre-enforcement Review Standard, Causation, and Redressability

The Sixth Circuit's standard for a pre-enforcement challenge to a statute has three components: (1) a substantial probability that Plaintiff will engage in a course of conduct that is (2) arguably affected with a constitutional interest, but is proscribed by statute, and (3) certain threat of prosecution under the statute. *Crawford*, 868 F.3d at 454–55.

### a. Substantial Probability of Engaging in Conduct

The Court finds Plaintiff has met the first element. An organization is injured when its "ability to further its goals has been 'perceptively impaired' so as to constitute[] far more than simply a setback to the organization's social interests." *Greater Cincinnati Coal. for the Homeless v. Cincinnati*, 56 F.3d 710, 716 (6th Cir. 1995) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). Plaintiff's Amended Complaint notes that it "produces drag-centric performances, comedy sketches, and plays." (ECF No. 10 at PageID 52.) Ms. Rodley's uncontroverted testimony was that Plaintiff puts on "three productions a year to raise money for fellow LGBTQ non-profits" and provides "a space outside of the bars and clubs where people can enjoy this art form." (ECF No. 81 at 1064.) She also testified that most of their shows are held at the Evergreen Theater within Shelby County with no age restrictions. (*Id.* at PageID 1069.) She said that the exhibits Plaintiff introduced at trial constitute "content that is common in Friends of George's shows"—as a matter of fact, all but one of them are Plaintiff's productions since 2011.

The Court finds Ms. Rodley's uncontroverted testimony is credible.  Based on her testimony, the Court finds that Plaintiff has been producing "drag-centric performances" since 2011 with multiple performances each year in its Evergreen Theater within Shelby County with no age restrictions, and no criminal incidents.  And Plaintiff intends—beyond a substantial probability—to continue producing drag performances with "male or female impersonators" as part of its mission of raising money for LGBTQ nonprofit organizations and taking drag shows into the mainstream.  Plaintiff also intends to continue producing drag-centric performances. What is more, Plaintiff's suit to enjoin enforcement of the AEA reflects its commitment to assert "the right of artists to communicate their art and their message to the general public."  (ECF No. 81 at PageID 1054.)

> **b.      Conduct Is Arguably Affected with a Constitutional Interest but Is Proscribed by Statute**

The Court finds Plaintiff has also met the second element.  Defendant asks the Court to first determine the scope of the AEA to assess Plaintiff's standing.  Unsurprisingly, Defendant's understanding of the AEA's scope is much narrower than Plaintiff's.  To accept Defendant's position the Court would have to agree to apply the Tennessee Supreme Court's narrowing construction to the AEA's "harmful to minors" standard.  *See Davis-Kidd v. McWherter*, 866 S.W.2d 520, 528 (Tenn. 1993).  And the Court would have to take Defendant's choice between "one of two ways" in which the AEA's applicable location can be understood.  (ECF No. 85 at 1327–29.)

But this juncture is about standing to sue, not success on the merits.  Plaintiff need only show that its conduct (that is expressive conduct) is "arguably affected with a constitutional interest, but proscribed by statute[.]"  *Crawford v. United States*, 868 F.3d 438, 454 (6th Cir. 2017).  "Arguably" is not a high standard.  In fact, it is a low one.  The intricacies of the AEA's

constitutionality and its impact on Plaintiff's expressive conduct will be fully discussed in the merits section below.  Suffice to say, in determining standing, the Court concludes that the AEA criminalizes "performances that are harmful to minors," which include those that are "sexual in nature."  (ECF No. 19-1.)  And the Court finds the AEA amends Tennessee Code Annotated § 7-51-1401 and § 7-51-14707—which regulate operators of adult-oriented establishments—in one significant way that impacts Plaintiff.  The AEA regulates the performers themselves, implicating their First Amendment rights with criminal consequences.  After weighing the evidence at trial, the Court finds that Plaintiff's exhibits are performances that both described and represented sexual content that is arguably constitutionally-protected.

The parties dispute whether Plaintiff's performances are proscribed by the statute: Plaintiff contends that some might say their performances meet the definition of "harmful to minors" under § 39-17-901.  Defendant disagrees, contending that even Plaintiff does not allege that its performances go that far.  Both statements can be true—Plaintiff can believe its performances are not proscribed by statute while believing others may disagree.  The Parties can litigate this question's merits, but for standing purposes, the Court finds that Plaintiff showed that its performers' conduct is at least "arguably" proscribed by § 39-17-901.  The Court also finds that the Parties' dispute on this point fortify the conclusion that Plaintiff's conduct is arguably affected with a constitutional interest that is proscribed by statute.

### c.    Certain Threat of Prosecution Under the Statute

Finally, the Court finds Plaintiff has met the third element.  Plaintiff expressed concern that the AEA "could subject them to felony charges," so it will need either to "cancel the show, or add an age restriction to an event that has always been open to all ages."  (ECF No. 7 at PageID 45; ECF No. 10 at PageID 62.)  Ms. Rodley testified that "some or all of [Plaintiff's] board members/performers are threatened with potential for criminal prosecution" under the

AEA.  (ECF No. 81 at PageID 1065–66.)  Defendant's cross-examination revealed that Plaintiff

does not think that their performances lack artistic value.  (*Id.* at PageID 1096–97.)  And

Defendant's briefs emphasize that Plaintiff "disclaims that it has or will engage in any conduct"

that violated the AEA.  (ECF No. 58 at PageID 788.)

But neither Plaintiff nor Ms. Rodley are law enforcement officers tasked with the AEA's

enforcement.  Plaintiff can hold the conviction that its productions are not harmful to minors

while harboring the fear that Defendant, armed with a criminal statute, disagrees.  This position

accords with Plaintiff's suit for a permanent injunction of the AEA.  At this stage, the question

before the Court is not whether Plaintiff's past conduct violates the AEA.  Rather, the question is

whether Plaintiff faces what *Crawford* calls a "certain threat of prosecution."[13]

The Court finds that Plaintiff's exhibits at trial "describe or represent" sexual content of a

wide range: from masturbation wordplay that a fifteen-year-old may or may not understand, to a

thinly-veiled, but clearly-highlighted, depiction of sexual acts that would not escape an eight-

year-old's attention.  The line between obscenity and art is so subjective that Justice Potter

Stewart's comment: "I know it when I see it" remains relatable in 2023.  *Jacobellis v. Ohio*, 378

U.S. 184, 197 (1964).  But Defendant asks the Court to take comfort in the fact that the AEA's

test merely adapts the constitutionally-upheld *Miller v. California* standard and extends it to

material that is harmful to minors.  Defendant argues that "minor" here means reasonable 17-

year-olds only.  This definition of "minor" is based on Defendant's theory that the Tennessee

---

[13] In its 2013 decision in *Clapper*, the Supreme Court noted that "threatened injury must be
*certainly impending.*"  *See Clapper*, 568 U.S. at 409.  Later, in *Susan B. Anthony List v.
Driehaus*, which set the standard for standing in pre-enforcement challenges to legislative acts,
the Supreme Court used the words "credible threat of prosecution."  573 U.S. 149, 159 (2014).
Decided by the Sixth Circuit in 2017, *Crawford* rephrased the standard by synthesizing
*Driehaus* with *Clapper* and switched the standard's language to "certain threat of prosecution."
868 F.3d at 454–55.

Supreme Court's narrowing construction of a statute regulating the commercial display of adult material applies to the AEA here.  (ECF No. 85 at PageID 1332–33 (citing *Davis-Kidd v. McWherter*, 866 S.W.2d 520, 528 (Tenn. 1993)).)

The Court will fully discuss Defendant's arguments in the merits section.  But to determine injury-in-fact, the Court only needs to find whether Plaintiff faces a certain threat of prosecution—not certain prosecution[14]—under the AEA.  In other words, is there a certainly-impending threat that a Shelby County law enforcement officer will determine that Plaintiff's performances violate the AEA?  The Court finds that the answer is yes.  Plaintiff has met its burden of proving a "certain threat of prosecution" under the AEA for two main reasons.  First, Defendant's narrowing construction by substituting 17-year-old for "minors" veers so far from the AEA's text that neither reasonable people nor officers in Shelby County would have fair notice of the AEA's meaning.[15]  The Court finds that a reasonable officer watching these performances could conclude they are harmful to children, say a five- or eight-year-old, and arrest Plaintiff's performers under the AEA.

---

[14] Black's Law Dictionary defines "prosecution" as "[t]he commencement and carrying out of any action or scheme."  *Prosecution*, BLACK'S LAW DICTIONARY (11th ed. 2019).  Both *Crawford* and *Driehaus* use the word "enforcement" interchangeably with "prosecution."  868 F.3d at 460 ("[Plaintiff] has not alleged any facts that would show a credible threat of enforcement against him."); 573 U.S. at 161 ("We agree: Petitioners have alleged a credible threat of enforcement.").

[15] Even if the *Davis-Kidd* opinion were attached with the AEA (it is not), some might say that an equally convincing reading of *Davis-Kidd* is that the Tennessee Supreme Court applied its narrowing construction only to the adult materials display statute (§ 39-17-914(a)) and not to the "harmful to minors" standard in § 39-17-901.  Also, the Tennessee Supreme Court decided *Davis-Kidd* in 1993.  In 2008, the Third Circuit reviewed the Child Online Protection Act on remand from the United States Supreme Court in *ACLU v. Mukasey*.  534 F.3d 181 (3d Cir. 2008), *cert. denied*, 555 U.S. 1137 (3d Cir. 2009).  The Third Circuit found that the definition of "harmful to minors" in that statute—which is nearly identical to the one in the AEA—was unconstitutionally vague because it "applies in a literal sense to an infant, a five-year old, or a person just shy of age seventeen."  *Id.* at 191.

31

Second, even if the Court were to accept Defendant's argument that the AEA applies only to a "reasonable-17-year-old minor," Plaintiff would still face a certain threat of criminal prosecution.  In *Ginsberg v. New York*, the Supreme Court's discussion on what was deemed to be harmful to "minors under 17 years of age," was the so-called "girlie" magazines—material that depicts "female nudity . . . showing female buttocks with less than an opaque covering, or the showing of the female breast with less than a fully opaque covering of any portion thereof below the top of the nipple[.]"  390 U.S. 629, 631–33 (1968) (internal quotations omitted). Although many could debate the artistic value of Plaintiff's performances, few would think they are less "obscene" than the "girlie magazines" found to be harmful to minors in *Ginsberg*.  And none could categorically dismiss the threat that a Shelby County officer may find them to be harmful to minors.  The obscenity standard for adults already gives a lot of discretion to an individual officer's judgment on what she considers harmful under community standards.

Section 39-17-901's "harmful to minors" standard lowers the floor for criminal behavior, equipping law enforcement officers with even more discretion.  The chance that an officer could abuse that wide discretion is troubling given an art form like drag that some would say purposefully challenges the limits of society's accepted norms.  And the AEA covers a wide geographical reach: "in a location where adult cabaret entertainment could be viewed by a person who is not an adult."[16]

The Court emphasizes that the fear of prosecution from law enforcement officers is not merely speculative but certainly impending.  The Parties stipulate that Defendant intends to enforce the AEA.  Moreover, the AEA, unlike the statutes in *Ginsberg*, *Miller*, and *Davis-Kidd*,

---

[16] As discussed below, while the Supreme Court upheld a similar standard in *Ginsberg* and *Miller*, this case is different because the AEA covers a much wider geographical scope than the statute in these two cases.

32

criminally sanctions not the business operators but the performers themselves.  The AEA also contains no textual scienter requirement, safe harbors, or even affirmative defenses—like parental consent—present in similar obscenity statutes as discussed more fully below.

The Court finds that Plaintiff's past performances and present efforts to continue its mission of taking drag into the mainstream subjects it to a certain threat of enforcement under the AEA.  Defendant's counsel argues that they think Plaintiff's exhibits are not "harmful to minors" under the AEA.  But this would lead to Plaintiff taking an enormous risk.  It would have to eat the proverbial mushroom to find out whether it is poisonous.  *See also Babitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (observing that a plaintiff "should not be required to await and undergo a criminal prosecution as the sole means of seeking relief").  Our jurisprudence does not demand such an extreme measure—Article III requires a threat of prosecution, not actual prosecution.  So the Court finds Plaintiff has met Article III's injury-in-fact requirement.

### d.    Causation and Redressability

The Court finds that Plaintiff has shown causation and redressability, fulfilling the rest of Article III standing requirements.  The AEA caused the threat of prosecution, the crux of Plaintiff's injury in this pre-enforcement action.  And a favorable ruling for Plaintiff—in the form of the declaratory and injunctive relief it seeks—would redress its harm from the threat of criminal prosecution.  An order declaring the AEA unconstitutional, and enjoining Defendant's enforcement of the AEA would redress Plaintiff's injury.  The Court therefore finds Plaintiff has standing to bring this pre-enforcement overbreadth challenge to the AEA.

### 2.    Plaintiff Can Assert the Interest of Parties not Before this Court

The Supreme Court has noted the particular importance of protecting the First Amendment from vague and substantially overbroad regulations that may chill speech.

33

*N.A.A.C.P. v. Button*, 371 U.S. 415, 433 ("Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity.").  The Sixth Circuit has held that the "overbreadth doctrine provides an exception to the traditional rules of standing and allows parties not yet affected by a statute to bring actions under the First Amendment based on a belief that a certain statute is so broad as to 'chill' the exercise of free speech and expression."  *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1182 (6th Cir. 1995).

Allegations of a "subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418 (2013).  But the Sixth Circuit noted the difference between "objective chill," which refers to laws that produce direct injuries, and "subjective chill," which refers to laws that produce no injuries.  *See Speech First, Inc. v. Schlissel*, 939 F.3d 756, 764 (6th Cir. 2019) ("In order to have standing, therefore, a litigant alleging chill must still establish that a concrete harm—i.e., enforcement of a challenged statute—occurred or is imminent.").  The upshot is that objective chill—in the form of an imminent criminal enforcement of a challenged statute—is sufficient to prove Article III injury.  *Id.* at 765.

As the Court already discussed above, Plaintiff proved Article III standing by meeting the *Crawford* elements.  Plaintiff now benefits from the First Amendment jurisprudence's relaxation of standing requirements: it can now assert the rights of parties not before this Court in its overbreadth challenge.  Our Circuit's Chief Judge succinctly explained the rationale behind this powerful doctrine in *Holder*:

> [T]he whole point of a facial challenge, or what the courts in the First Amendment context have come to call an overbreadth challenge, is to permit the claimant to strike the law in its entirety based on its application to other individuals not before the court.  The overbreadth doctrine thus changes the customary rules of constitutional litigation: It relaxes the general prohibition against vicarious litigation by allowing claimants to assert the rights of third parties, and it permits a court to strike a law in its entirety even though it

34

legitimately may be enforced in some other settings. *Broadrick*, 413 U.S. at 612–13. Due to the risk that "enforcement of an overbroad law" may "deter[ ] people from engaging in constitutionally protected speech" and may "inhibit[ ] the free exchange of ideas," the courts will strike a law on its face "if it prohibits a substantial amount of protected speech" both "in an absolute sense" and "relative to the statute's plainly legitimate sweep." *United States v. Williams*, 553 U.S. 285 (2008); *see also Broadrick*, 413 U.S. at 615."

557 F.3d at 335–36. Facial invalidation of a statute is "strong medicine that is not to be casually employed." *United States v. Williams*, 553 U.S. 285, 293 (2008) (citations and internal quotations omitted). Hence, Plaintiff has the burden of proving substantial overbreadth—that is a substantial number of the AEA's applications must be "unconstitutional, in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010). Since the AEA imposes criminal sanctions on speech, its chilling effect is magnified. *Cf. Ashcroft v. ACLU*, 542 U.S. 656, 667 (2004) (observing the potential chilling effect of a regulation on speech is "eliminated, or at least diminished," when the challenged statute does not impose criminal sanctions).

Plaintiff presented uncontroverted evidence at trial demonstrating potentially unconstitutional applications of AEA in Shelby County. Although Plaintiff's associational standing theory failed, meaning the Court did not consider the potential injuries to its members, the overbreadth doctrine now permits Plaintiff to assert those injuries on behalf of parties not before the Court. Ms. Rodley also testified as Plaintiff's board member, and as President and Festival Director of Mid-South Pride Foundation, Inc., a nonprofit that hosts the "annual pride festival" in Memphis, Tennessee. (ECF No. 23-3 at PageID 141.) Plaintiff can assert the harm that AEA purportedly inflicted on the Mid-South Pride organization and Absent Friends, another theater organization based in Memphis. Lastly, Plaintiff can present hypotheticals—as it has in both the pretrial briefs and at trial—to demonstrate unconstitutional applications of the AEA within Shelby County. *See Holder*, 557 F.3d at 335 ("Although litigation by hypothetical

35

generally is frowned upon, if not barred in other areas of constitutional litigation, it is sometimes required in free-speech cases.") (compiling cases) (internal quotations and citations omitted). The Court will discuss the merits of these non-parties' harm in the substantial overbreadth portion of this order.  At this point, the Court finds that Plaintiff can bring these claims under the First Amendment's overbreadth doctrine.

These harms from AEA's substantial overbreadth are fairly traceable to the AEA and would be redressed by the relief Plaintiff seeks: a judgment declaring the AEA unconstitutional and a permanent injunction against Defendant.  The Court finds therefore that Plaintiff can assert the interests of parties not before this court.

### Merits

The First Amendment generally prevents the government from making a law "abridging the freedom of speech."  U.S. Const. amend. I.  The Supreme Court has interpreted "speech" to include "expressive conduct." *Texas v. Johnson*, 491 U.S. 397, 404 1989 ("[W]e have acknowledged that conduct may be 'sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments.'" (quoting *Spence v.* Washington, 418 U.S. 405, 409 (1974)).  But not all speech is valued equally.  The Supreme Court has identified certain types of speech holding "such slight social value," that any interest in protecting that speech is "clearly outweighed by the social interest in order and morality." *R.A.V. v. St. Paul*, 505 U.S. 377, 382 (1992) (identifying obscenity, defamation, and fighting words as examples of "low value speech").

Outside of low value speech, federal courts reviewing restrictions on speech "because of disapproval of the ideas expressed," apply different tiers of scrutiny. *Id.*  As the Court discusses below, either strict or intermediate scrutiny usually applies.  The level of scrutiny depends on

36

several factors, including whether the regulation is based on the content of, or the viewpoint expressed by, that speech.

Plaintiff argues that the AEA is a content-based, view-point-based, restriction on speech that fails strict scrutiny. Defendant disagrees, arguing that the AEA is a time, place, and manner restriction that should be analyzed under intermediate scrutiny. But in anyevent, Defendant says that the AEA passes even the higher standard of strict scrutiny. The Court begins by determining the standard of review.

## I.      Standard of Review

A content-based regulation, which targets "speech based on its communicative content," is presumptively unconstitutional and must pass strict scrutiny. *Reed v. Gilbert*, 576 U.S. 155, 163 (2015); *see also Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002) ("As a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.") (citations and internal quotations omitted). By contrast, a content-neutral regulation, which is "agnostic as to content" need only meet intermediate scrutiny. *Austin v. Reagan National Advertising of Austin*, 142 S.Ct. 1464, 1471 (2022).

The Court's first question is whether the law is content-based on its face—as a matter of text alone. *See Reed*, 576 U.S. at 165. This is because a facially content-based law is subject to strict scrutiny regardless of the government's motive. *See id.* ("[A]n innocuous justification cannot transform a facially content-based law into one that is content neutral.").

### A.      Is the AEA a Content-based Restriction as a Matter of Text?

Plaintiff argues that the AEA is a facially content-based restriction for two reasons. First, the AEA prohibits a specific type of content: "adult-oriented performances that are harmful to

37

minors." (ECF No. 81 at PageID 1188.)  Second, it is both a content- and viewpoint-based restriction because it targets the identity of the performers, particularly "male or female impersonators." (ECF No. 81 at PageID 1189.)  At trial, Defendant conceded that the AEA "does reference content in the statute,"[17] (*id.* at PageID 1193) but insisted that the AEA does not discriminate based on viewpoint (*id.* at PageID 1198).

### 1.    The AEA is a Content-Based Regulation

The Court concludes that the AEA is a facial content-based restriction.  Section 2 of the AEA imposes criminal sanctions on performers of "adult cabaret entertainment" by amending Tennessee Code Annotated § 7-51-1407, the Tennessee statute that currently defines "[r]estrictions on locations of adult-oriented businesses." (ECF No. 19-1 at PageID 93–94.) Section 1 of the AEA defines "[A]dult cabaret entertainment," in part, as "adult oriented performances that are harmful to minors." (*Id.* at PageID 93.)  Section 1 defines "harmful to minors," by drawing from the state's criminal code's definitions on obscenity in Tennessee Code Annotated § 39-17-901.  Section 39-17-901's definition is this: "'Harmful to minors' means that quality of any description or representation, in whatever form, of nudity, sexual excitement, sexual conduct, excess violence or sadomasochistic abuse when the matter or performance: [adapted *Miller*[18] three-prong test (*See supra pp.* 4–5)]." (*Id.*)  At trial, the Parties did not dispute that the AEA is content-based because it targets "speech based on its communicative content"—that is, content that is not obscene for adults but may be indecent and harmful to minors. (ECF No. 81 at PageID 1189, 1193.)

---

[17] Defendant quickly—and correctly—pointed out that sometimes, a court can conclude that a statute is content-based, but treat it as if it were content-neutral. (ECF No. 81 at PageID 1193 (referring to the "secondary effects doctrine").)  The Court will discuss that issue below.

[18] Defendant describes the standard as an adapted version of the obscenity test in *Miller v. California*, 413 U.S. 15, 21 (1973).

38

But Defendant's trial brief presents an argument that the Court will now address. Defendant acknowledged that the Supreme Court in *R.A.V.*, noted that "low value" speech like fighting words and obscenity cannot be made "vehicles for content discrimination unrelated to their distinctively proscribable content." (ECF No. 58 at PageID 792 (citing 505 U.S. at 383–84).) Defendant argues that the AEA fits within one of *R.A.V.*'s exceptions to this rule: a state may choose to prohibit "only that obscenity which is the most patently offensive in its prurience," which the AEA does by regulating a subset of "unprotected obscene speech." (*Id.*)

The Court disagrees. There is no question that obscenity is not protected by the First Amendment. But there is a difference between material that is "obscene" in the vernacular, and material that is "obscene" under the law. *Miller v. California* provides the standard for determining "obscenity" under the law. 413 U.S. 15, 21 (1973) (setting out a three-prong standard). Legal obscenity is an exceptionally high standard as one of its prongs requires that the speech "not have serious literary, artistic, political, or scientific value." *Id.* Moreover, speech that is not obscene—which may even be harmful to minors—is a different category from obscenity. Simply put, no majority of the Supreme Court has held that sexually explicit—but not obscene—speech receives less protection than political, artistic, or scientific speech. *See Ashcroft v. A.C.L.U..*, 535 U.S. 234, 245 (2002) ("It is also well established that speech may not be prohibited because it concerns subjects affecting our sensibilities."); *Reno v. A.C.L.U.*, 521 U.S. 844, 874 (1997) (reaffirming that the First Amendment protects sexual expression which is indecent but not obscene).

The AEA's regulation of "adult-oriented performances that are harmful to minors under § 39-17-901" does target protected speech, despite Defendant claims to the contrary. Whether some of us may like it or not, the Supreme Court has interpreted the First Amenment as

39

protecting speech that is indecent but not obscene. *See Brown v. Ent. Merchs. Ass'n.*, 564 U.S. 786, 794 (2011) ("No doubt a State possesses legitimate power to protect children from harm, but that does not include a free-floating power to restrict the ideas to which children may be exposed.") (citations and internal quotations omitted); *F.C.C. v. Pacifica Found.*, 438 U.S. 726, 745–46 (1978) ("For it is a central tenet of the First Amendment that the government must remain neutral in the marketplace of ideas."). Because the AEA's text targets such speech, the Court finds it is a content-based regulation. The AEA draws distinctions based on the message a speaker conveys: adult-oriented performances that are harmful to minors are sanctioned with a criminal penalty while others are not.[19] This fact alone does not make the AEA unconstitutional—but it does make it a content-based regulation that may be possibly subject to strict scrutiny review.

## 2. The AEA is a Viewpoint-based Regulation

The Court also finds that the AEA is not only a content-based regulation, but also viewpoint based. Viewpoint-based regulations "raise[] the specter that the Government may effectively drive certain ideas or viewpoints from the market place." *R.A.V.*, 505 U.S. at 387 (1992); *see also Reed*, 576 U.S. at 168 ("Government discrimination among viewpoints—or the regulation of speech based on the 'specific motivating ideology or the opinion or perspective of the speaker'—is a 'more blatant' and 'egregious form' of content discrimination."). The Parties' briefs and arguments at trial focused on the AEA's textual reference to "male or female impersonators." After all, Plaintiff is a theater organization with performers who are "male or female impersonators." (ECF No. 10.) And here, the AEA regulates the performer.

---

[19] A content-based statute does not automatically merit strict scrutiny analysis. The purpose of this section is just to determine whether the AEA is facially content-based and the Court concludes that it is.

Plaintiff argues that identifying these performers—especially "male or female impersonators"—necessarily makes the statute a viewpoint-based regulation because the prohibited conduct "cannot be defined without referencing . . . the perspective of the speaker." (ECF No. 35 at 498–99.)  Plaintiff claims that this formulation outlaws a "drag performer wearing a crop top and mini skirt… but not a Tennessee Titans cheerleader."  (*Id.* at PageID 499.)  Defendant disagrees, contending that the "reference to specific types of performers clarifies the speech that is 'harmful to minors' *without* narrowing the covered speech."  (ECF No. 58 at PageID 797 (emphasis in original).)  Defendant points to the phrase "or similar entertainers," as a catchall that would in fact criminalize a cheerleader whose performance is harmful to minors.  (ECF No. 81 at PageID 1199.)  And Defendant points out that the AEA's language was copied verbatim from current law that has been "on the books for many, many decades."  (ECF No. 58 at PageID 782 (citing AEA's legislative history); *see also* ECF No. 81 at PageID 1205 ([Defense Counsel to the Court:] "I just want to reiterate that this language is pulled directly from a statute that's been on the books since 1995.").

Defendant is correct that the AEA incorporated this language from existing state law.  In the adult entertainment context, the earliest appearance of the phrase "male or female impersonators" known to this Court is from 1987.  *See The Adult-Oriented Establishment Registration Act of 1987*, 1987 Tenn. Pub. Acts 841, ch. 432, § 2.  But pulling language from old law that was passed in 1987 does not insulate the AEA's language from this Court's review of a new law in 2023.

In short, the AEA uses the language in a different way.  The "Adult-Oriented Establishment Registration Act" ("AERA"), where this language first appeared, regulates adult-oriented businesses that are zoned in fixed locations in Shelby County.  Meanwhile, the AEA

41

regulates the performers themselves—implicating their First Amendment rights—in Section 2(B)'s textually-broad language of "[i]n a location where the adult cabaret entertainment could be viewed by a person who is not an adult."[20] ("Location Provision") (ECF No. 19-1 at PageID 93.)  What this means is that the AERA and AEA share similar language but operate differently.  Even though the "male or female impersonator" language appears in both, it employs no viewpoint-discrimination in the AERA context because it regulates the business owner—the employer of the "male or female impersonator."  By contrast, the same language matters greatly in the AEA, which regulates the "male or female impersonator."  Simply put, the AEA directly impacts the performers' First Amendment rights in a way that the AERA does not.

The Court finds this phrase problematic.  First, while including "male or female impersonators," in a list with "topless dancers, go-go dancers, exotic dancers, strippers . . . or similar entertainers" may have escaped many readers' scrutiny in 1987, it may not do so with ease in 2023.  In 1987, homosexual intercourse was considered sodomy and was a crime in Tennessee[21], "Don't Ask Don't Tell" had not been enacted (much less repealed)[22] for our military, and same-sex couples did not have a recognized fundamental right to marry[23].  The phrase "similar entertainers" seems to refer to dancers traditionally associated with "adult-oriented businesses."  In 1987, associating "male or female impersonators" in that category may have called for little or no concern.  This Court views categorizing "male or female

---

[20] The Court will discuss the Defendant's "natural reading," or in the alternative, request for a narrowing construction later in this order.

[21] *See Campbell v. Sundquist*, 926 S.W.2d 250 (Tenn. 1996) (recognizing that the right to privacy renders the state sodomy statute unconstitutional)

[22] *See Don't Ask, Don't Tell Repeal Act of 2010*, 124 Stat. 3515 (repealing 10 U.S.C. § 654, which required members of the Armed Forces to be separated for engaging in homosexual conduct).

[23] *See Obergefell v. Hodges*, 576 U.S. 644 (2015) (recognizing the Fourteenth Amendment guarantees same-sex couples the right to marry).

impersonators" as "similar entertainers" in "adult-oriented businesses" with skepticism. Regardless of the Tennessee General Assembly's intentions, the AEA's text criminalizes performances that are "harmful to minors" by "male or female impersonators," and the Court must grapple with that text. The Court finds that this phrase discriminates against the viewpoint of gender identity—particularly, those who wish to impersonate a gender that is different from the one with which they are born. An illustration might be helpful.

Assume an individual, who identifies as male, holds a guitar and wears an "Elvis Presley" costume that is revealing without being legally obscene, but indecent enough to be potentially harmful to minors.[24] If this individual "performs" by telling jokes in Elvis' voice in "a location where adult cabaret entertainment could be viewed by a person who is not an adult," it is unclear whether this person would violate the AEA.[25] One could argue, as Defendant does, that the individual would qualify as a "similar entertainer," who belongs in the same category as "topless dancers, go-go dancers, exotic dancers, strippers." But is that necessarily so? The similar entertainers' common thread—aside from being traditionally associated with "adult-oriented establishments"—is that they are all dancers of a sort. What if the Elvis impersonator does not dance?[26] Does this performance have any redeeming value to a five-year-old? It remains unclear whether that performer would violate the AEA.

But if a person who identifies as a female wore the same Elvis costume and engaged in the same performance, she would clearly be a male impersonator. The AEA is viewpoint

---

[24] The Bluff City nods at one of its favorite sons, but the same principle applies to any other character that "male or female impersonators" may wish to portray.

[25] The AEA does not define "male or female impersonator." Is a male individual who impersonates a male character a male impersonator? Likewise, is a female who dresses up as a female character a female impersonator?

discriminatory in that it will more likely punish the latter, but not the former, for wearing the same constume and conducting the same performance.

Defendant disagrees.  He argues that if the "list of covered performers included *only* 'male or female impersonators,' then an argument could be made that the State was using an identity-based restriction."  (ECF No. 58 at PageID 797.)  But the Court need not encounter a law as clear as Defendant's hypothetical statute to accept the soundness of its conclusion.  The Court need only ensure that the government not use a class of speech—like sexual speech that is not obscene but potentially harmful to minors—as a "vehicle for content discrimination unrelated to [its] distinctively proscribable content."  *See R.A.V.*, 505 U.S. at 383–84.  While Tennessee has the power to protect children from harmful materials, it must do so without an "unnecessarily broad suppression of speech addressed to adults."  *Reno*, 875 U.S. at 875.  Given an appropriate scope, it may regulate adult-oriented performers who are harmful to minors.  But it cannot, in the name of protecting children, use the AEA to target speakers for a reason that is unrelated to protecting children.  The Court finds that the AEA's text targets the viewpoint of gender identity—particularly those who wish to impersonate a gender that is different from the one with which they are born.  This text makes the AEA a content-based, viewpoint-based regulation on speech.

### B.     Did the Government Pass the AEA Because of an Impermissible Purpose?

Should another court disagree and find that the AEA is a content-neutral regulation, the Court presents this alternative and independent basis for its conclusion.  The Supreme Court has held that facially content-neutral laws will be considered content-based if "there is evidence that an impermissible purpose or justification underpins" the law.  *Austin*, 142 S. Ct. at 1475.  Courts considering this question have studied legislative history to see if there is "evidence of an

impermissible legislative motive" behind a challenged act. *Reed*, 576 U.S. at 166; *Hill v. Colorado*, 530 U.S. 703 (2000) (relying on legislative history).

The Court is aware of the vagaries of using legislative history in interpreting statutory text. *See Exxon Mobil Corp. v. Allapattah Services*, 545 U.S. 546, 568 (2005) ("[L]egislative history is itself often murky, ambiguous, and contradictory. Judicial investigation of legislative history has a tendency to become [an exercise in] 'looking over a crowd and picking out your friends.'"). But Supreme Court precedent and practice instruct this Court to look at the AEA's legislative history, especially in an action over a law with no enforcement history. *See Reed*, 576 U.S. at 166 (identifying cases that used legislative history in applying this test). The Parties echoed this point at trial, and asked the Court to look at both the legislative history and text to see whether Tennessee adopted the AEA for an impermissible purpose. (ECF No. 81 at PageID 1225–26). The Court, with reluctance, turns to its mandated task of examining the AEA's legislative history.

### 1.    Impermissible Purpose from the AEA's Legislative History

The Court incorporates its summary of the AEA's legislative history from this order (*See supra* pp. 8–12.) The Court will analyze the AEA's text, and look at both text and history together to determine whether the Tennessee General Assembly passed the bill for an impermissible purpose. As the Court observed above, the legislative history strongly suggests that the AEA was passed for an impermissible purpose. (*Id.* at 12.)

### 2.    Impermissible Purpose of the AEA's Text

The Parties remind the Court that the AEA's text is the "best indicator of intent." *Nixon v. United States*, 506 U.S. 224, 232 (1993); *But see* Antonin Scalia & Bryan A. Garner, *Reading Law*: *The Interpretation of Legal Texts* 397 (2012) (describing the idea of a statute's plain

language being the best evidence of legislative intent as a "false notion").  For the same reasons

that the Court found that the AEA is a viewpoint-based restriction on speech, the Court also finds

that the text of the AEA, while inconclusive on its own, favors a conclusion that it was passed for

an impermissible purpose.

The Court reached this conclusion for three main reasons.  First, as already discussed, the

AEA's text is a viewpoint-based discrimination against those who wish to impersonate a gender

that is different from the one with which they are born.  While not dispositive, this fact is

evidence that the Tennessee General Assembly carelessly, if not intentionally, passed the AEA

for the inappropriate purpose of chilling constitutionally-protected speech.  More importantly,

the AEA remarkably departs from the AERA because it regulates not the operator of the adult-

oriented business but the performer herself.  (ECF No. 19-1 at PageID 93 (showing that the AEA

amends Tenn. Code Ann. § 7-51-1401 to this effect); *see also* ECF No. 35-1 at PageID 519

("There is a first offense violation that's in the bill before you now and it would be applied to the

performer[.].)

Second, the AEA's lack of a textual scienter requirement troubles the Court for a statute

that regulates speech with criminal sanctions.  Several cases in which the Supreme Court upheld

a restriction on speech contained a textual scienter requirement of "knowing."  *See e.g. New York*

*v. Ferber*, 458 U.S. 747 (1982); *Ginsberg v. New York*, 390 U.S. 629 (1968); *Miller*, 413 U.S. at

15.  One of these cases is *Miller*, which Representative Bulso cited as a basis for the AEA's

language on its "harmful to minors" standard.  (ECF No. 35-1 at PageID 605 (citing 413 U.S.

15).)  Having drawn language from a case analyzing a statute with a textual scienter requirement

but not including that provision in the AEA can be evidence that the legislature passed the law to

chill constitutionally-protected speech by lowering the requisite mens rea in the AEA to criminalize more conduct.

Third, the combination of the AEA's breadth and lack of affirmative defenses trouble the Court. The AEA criminalizes speech on "public property, or [i]n a location where the adult cabaret entertainment could be viewed by a person who is not an adult." (ECF No. 19-1 at PageID 93.) The Court will address Defendant's argument as to what he considers the purported natural reading of this language. Suffice to say for now that the Court's natural reading of the text suggests that this language is extremely broad: a child could be present in several locations around Shelby County. Without an accompanying affirmative defense, as Senator Yarboro warned, this could indicate that the AEA's text criminalizes "adult cabaret entertainment" virtually anywhere.

### 3.   The Legislative History and the AEA's Text Indicate an Impermissible Purpose

Viewed together, the AEA's text and legislative history point this Court to the conclusion that the Tennessee General Assembly passed the AEA for an impermissible purpose. The Court finds that the AEA's text discriminates against a certain viewpoint, imposes criminal sanctions, and spans a virtually unlimited geographical area. As a criminal statute that regulates the performers, the AEA offers neither a textual scienter requirement nor affirmative defenses. For these reasons, the AEA can criminalize—or at a minimum chill—the expressive conduct of those who wish to impersonate a gender that is different from the one with which they were born in Shelby County. Such speech is protected by the First Amendment.

The Court now turns to the AEA's legislative history. Simply put, the Tennessee General Assembly enacted the AEA—a statute regulating speech with criminal sanctions—in a way that

is purposefully overbroad such that it can chill speech that may be constitutionally-protected. The Court reaches this conclusion for four main reasons.

First, the legislative history supports the Court's observation that the AEA materially changes the regulatory scheme in adult-oriented businesses. While the AERA imposed penalties on operators hosting adult-oriented entertainment when minors were present, the AEA criminally sanctions the performers themselves. Senator Johnson, the Senate sponsor, made this exact observation when he introduced the AEA. This significant shift that AEA introduces to the punitive structure—making performers criminally liable for potential underage viewing of their performances—suggests the bill's impermissible purpose. The bill criminalizes, or at least chills, the expression of a class of performers, rather than the business operators, or even parents, who facilitate the exposure of adult cabaret entertainment to minors.

Second, the legislative history lends credence to the Court's conclusion that the AEA facially discriminates against a particular viewpoint. Arguing that the AEA is an attempt create adult-only zones, Defendant noted that there are nine references in the legislative history to "age restricted venues." (ECF No. 82 at PageID 1258.) But that logic cuts both ways. A closer look at the transcript, which is only 100 pages long, reveals at least twenty-nine references to "drag," and eleven references to "male and/or female impersonators" which is part of the AEA's text. From this, the Court concludes that the legislature had a robust debate on the statutory text of "male or female impersonator." Despite repeated objections from fellow legislators about the language and purpose of the AEA and the broad sweep of the act, the legislative history shows that the legislature knew what they were doing and deliberately chose to retain those words in the statute. So, those words are there because the legislature intended to keep them there.

The word "drag" never appears in the text of the AEA.  But the Court cannot escape that "drag" was the one common thread in all three specific examples of conduct that was considered "harmful to minors," in the legislative transcript.  Ms. Starbuck, the sole witness who spoke in favor of the AEA, mentioned "Boro Pride" as the specific example of a performance that is harmful to minors.  (ECF No. 35-1 at PageID 530.)  Representative Zachary spoke about a "drag show" in Knox County as an example of a performance that he thinks the AEA would protect children from.  (*Id.* at PageID 602.)  Finally, Representative Todd, the AEA's House sponsor, identified a "drag show" as an instance of adult cabaret entertainment.  (*Id.* at PageID 584.)

Defendant reminds the Court that the "remarks of a single legislator, even the sponsor, are not controlling in analyzing legislative history."  (ECF No. 58 at 799 (citing *Chrysler Corp. v. Brown*, 441 U.S. 281, 311 (1979)).)  While not controlling, as the co-sponsor, Representative Todd's remarks are persuasive to the Court.  There is no question that the legislative history includes statements of legislators expressing their desire to protect minors from sexually explicit performances.[27]  Yet when Representative Todd explained why he was "asked to come up with legislation" that led to the AEA, he recounted the events behind a "drag show" in Jackson—in doing so, not once did he mention any overly sexual content that affects children.  (ECF no. 35-1 at PageID 584–85.)  He only referred to a "drag show" that was listed as "family-friendly."  (*Id.*)  He had not yet seen the performance and therefore could not have made a sound determination about the show's sexual impropriety for minors.  His statement as House sponsor of the bill suggests that the AEA was not proposed to empower the state to protect minors from actual

---

[27] For the Tennessee General Assembly's consuming concern over the health of their children through the AEA, in defending the AEA, the Tennessee Attorney General's Office asked the Court to apply a narrowing construction to the "harmful to minors" standard by ruling that "minors" meant "a reasonable 17-year-old."  (ECF No. 81 at PageID 1136 (citing *Davis-Kidd Booksellers, Inc. v. McWherter*, 866 S.W.2d 520, 528 (Tenn. 1993).)

49

instances of indecent "adult cabaret entertainment," but rather that the AEA is geared towards placing prospective blocks on drag shows—regardless of their potential harm to minors.

Third, this criminal statute contains neither a textual scienter requirement nor affirmative defenses. Nothing in the legislative history indicated the legislators even contemplated adding these narrowing mechanisms to their statute that criminalized forms of expressive speech. But unlike the *Miller* test—which was discussed during deliberations and contained a textual "knowing" scienter requirement—the AEA has no textual scienter requirement.

Representative Todd asserted that attorneys reviewed the AEA and were very confident that it will be upheld in Court. Nowhere was *Davis-Kidd* discussed in the AEA's legislative history—a case of great importance to the AEA. Defendant cites *Davis-Kidd* as a case that is important to this Court's assessment of the AEA's constitutionality in that it may save the AEA from vagueness by cabining the "harmful to minors" standard, and narrowing the AEA's scope by adding a non-textual scienter requirement of "knowing." 866 S.W.2d at 528. *Davis-Kidd* contains an affirmative defense for parental consent as well. *Id.* at 535. It even contains language that explicitly attempts to create the "adult-only" zones that Defendant ascribe to the AEA. *Id.* at 535. These facts indicate to the Court that the legislature did not bother reducing—or even contemplate reducing—the potency of their speech restriction.

Fourth, the Court finds that the AEA regulates an area that is of an alarming breadth. Representative Yarboro pointed out that the Location Provision in the AEA effectively meant that it applied to anywhere in the world—anywhere a child could view it means anywhere. Defendant pointed out at trial that the legislature "specifically referenced age-restricted venues" in the legislative history. (ECF No. 82 at PageID 1258.) But as Defendant raises in his brief, text is the best indicator of intent. And the AEA's text makes no mention of age-restricted

50

venues.  To the contrary, the AEA's Location Provision is exceptionally broad.  Plaintiff could build a card-checking fortress around its theatre and a child *could* still be present.  Compare this language to the one in *Davis-Kidd*: "It is unlawful for a person to display . . . [adult material] which contains material harmful to minors anywhere minors are *lawfully* admitted."  866 S.W.2d at 535 (emphasis added).

Remember the Supreme Court requires that restrictions on First Amendment Rights "must be narrowly drawn and represent a considered legislative judgment that a particular mode of expression has to give way to other compelling needs of society."  *Broadrick*, 413 U.S. at 611–12.  But here the AEA's text is not narrowly drawn and the legislative history does not demonstrate a considered legislative judgment.  For all these reasons, the Court makes the factual finding that the text and history of the AEA point to a conclusion that the AEA was enacted for an impermissible purpose.

## C.    Does the "Secondary Effects" Doctrine Apply Here?

Under the "secondary effects" doctrine, courts must apply intermediate—not strict scrutiny—to a content-based law designed to combat the undesirable secondary effects of the regulated speech.  *See Richland Bookmart, Inc. v.* Nichols, 137 F.3d 435, 440 (6th Cir. 1998) ("Accordingly, the Court in *City of Renton*, like the Court in *American Mini Theatres*, decided that the zoning ordinances at issue could be reviewed under the standard applicable to content-neutral regulations, even though the ordinances were plainly content-based.).  The doctrine's definitive case is *Renton v. Playtime Theatres, Inc.*, in which the Supreme Court applied intermediate scrutiny in upholding a zoning ordinance that excluded adult-oriented theatres within 1,000 feet of any residential zone, church, park, or school.  475 U.S. 41, 46 (1986).  Despite the law's content-based regulation of adult-oriented theatres, the Supreme Court in

*Renton* treated the law as if it were content-neutral because the zoning ordinance "is aimed not at the *content* of the films shown at 'adult motion picture theaters,' but rather at the *secondary effects* of such theaters on the surrounding community." *Id.* at 47.  The Supreme Court based its conclusion on the district court's finding that "the City Council's predominate concerns were there secondary effects of adult theaters, not with the content of the adult films themselves." (*Id.*)

Defendant claims the secondary effects doctrine applies here because "by protecting children from obscene content, the Act inherently addresses the secondary effects associated with exposure to such content—namely, an increase in 'sexual exploitation crimes.'"  (ECF No. 58 at PageID 796.)  Defendant cites the Senate session testimony of Ms. Starbuck, an "advocate for children harmed by sexualization and exploitation," who remarked that "normalizing the sexualization of children empowers child predators and increases the demand to exploit and sexually abuse children."  (*Id.*)  And so Defendant asks the Court to apply *Renton* in upholding the AEA because the Tennessee General Assembly's predominate concerns were not the adult cabaret entertainment performers' expressive conduct, but the "increase in sexual exploitation" they bring.  (ECF No. 65 at PageID 939.)

The Court finds the secondary effects doctrine does not apply in this case.  In *Renton*, the Supreme Court affirmed the district court's finding that the legislature's "predominate concerns" were not the adult theaters themselves but the secondary effects of adult theaters on the surrounding community.  475 U.S. at 47–48.  This was because the legislature designed the zoning ordinance "to prevent crime, protect the city's retail trade, maintain property value, and generally 'protec[t] and preserv[e] the quality of [the city's] neighborhoods, commercial districts, and the quality of urban life,' not to suppress the expression of unpopular views."  *Id.*

This District Court does not find that the Tennessee General Assembly's predominate concerns were "increase in sexual exploitation."  Rather, the Corut finds that their predominate concerns involved the suppression of unpopular views of those who wish to impersonate a gender that is different from the one with which they were born.  Defendant's identification of "increase in sexual exploitation" as the legislature's predominate concern in passing the AEA draws not from legislators, but from Ms. Starbuck's testimony.  (ECF No. 58 at PageID 796) (citing ECF No. 35-1 at PageID 528 ("It's no wonder we have skyrocketing mental health crisis amongst our confused and vulnerable youth with more sexual exploitation crimes reported than ever before.").  The only other time "sexual exploitation" was mentioned in the legislative transcript was in Ms. Starbuck's testimony.  (*Id.* at PageID 32 ("[Children] are seeing adults clap every time an article of clothing is removed, the adults are thunderously clapping.  And so they are making associations that when you take your clothes off, you're rewarded money . . . But continuing that behavior is sending that message to children and it[']s normalizing that sexual exploitation.").)  On the other hand, the record is replete with references to the expressive conduct of "male or female impersonators," "drag shows," "Pride" events, and more.  The Court's determination that the AEA was enacted for an impermissible purpose is broad enough to reject the notion that the AEA is aimed not at the content of expressive speech but rather at its secondary effects.

The Court is sympathetic to the legislature's concerns about the harms from the increased sexualization of children.  There is no question that Tennessee has a compelling government interest in protecting the physical and psychological well-being of minors.  But Supreme Court precedent precludes Defendant from invoking the "secondary effects" doctrine to protect children from speech that is harmful to minors on the basis that the speech could make them

53

susceptible to sexual predation.  *See also Reno v. ACLU*, 521 U.S. 844, 867–68 (1997) (declining to apply the secondary effects doctrine where the purpose of the statute is to "protect children from the primary effects of 'incident' and 'patently offensive' speech rather than any 'secondary effect' of such speech").

But even if the Court grants Defendant that the "increase in sexual exploitation crimes," is a valid secondary effect, the Court concludes that *Renton*'s holding does not control in this case because of one key difference: *Renton* is a zoning ordinance and the AEA is not.  In other words, prohibiting adult-oriented businesses from locating within 1,000 feet of establishments is not the same as invoking criminal penalties against performers of "adult cabaret entertainment" in "public property" or in "any location where the adult cabaret entertainment could be viewed by a person who is not an adult."

At trial, Defendant argued that the AEA is "less restrictive" than the zoning law in *Renton* because performers "literally can [perform] at any place, any venue, so long as they're carded at the door."  (ECF No. 81 at PageID 1197.)  This argument relies on Defendant's reading of the AEA's Location Provision really means prohibiting such performances except "[a]nywhere people are carded at the door."   (ECF No. 81 at PageID 1191–92 ("We think clearly what the legislature was saying to that language is, we want this to be carded, just like bars where alcohol is sold[.]").)  Defendant offered another way to understand his position after trial: Section 2(c)(1)(B) "should be read to apply '[i]n a location where the adult cabaret entertainment could [permissibly] be viewed by a person who is not an adult.'"  (ECF No. 85 at PageID 1329.)

The Court rejects Defendant's reading of the statute because it is completely unmoored from the text.  Nowhere does the word "card" or "identification" appear in the AEA nor does it

strongly suggest some sort of "carding" mechanism that would create specific "adult-only zones."  A dictionary definition of the word "could" is the past tense of the word "can," which is an auxiliary verb that means "be physically or mentally able to" or "used to indicate possibility."  *Can*, The Merriam-Webster Dictionary (rev. ed. 2022).  This definition, which lends itself to a plain meaning, is consistent with Plaintiff's position that the word "could," means "is possible."  (*See also* ECF 39-2 at PageID 689.)  Yet Defendant insists that the Court should add the word "permissibly" to modify "could" as a proper way to understand the statute under various canons of construction.  The Court refuses to engage in such rewriting of the statute.

Still, the Court hesitantly accepts Defendant's invitation to look into the AEA's legislative history to read the legislature's intent into the statute.  As the Court's discussion on that issue showed, the legislative transcript includes references to age-restricted zones in discussions led by the Senate Sponsor and House Sponsor.  Yet the legislators passed a statute that mentioned nothing of the sort.  Worse still, a legislator warned the sponsors of the AEA's overbreadth by prohibiting adult cabaret entertainment "anywhere a child could view a performance."  (*See e.g.* ECF No. 58 [Defendant's Trial Brief] at PageID 783 ("The legislature sought to 'apply the same standards' from existing law to locations where children could be present.")  And another legislator warned them the law is both vague and overbroad such that it "[would] not stand up in court."  (ECF No. 35-1 at PageID 601.)  Neither sponsor responded to these concerns—Representative Todd rather expressed his confidence in Defense counsel's ability to defend the AEA in court—and the Tennessee General Assembly passed the AEA in this current form.

At bottom, the Court refuses to adopt Defendant's atextual reading of the AEA[28] to effectuate the legislature's purported intent.  To do so would depart from the Court's limited role in interpreting the law.  Further, the legislative history compels this conclusion.  It shows that the proposed language was expressly discussed yet eventually discarded by the legislature.  Therefore, the AEA is unlike *Renton*'s zoning ordinance and its holding does not control here.

## II.     Strict Scrutiny

The discussion above leads to one conclusion: the Court must apply strict scrutiny to the AEA.  This means that the AEA is "presumptively unconstitutional."  *See Reed*, 576 U.S. at 163 ("Content-based laws—those that target speech based on communicative content—are presumptively unconstitutional[.]").  The burden is therefore on Defendant to prove that the AEA is "narrowly tailored to serve compelling state interests."  *Id.* (quoting *R.A.V.*, 505 U.S. at 395); *see also Ashcroft v. ACLU,* 542 U.S. 656, 665 (2004) ("When plaintiffs challenge a content-based speech restriction, the burden is on the Government to prove that the proposed alternatives will not be as effective as the challenged statute.").  In the end, the Court inquires "whether the challenged regulation is the least restrictive means among available, effective alternatives." *Ashcroft*, 542 U.S. at 666.

---

[28] Defendant argues that his construction is the best reading of the statute but in the alternative, asks this Court to invoke the constitutional avoidance canon.  (ECF No. 81 at PageID 1161, 1287.)  This canon suggests that a court reading statutory language susceptible of multiple interpretations may adopt a construction that avoids serious constitutional issues.  *Jennings v. Rodriguez*, 138 S.Ct. 830, 836 (2018).  The Supreme Court has held that First Amendment law mandates that if a statute is "'readily susceptible' to a narrowing construction that would make it constitutional, it will be upheld."  *Virginia v. American Booksellers* Ass'n, 484 U.S. 383, 397 (1988).  But The Supreme Court's command came with a clear caveat: "We will not rewrite a state law to conform it to constitutional requirements."  *Id.*; *Jennings*, 138 S.Ct. at 836 ("But a court relying on [constitutional avoidance] still must *interpret* the statute, not rewrite it.").

56

**A.      Does Tennessee Have a Compelling State Interest?**

There is no question that Tennessee has a compelling state interest in "protecting the physical and psychological well-being of minors, which extended to shielding them from indecent messages that are not obscene by adult standards." *Reno*, 521 U.S. at 879 (citing *Sable Comm. of Cal., Inc. v. F.C.C.*, 492 U.S. 115, 126 (1989) (internal quotation marks omitted).  The Parties do not dispute this issue.

**B.      Is the AEA Narrowly Tailored?**

The Court finds the AEA is not narrowly tailored to achieve Tennessee's compelling state interests.  In cases where a legislative act restricts indecent speech, which is not obscene to adults, the Supreme Court has been clear that those circumstances must be "relatively narrow and well-defined[.]"  *Erznoznik*, 422 U.S. at 212; *see also Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794 (2011) ("No doubt a State possesses legitimate power to protect children from harm, but that does not include a free-floating power to restrict the ideas to which children may be exposed.").  The Court concludes that the AEA is neither relatively narrow nor well-defined.

Defendant's position in this case has always been that strict scrutiny does not apply to the AEA.  And to the extent that it does, Defendant thinks "the statute is the least restrictive means, because it opens every single venue that does not have an age restriction imposed."  (ECF No. 82 at PageID 1265.)  The Court has already explained its refusal to adopt Defendant's reading of AEA's Location Provision in Section 2(c)(1)(B) as creating zones for adult cabaret entertainment "anywhere that imposes an age restriction."  The plain reading of Section 2(c)(1)(B) is that the AEA criminally sanctions qualifying performers virtually anywhere—this includes private events at people's homes or arguably even age-restricted venues.

This restriction on the First Amendment rights of Shelby County residents is not only alarmingly overbroad, the AEA contains no textual scienter requirement and no affirmative defenses. *See Smith v. California*, 361 U.S. 147, 219–20 (1959) (striking down a law that did not contain a scienter requirement because of its chilling effect on speech). This includes the affirmative defense of parental consent, which reflects the "consistently recognized [constitutional principle] that the parents' claim to authority in their own household to direct the rearing of their children is a basic in the structure of society." *Ginsberg*, 390 U.S. at 639. Parental consent has been critical to the constitutionality of similar laws that restrict speech that is indecent but not obscene to adults. *See id.*; *Davis-Kidd v. McWherter*, 866 S.W.2d 520, 528 (Tenn. 1993) (upholding obscenity law that contained a parental consent affirmative defense).

Still, Defendant insists that "the state's interest in protecting children is independent of the parents." (ECF No. 82 at PageID 1273.) This bold assertion may collide with the Supreme Court's holding in *Ginsberg*. But even if it did not, this argument conflicts with the notion that the AEA is narrowly-tailored to achieve the state's interest. As discussed above, the AEA changes Tennessee's punitive scheme in that it criminalizes not the business operator but the performer. The AEA inflicts no punishment to the parent who brings their minor child to view adult cabaret entertainment. If the AEA was truly designed to advance "the state's interest in protecting children independent of the parents," then its punitive scheme belies that design.

Defendant asserted that the legislative record shows that the legislature "attempted to find the least restrictive means [] and that is exactly what they did . . . [the legislature] limited [adult cabaret performance] to venues where children could not be present, and their interest here is protecting children. . . that is the best evidence of least restrictive means." (ECF No. 82 at PageID 1265–66.) Defendant also alerted the Court that Plaintiff "has not identified a single less

restrictive means," and so he had no "opportunity to put any evidence on [about] any less restrictive means, because no less restrictive means was ever identified." (ECF No. 82 at PageID 1266.)

But from the very beginning of this suit, Plaintiff has raised the issues this Court just discussed about the AEA's lack of affirmative defenses, silence on a scienter requirement, novel punitive scheme, and overbroad geographical scope. (ECF No. 10 at PageID 59–60.) Instead of substantially addressing these concerns, Defendant focused his theory of the case on why the Court should adopt his reading of the AEA. The Court rejects that theory, and finds that Defendant has not met his burden of proving the AEA is the least restrictive means to achieve Tennessee's legitimate compelling interest in protecting minors.[29] Defendant's argument fails and the Court finds that the AEA is not narrowly tailored to serve its legitimate compelling interest.

## III.    Vagueness

The vagueness doctrine arises not from the First Amendment but from the "Due Process [of Law] Clause of the Fifth Amendment." *United States v. Williams*, 553 U.S. 285, 304 (2008). A law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Id.* (citing *Hill v. Colorado¸*530 U.S. 703, 732 (2000) and *Grayned v. Rockford*, 408 U.S. 104, 108–09 (1972)). While "perfect clarity and precise guidance" have never been required of free speech restrictions, a plaintiff challenging a law for overbreadth—as in this case—can "complain of the vagueness of the law as applied to the

---

[29] At trial, Defendant conceded that if the Court were to apply strict scrutiny and reject his reading or narrowing-constructions, the AEA fails strict scrutiny. (ECF No. 82 at PageID 1276–77.)

conduct of others[.]"  *Id.* (citations omitted).  The Sixth Circuit has held that the "strictness of our vagueness scrutiny is proportionate to the burden that the law imposes on those whom it regulates."  *Libertarian Party of Ohio v. Husted*, 751 F.3d 403, 422 (6th Cir. 2014).  And when it comes to restriction on speech, "rigorous adherence to [the fair notice] requirements is necessary to ensure that ambiguity does not chill protected speech.  *Id.*

Plaintiff's position on its vagueness argument shifted during litigation, and found its home in the AEA's reference to Tennessee Code Annotated § 39-17-901.  (ECF No. 62 at PageID 878–79.)  Stated simply, Plaintiff argues that the "harmful to minors" standard incorporated in the AEA is unconstitutionally vague in that it can apply to minors from age five to seventeen years.  (*Id.*)  Because "'contemporary community standards' are not the same for a five-year-old and a seventeen-year-old," Plaintiff argues that what is "harmful to minors" could chill performers faced with great uncertainty as they run the risk of violating a criminal statute with their speech.  (*Id.* at PageID 879.)  Asked at trial whether she thinks Plaintiff's performances are "appropriate for children of any age," Ms. Rodley testified that she does not know if she would bring a five-year-old to a show, but definitely a "15-, 16-year-old, 17-year-old."  (ECF No. 81 at PageID 1114.)  Ms. Rodley offered uncontroverted testimony that Plaintiff considers some content, which may be appropriate for an older teenager, may not be appropriate for a younger child.  (*Id.*)

Clarity on this point matters greatly to Plaintiff, an organization seeking to provide a space for drag-centric performances outside of age-restricted venues, as the expression in its productions would be chilled by the vagueness of the "harmful to minors standard."  Plaintiff points the Court to the Third Circuit's 2008 decision in *A.C.LU. v. Mukasey*, which analyzed the Child Online Protection Act's ("COPA") "harmful to minors" standard.  534 F.3d 181 (3d Cir.

2008), *cert. denied*, 555 U.S. 1137 (3d Cir. 2009). The Third Circuit found that the definition of "harmful to minors" in that statute[30]—which is nearly identical to the one in the AEA—was unconstitutionally vague because it "applies in a literal sense to an infant, a five-year old, or a person just shy of age seventeen." *Id.* at 191.

Defendant disagrees on two grounds. First, even though Defendant does not contest the substantial similarity with respect to the "harmful to minors" standard between the AEA in this case and COPA in *Mukasey*, he resists Plaintiff's attempt to extend *Mukasey*'s holding to this case. (ECF No. 65 at PageID 941.) Defendant argues that while *Mukasey* banned content harmful to minors, the AEA merely creates "adult-only" zones. (*Id.*) This argument does not convince the Court.

As already discussed above, Defendant's reading of the AEA's geographical scope is unmoored from the text and unsupported—if not contravened—by the legislative history. The AEA's expansive geographical coverage is not as meager as Defendant portrays it to be. Moreover, *Mukasey*'s rationale for its vagueness holding applies just as much in this case. The *Mukasey* panel found the "harmful to minors" standard unconstitutionally vague because they "believed that a 'Web publisher will be forced to guess at the bottom end of the range of ages to

---

[30] In the COPA statute, "'minor' means any person under 17 years of age." *Mukasey*, 534 F.3d at 184–185. "[M]aterial that is harmful to minors" includes any communication that is obscene or that:

> (A) the average person, applying contemporary community standards, would find, taking the material as a whole and with respect to minors, is designed to appeal to, or is designed to pander to, the prurient interest;
> (B) depicts, describes, or represents, in a manner patently offensive with respect to minors, an actual or simulated sexual act or sexual contact, an actual or simulated normal or perverted sexual act, or a lewd exhibition of the genitals or post-pubescent female breast; and
> (C) taken as a whole, lacks serious literary, artistic, political, or scientific value for minors.
> *Id.*

which the statute applies,' and thus will not have 'fair notice of what conduct would subject them to criminal sanctions under the COPA' and 'will be deterred from engaging in a wide range of constitutionally protected speech.'"  543 F.3d at 205.

The Court finds the same could be said here with an even greater degree of conviction because the AEA—unlike the COPA—has neither a textual scienter requirement nor affirmative defenses.  Moreover, the AEA's punitive structure targets the performer—no matter if her performance is for commercial purposes or not—while COPA only punishes those who post content "on the Web 'for commercial purposes.'"  For these reasons, the Due Process of Law implications and the First Amendment impact of the AEA's "harmful to minors" standard carry more weight in this case.  The Court finds that this language is unconstitutionally vague.

But Defendant is not done.  Defendant's second argument claims that this Court is bound by the Tennessee Supreme Court's narrowing construction of "harmful to minors" to include "only those materials which lack serious literary, artistic, political or scientific value for a reasonable 17-year-old minor."  *Davis-Kidd Booksellers, Inc. v. McWherter*, 866 S.W.2d 520, 528 (Tenn. 1993) (evaluating the same "harmful to minors" standard used by the AEA"); *see also* Tenn. Code Ann. § 39-17-901.

In *Davis-Kidd*, the Tennessee Supreme Court had to resolve whether a Tennessee law that made it a "criminal offense for a person to *display* for sale or rental a visual depiction [of various media], which contains material *harmful to minors* anywhere minors are lawfully admitted."  866 S.W.2d at 522.  The Tennessee Supreme Court found that the "display statute" was "readily susceptible to a narrowing construction which makes it only applicable to those materials which lack serious literary, artistic, political, or scientific value for a reasonable 17-year-old minor."  *Id.*  Under this narrowing construction, the Tennessee Supreme Court found

62

that the display statute was "not overbroad and fully complies with the First Amendment." *Id.*; *see also Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983) (observing that the United States Supreme Court has "traditionally viewed vagueness and overbreadth as logically related and similar doctrines).

The Court finds that Defendant overstates the Tennessee Supreme Court's holding in *Davis-Kidd*. The text of the Tennessee Supreme Court's opinion is clear: "Accordingly, we hold that the *display statute* applies only to those materials which lack serious literary, artistic, political, or scientific value for a reasonable 17-year-old minor." *Davis-Kidd*, 866 S.W.2d at 528 (emphasis added). Defendant's argument would transform the Tennessee Supreme Court's holding to "Accordingly, we hold that the *'harmful to minors' standard in Tenn. Code. Ann. § 39-17-901* applies only to those materials which lack serious literary, artistic, political, or scientific value for a reasonable 17-year-old minor." The Tennessee Supreme Court never held that and neither will this Court. The Court rejects yet another offer from Defendant to accept an atextual construction of clear language. In doing so, the Court denies that it is duty bound to apply *Davis-Kidd*'s narrowing construction of a display statute to the AEA. Defendant's second argument therefore fails, and the Court finds that the AEA remains unconstitutionally vague.

## IV.   Substantial Overbreadth

The threat of enforcement from overbroad legislative acts "deters people from engaging in constitutionally protected speech, inhibiting the free exchange of ideas." *United States v. Williams*, 553 U.S. 285, 293 (2008). First Amendment jurisprudence recognizes a "substantial overbreadth doctrine," which empowers courts to invalidate a statute on overbreadth grounds if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quoting *Wash.*

*State Grange v. Wash. State Republican Party*, 552 U.S. 449 n.6 (2008)).  Facial challenges are "disfavored" because they risk "premature interpretation of statutes on the basis of factually barebones records," or "formulate a rule of constitutional law broader than is required by the precise facts[.]"  *Wash. State Grange*, 552 U.S. at 450.  This doctrine has been called "strong medicine that is not to be casually employed."  *Williams*, 553 U.S. at 293 (internal quotation marks and citations omitted omitted).  The first step in overbreadth analysis is to construe the challenged statute.  *Id.*

The Parties' disagreement on this issue centers on two of the AEA's provisions.  First is the "harmful to minors standard as that term is defined by § 39-17-901," in Section 1(A).  Second is the Location Provision in Section 2 (c)(1)(B).  Plaintiff argues the text's plain meaning is that Section (1) applies to anyone below the age of 18 and Section (2) means anywhere a minor could be present, which means virtually anywhere.  Defendant repeats two arguments the Court addressed above: first that the Court is bound by the Tennessee Supreme Court's narrowing construction of the "harmful to minors standard" in *Davis-Kidd*, 866 S.W.2d at 528, and second, that the "most natural reading, at least in [Defendant's] view" of Section 2 (c)(1)(B) is that it permits adult cabaret entertainment "[a]nywhere people are carded at the door."

The Court has already explained its rejection of Defendant's position that the Tennessee Supreme Court's narrowing construction in *Davis-Kidd* is binding here (*See supra* pp. 62–63), and Defendant's natural reading of the second provision (*See supra* pp. 54–55).  In this light, the Court finds that Plaintiff carried its burden of proving the AEA's substantial overbreadth in relation to its plainly legitimate sweep.  The Court notes—as it will discuss more fully below— that its power to issue any injunction is limited to Defendant District Attorney Mulroy of Shelby County.  The Court's analysis of Plaintiff's organizational standing ignored any testimony and

other evidence that Plaintiff proffered from outside Shelby County.  For the same reasons, the Court limits its inquiry for the statute's "plainly legitimate sweep" to Shelby County only.  While Plaintiff needs to demonstrate unconstitutional applications of the AEA, it need only show substantial overbreadth in relation to the AEA's reach in Shelby County—and not the entire State.[31]

At trial, Plaintiff presented evidence of the AEA's harm on its "male or female impersonator[]" members who perform drag shows.  As Ms. Rodley testified, some of Plaintiff's performances, featuring Plaintiff's member-performers, might not be appropriate—or at least devoid of any redeemable social value—for children as young as four or five.

The threat of prosecution from a law officer armed with a vague "harmful to minors" standard from the AEA could chill a drag show group into paralysis.  After all, a statute imposing criminal sanctions on speech magnifies any chill it inflicts on those who fear prosecution for their expression.  The Court finds that these members' harms, which the Court disregarded under associational standing, add to the number of unconstitutional applications of the AEA in Shelby County under the substantial overbreadth doctrine.

Plaintiff also submitted a declaration from Ms. Mystie-Elizabeth Watson, Producer and Director of Absent Friends.  (ECF No. 23-2 at PageID 138.)  Absent Friends is a theater organization that hosts monthly shows of a musical comedy that incorporates live actors—among them drag performers.  (*Id.* at 139.)  Ms. Watson attested that due to their drag performers' fear of potential prosecution from the AEA, they had to place a previously-unneeded age-restriction on their shows, which have historically been attended by families with minor teenagers.  (*Id.*)

---

[31] This distinction ultimately made no difference as the Court's analysis of the AEA ultimately found that the overbroad statute applied to virtually anywhere in Tennessee and anyone not over 18.

Their performers fear police surveillance and the risk of criminal charges. (*Id.*)  The Court finds that Ms. Watson's uncontested affidavit not only shows another unconstitutional application of the AEA, it also corroborates the Plaintiff's members' fears of prosecution from an overbroad statute.

Ms. Rodley also provided uncontroverted testimony as President and Festival Director of Mid-South Pride, which hosts the Regional Pride Festival for the LGBTQ community in Memphis.  She testified that since the AEA's enactment, she witnessed a "noticeable decline in sponsorship for the 2023 festival."  (ECF No. 23-3 at PageID 141.)  The 2022 Mid-South Pride festival had a total of 43 sponsors while on March 30, 2023—a day before this Court issued an Temporary Restraining Order enjoining the AEA's enforcement—the 2023 festival had only 23 sponsors.  (*Id.* at PageID 142.)  Also, while the festival secured 90% of its annual budget from sponsors 60 days before the event in 2022, it secured only 60% of its annual budget 63 days before the event this year.  (*Id.*)  The Court finds that these injuries to Mid-South Pride's organization show another unconstitutional application of the AEA.  The Court finds that the AEA's impact on a major festival for the LGBTQ community in Memphis matters greatly in assessing the AEA's unconstitutionality in relation to its plainly legitimate sweep in Shelby County.

The Court can recount the hypotheticals the Parties discussed from both the Temporary Restraining Order hearing and trial, but that would be unnecessary.  For the above reasons, the Court finds that Plaintiff carried its burden of proving the AEA's substantial overbreadth in relation to its plainly legitimate sweep in Shelby County.  The Court understands that the overbreadth doctrine is strong medicine.  But a debilitated patient should not forgo medicine on account of its strength.  This statute—which is barely two pages long—reeks with constitutional

maladies of vagueness and overbreadth fatal to statutes that regulate First Amendment rights. The virulence of the AEA's overbreadth chills a large amount of speech, and calls for this strong medicine.

## Remedy

Plaintiff seeks a declaratory judgment that the entire AEA is unconstitutional and an injunction against Defendant from enforcing its provisions in Shelby County.  The Court considers these requests in turn.

## I.      Declaratory Judgment

Declaratory relief under the Declaratory Judgment Act is "not precluded when . . . a federal plaintiff demonstrates a genuine threat of enforcement of a disputed state criminal statute." *Ellis v. Dyson*, 421 U.S. 426 (1975).  For all the above reasons, Plaintiff—and the non-parties whose interests Plaintiff asserts—face a certain threat of criminal prosecution from an unconstitutional legislative act.  Plaintiff therefore has a "continuing, actual controversy, as is mandated by both the Declaratory Judgment Act and Art[icle] III of the Constitution[.]"  *Id.* at 433.  The Court answers the central question of law in this case and **GRANTS** Plaintiff's request for a declaratory judgment.

The Court therefore **HOLDS** and **DECLARES** that the Adult Entertainment Act is an **UNCONSTITUTIONAL** restriction on speech.  (ECF No. 19-1.)  The Court concludes that the AEA violates the First Amendment as incorporated to Tennessee by the Fourteenth Amendment, and it cannot be enforced consistently with the supreme law of the land: the United States Constitution.

## II.    Injunctive Relief

Plaintiff also seeks injunctive relief against District Attorney General Steven J. Mulroy. A party in a § 1983 action is "entitled to a permanent injunction if it can establish that it suffered a constitutional violation and will suffer continuing irreparable injury for which there is no adequate remedy at law." *Saieg v. Dearborn*, 641 F.3d 727, 733 (6th Cir. 2011) (internal quotation marks omitted). A party seeking a permanent injunction must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).

Plaintiff meets all four factors. First, Plaintiff suffered an irreparable injury in the form of an objective chill to its First Amendment rights—along with other parties whose rights Plaintiff asserted—from the threat of the AEA's enforcement in Shelby County. *See Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S.Ct. 63, 67 (2020) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). Second, monetary damages are inadequate here because the First Amendment rights of Shelby County residents are at stake with criminal consequences.

Third, the balance of equities favor granting an injunction because without it, Plaintiff— and other Shelby County residents—will be barred from engaging in protected First Amendment expression. Defendants also agreed that the state's existing obscenity laws can punish most— and possibly all—of the conduct that the AEA seeks to regulate. And fourth, public interest would not be disserved by a permanent injunction because "it is always in the public interest to

68

prevent the violation of a party's constitutional rights."  *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994).

For the above reasons, the Court **ENJOINS** District Attorney Steven J. Mulroy from enforcing the Adult Entertainment Act within his jurisdiction in **SHELBY COUNTY, TENNESSEE**.  (ECF No. 19-1.)

## CONCLUSION

Let there be no mistake about this Court's recognition that Tennessee has a compelling government interest in protecting its minor population.  Scores of concerned Tennesseans asked the Court to uphold the Adult Entertainment Act because their State supposedly enacted it to protect their children.  Tennesseans deserve to know that their State's defense of the AEA primarily involved a request for the Court to alter the AEA by changing the meaning of "minors" to a "reasonable 17-year-old minor."  In other words, while its citizens believed this powerful law would protect all children, the State's lawyers told the Court this law will only protect 17-year-olds.  This is only one of several ways in which Tennessee asked this Court to rewrite the AEA.

To rewrite this law would not only violate the separation-of-powers principle, but it would also offer perverse incentives for legislators to continue their troubling trend of abdicating their responsibilities in exercising "considered legislative judgment."  The Tennessee General Assembly can certainly use its mandate to pass laws that their communities demand.  But that mandate as to speech is limited by the First Amendment to the United States Constitution, which commands that laws infringing on the Freedom of Speech must be narrow and well-defined.  The AEA is neither.

69

The Court therefore **DECLARES** that the Adult Entertainment Act **IS**

**UNCONSTITUTIONAL** and **ENJOINS** District Attorney Steven J. Mulroy from enforcing the

AEA within his jurisdiction in **SHELBY COUNTY, TENNESSEE**.

**SO ORDERED**, this 2nd day of June, 2023.

      s/Thomas L. Parker
THOMAS L. PARKER
UNITED STATES DISTRICT JUDGE