IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
NORTHERN DIVISION

| | |
|---|---|
| BLOUNT PRIDE, INC., *a 501(c)3 nonprofit organization*, and MATTHEW LOVEGOOD,<br><br>PLAINTIFFS,<br><br>v.<br><br><br><br>RYAN K. DESMOND, *in his individual and official capacity as the District Attorney General of Blount County, Tennessee*, JAMES BERRONG, *in his official capacity as Blount County Sheriff*, TONY CRISP, *in his official capacity as Maryville Police Chief*, DAVID CARSWELL, *in his official capacity as Alcoa Police Chief*, and JONATHAN SKRMETTI, *in his official capacity as Attorney General of Tennessee*,<br><br>DEFENDANTS. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **Case No.**<br><br><br><br>**COMPLAINT FOR VIOLATIONS OF THE CIVIL RIGHTS ACT OF 1871, 42 U.S.C. § 1983** |

---

**PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION WITH INCORPORATED MEMORANDUM OF LAW**

---

Plaintiffs Blount Pride, Inc., and Matthew Lovegood are preparing for a September 2, 2023 Pride event that will feature "male or female impersonators"—better known as "drag queens." Citing a new and already-once-declared-unconstitutional Tennessee law that was designed to criminalize drag performances, Defendant Ryan K. Desmond has threatened to prosecute the Plaintiffs under Tennessee Code Annotated § 7-51-1407 if they move forward with their event.

-1-

Defendant Desmond's letter threatening arrests and prosecutions under the statute and advising law enforcement agencies to make such arrests was received by Plaintiffs on August 29, 2023, just four days prior to the event. Defendants made no effort to meet with Plaintiffs, and the letter itself states that prior to sending it, Defendant Desmond attempted to identify ways to prevent the event from occurring altogether. On August 28, 2023, Defendant Crisp contacted Maryville College, a private institution hosting the September 2 event, and requested a copy of the event contract. The following day, on August 29, 2023, Defendant Crisp contacted Maryville College President Bryan F. Coker, notifying Mr. Coker of the letter and asking to arrange a meeting to discuss the event in an apparent effort to interfere with Plaintiffs' constitutionally-protected rights of assembly, association, and speech.

As a result, the Plaintiffs move this Court to immediately issue a Temporary Restraining Order enjoining Defendants Ryan K. Desmond, James Berrong, Tony Crisp, and David Carswell, in their official capacities, from enforcing, detaining, arresting, seeking warrants, or taking any other action to enforce or threaten to enforce T.C.A. § 7-51-1407 pending further orders of the Court. Plaintiffs further seek a Temporary Restraining Order barring Defendants Ryan K. Desmond, James Berrong, Tony Crisp, and David Carswell, in their official capacities, from interfering with the September 2, 2023 Blount Pride event by any means. The Plaintiffs also seek a Preliminary Injunction to the same effect and against interference with future events.[1]

Plaintiffs have satisfied Fed. R. Civ. P. 65(b)1, because due to the imminent nature of the injury as set forth herein, it is possible that a hearing may not be practicable prior to September 2,

---

[1] Plaintiffs are not seeking a Temporary Restraining Order against Attorney General Skrmetti as he does not have direct enforcement authority that would allow him to interfere with the September 2, 2023 event.

2023. Additionally, Plaintiffs' counsel have either provided or attempted to provide notice to all Defendants as set forth in the Certificate of Compliance below.

## I. <u>INTRODUCTION</u>

The Plaintiffs have filed this suit challenging the constitutionality of T.C.A. § 7-51-1407 ("the Act"). The Act prohibits a person from performing "adult cabaret entertainment on public property; or in a location where the adult cabaret entertainment could be viewed by a person who is not an adult." A first violation of the law is a Class A misdemeanor; a second violation is a Class E felony.

On its face, the Act is a content-based restriction on speech and expression protected by the First Amendment to the Constitution. The law also discriminates on the basis of viewpoint, defining prohibited conduct based on an individual's identity and message. Alternatively, the law was adopted by the State because legislators disagree with the message of the restricted speech. Thus, the law is presumptively unconstitutional, and it can only survive review if it is narrowly tailored to achieve a compelling government interest.

Tennessee has existing laws which regulate obscenity in the presence of minors. These statutes, portions of which Tenn. Code Ann. §7-51-1407 incorporates by reference, regulate commercial activity, contain affirmative defenses for parental consent, and include clearly defined time, place, and manner restrictions that carefully delineate the locations where the statutes apply. The State does not have a compelling interest in preventing minors from watching drag shows or in enhancing criminal penalties and imposing or broadening speech regulations based solely on the identity – and thus the viewpoint – of a speaker, though. Thus, the statute is far from "narrowly tailored." It also is not limited to public property or commercial establishments, instead reaching into the homes of private citizens. Nor does it contain scienter requirements or affirmative

defenses. Further, because the law criminalizes mere participation in a performance that violates the law, individuals who do not personally engage in the proscribed expressive conduct face arrest and prosecution even if they do not themselves engage in said conduct.

Finally, the law is unconstitutionally vague. It does not give citizens a reasonable opportunity to know what conduct is prohibited, nor does it give law enforcement explicit standards by which to enforce the law. If Defendants are permitted to enforce the Act, Plaintiffs' protected speech and expression will be chilled for fear they will be subject to arrest and prosecution.

## II.     <u>STATEMENT OF THE CASE</u>

In March of 2023, a drag-centric theatre company, Friends of George's, Inc., (FOG) filed suit in the United States District Court for the Western District of Tennessee, alleging that T.C.A. §7-51-1407 is an unconstitutional government restriction on speech. FOG sought injunctive relief against Shelby County District Attorney General Steve Mulroy in his official capacity. FOG argued that the Act is facially unconstitutional under the First Amendment because it is a content-based restriction on protected speech, impermissibly vague, and unconstitutionally overbroad. FOG sought both declaratory and injunctive relief. After a hearing in which the court heard arguments from both sides, Judge Thomas L. Parker issued a temporary restraining order enjoining District Attorney Mulroy from enforcing the Act. A bench trial was scheduled for May 22nd, 2023.

On June 2, 2023, after a full trial on the merits, the court issued its Findings of Fact and Conclusions of Law in *Friends of George's v. Mulroy*. *See generally Friends of Georges, Inc. v. Mulroy*, No. 223CV02163TLPTMP, 2023 WL 3790583 (W.D. Tenn. June 2, 2023). In its 70-page opinion, the court found that the Act is a content-based, viewpoint discriminatory speech regulation and that the Act is not narrowly tailored to achieve any compelling governmental interest. *Id.*

-4-

Additionally, the court concluded that the Act is unconstitutionally vague and overbroad. *Id.* The court granted FOG both declaratory relief ruling that the Adult Entertainment Act is an unconstitutional restriction on protected speech and injunctive relief permanently enjoining D.A. Mulroy, in his official capacity, from enforcing it within his jurisdiction.[2] *Id.*

Plaintiff Blount Pride, Inc., is a 501(c)(3) nonprofit entity that organizes and hosts an annual Pride festival in celebration of the LGBTQIA community. The festival hosts live drag performances by individual entertainers, including Plaintiff Matthew Lovegood, who performs under the name "Flamy Grant." Blount Pride's third annual Pride Festival is scheduled to begin Saturday, September 2, 2023. Plaintiff Lovegood is scheduled to perform in drag at the festival this year.

On Tuesday, August 29, 2023—just four (4) days before the festival—Blount Pride received an email from District Attorney General Ryan Desmond which stated in part: "Please see the attached notice regarding my office's prosecutorial position relative to the Adult Entertainment Act." In the letter, Defendant Desmond asserts that he intends to enforce the Act despite a federal court ruling in the Western District declaring the Act unconstitutional. Defendant Desmond states that the letter is a response to "a coming event planned for September 2, 2023, that is marketing itself in a manner which raises concerns that the event may violate certain criminal statutes within the State of Tennessee," and that the letter aims to "put potential parties on notice of possible ramifications of criminal conduct."

---

[2] Because of Tennessee's unique criminal prosecution structure, suits challenging the constitutionality of criminal statutes are typically be brought against District Attorneys General in their official capacities, thus injunctive relief in *Friends of George's* was, by stipulation of the parties, limited to DA Mulroy. Declaratory relief was not limited in any way. *Id.*

Blount Pride's promotional materials include social media posts on Facebook and Instagram. The posts include lists of vendors, planned entertainment, and photos of entertainers, including several photos of Plaintiff Lovegood's drag persona, "Flamy Grant." None of the posts is sexual in nature.

Defendant Desmond also addressed the letter to three law enforcement officials – Blount County Sheriff James Berrong, Alcoa Police Chief David Carswell, and Maryville Police Chief Tony Crisp. Defendant Desmond's decision to include these law enforcement officers in his letter empowers and encourages police to enforce the unconstitutional Act, and indeed Defendant Crisp has made clear his intent to both enforce the Act and to interfere with the scheduled event through his contact with the event's host, Maryville College. This Act and the actions of Defendants Desmond and Crisp chill the speech of Plaintiffs and any other person in Blount County who is subject to Defendant Desmond's jurisdiction. Worse, the letter specifically targets Plaintiffs for enforcement. The only other non-law enforcement recipients were representatives of the entities where the pride festival is being held – Maryville College and the cities of Maryville and Alcoa.

While Defendant Desmond claims that "we do not prematurely evaluate the facts or evidence related to potential investigations," he also states that his office conducted a "diligent search" to find a way to seek a prior restraint against Blount Pride, stating:

> It should be noted at this point that a diligent search of relevant statutory authority has revealed no mechanism under which a District Attorney General in the State of Tennessee could petition for a temporary injunction to enjoin an individual or group from organizing and holding an event that would be violative of the AEA.

In other words, Defendant Desmond tried to find a way to violate Plaintiffs' First Amendment rights by prior restraint. When that failed, he opted instead to send a letter threatening to prosecute them if they moved forward with the event. Had Defendant Desmond merely wished to notify the public that he intends to enforce the Act, he could have issued a public statement to

-6-

that effect. Instead, he sent a letter explicitly addressed to law enforcement, Blount Pride, and Maryville College threatening Blount Pride and the drag artists who are scheduled to perform. The letter is a naked attempt to chill Plaintiffs' speech and expression in retaliation for Blount Pride's social media posts and an explicit and credible threat to enforce an unconstitutional speech regulation.

## III.  ARGUMENT

Plaintiffs satisfy the requirements for obtaining a temporary restraining order and preliminary injunctive relief. As explained below, (1) Plaintiffs are likely to succeed on the merits of their claims; (2) Plaintiffs are likely to suffer irreparable harm in the absence of relief; (3) the issuance of the injunction would not cause harm to others; and (4) an injunction is in the public interest. *Williamson v. Recovery Ltd. P'ship,* 731 F.3d 608, 627 (6th Cir. 2013) (quoting *Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427, 432 (6th Cir. 2004)).  Where Plaintiffs demonstrate "irreparable harm which decidedly outweighs any potential harm to the defendant," the "degree of likelihood of success required" is less important, and plaintiffs need only raise "serious questions going to the merits."  *In re DeLorean Motor Co.,* 755 F.2d 1223, 1229 (6th Cir. 1985).  However, where, as here, "a party seeks a preliminary injunction on the basis of a potential constitutional violation, the likelihood of success on the merits often will be the determinative factor."  *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (quoting *Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir.2009)).

### A.  The *Friends of Georges* Declaration Applies to the Defendants Here.

In *Friends of Georges, Inc. v. Mulroy*, No. 223CV02163TLPTMP, 2023 WL 3790583, at *32 (W.D. Tenn. June 2, 2023), the Western District of Tennessee ruled that it "**HOLDS** and **DECLARES** that the Adult Entertainment Act is an **UNCONSTITUTIONAL** restriction on

speech." *Id.* "[T]he AEA violates the First Amendment as incorporated to Tennessee by the Fourteenth Amendment, and it cannot be enforced consistently with the supreme law of the land: the United States Constitution[,]" the Court explained. *Id.* Importantly, this ruling was also issued against "Defendant Steven J. Mulroy in his official capacity as District Attorney General of Shelby County[.]" *Id.* at *7.

The U.S. Supreme Court has made clear that "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71, 109 S. Ct. 2304, 2312, 105 L. Ed. 2d 45 (1989). "As such, it is no different from a suit against the State itself." *Id.* (citing *Kentucky v. Graham*, 473 U.S. 159, 165–166, 105 S.Ct. 3099, 3104–3105, 87 L.Ed.2d 114 (1985); *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691, n.55 (1978) ("official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent")). Put another way: "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. at 166.

The import of this precedent is that the District Attorney of Shelby County—in his official capacity—is "in all respects other than name" the same as the District Attorney here. *Id.* In their official capacities, both defendants are really the State of Tennessee as an "entity[,]" so both cases present "a suit against the State itself[,]" rather than a suit against any defendant individually. *See Will*, 491 U.S. at 71. In *Friends of Georges*, the State of Tennessee already litigated and lost the exact issue presented here, too, so the *Friends of Georges* declaration applies to this case. The State of Tennessee has not sought a stay pending appeal of the adverse declaration issued in *Friends of George*s, either.

-8-

Further, officers of the same government who are sued in their official capacity are in privity with one another. *See Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 402–03, 60 S. Ct. 907, 917, 84 L. Ed. 1263 (1940) ("There is privity between officers of the same government so that a judgment in a suit between a party and a representative of the United States is res judicata in relitigation of the same issue between that party and another officer of the government.") (citing *Tait v. W. Maryland Ry. Co.*, 289 U.S. 620, 627, 53 S. Ct. 706, 708, 77 L. Ed. 1405 (1933)); *see also Crawford v. Chabot*, 202 F.R.D. 223, 227 (W.D. Mich. 1998) ("A government official sued in his or her official capacity is considered to be in privity with the government. Therefore, a judgment for or against an official will preclude a subsequent action on the same claim by or against another official or agency of the same government. Similarly, a prior judgment involving the government will bar an action against individual officials of the government in their official capacity for the same claim.") (quoting Moore's Federal Practice 3d, § 131.40[3][e][ii] (citing *Gregory v. Chehi*, 843 F.2d 111, 120 (3d Cir.1988); *Schuster v. Martin*, 861 F.2d 1369, 1373 (5th Cir.1988); *Conner v. Reinhard*, 847 F.2d 384, 394 (7th Cir.1988); *Scott v. Kuhlmann*, 746 F.2d 1377, 1378 (9th Cir.1984)). Thus, when determining whether the government is bound by an earlier adverse result, "[t]he crucial point is whether or not in the earlier litigation the representative of the [government] had authority to represent its interests in a final adjudication of the issue in controversy." *Sunshine Anthracite Coal Co.*, 310 U.S. at 403.

That inarguably happened in *Friends of Georges, Inc.*, 2023 WL 3790583. There, the Tennessee Attorney General's Office was served with notice of the litigation and controlled the State's defense as permitted by Tennessee law. *See id.* ("James R. Newsom, III, Robert W. Wilson, Office of the Tennessee Attorney General and Reporter, Memphis, TN, Jessica Lyn Indingaro, Shelby County District Attorney General's Office, Memphis, TN, Steven James Griffin, Office of

the Tennessee Attorney General and Reporter, Nashville, TN, James Matthew Rice, Tennessee Attorney General's Office Attorney General's Office, Nashville, TN, for Defendant.").  The *Friends of Georges* declaration thus applies here for that reason, too, since the District Attorney of Shelby County and the District Attorney here are in privity with one another with respect to the official-capacity claims presented.

For all of these reasons, the *Friends of Georges* declaration applies to Defendant Desmond in this case. The State of Tennessee—which is the real defendant in both suits and must "be treated as" such, *see Kentucky v. Graham*, 473 U.S. at 166—thus cannot attempt to relitigate the issue anew here.  Instead, its remedy is appellate review in Sixth Circuit Case No. 23-5611, where—as noted above—the State of Tennessee, through the official-capacity defendant there, has neither sought nor obtained a stay pending appeal.

Likewise, the remaining Defendants, Berrong, Crisp, and Carswell ("Municipal Defendants") are on notice that the Act is unconstitutional. Even if they could claim ignorance of the *Friends of Georges* decision previously, Defendant Desmond's letter explicitly references Judge Parker's order and states that it is his official and professional position that the order is not binding or meaningful in any sense. In essence, Defendant Desmond has told municipal law enforcement within his jurisdiction that the final order of a federal judge, not subject to any stay, is not worth the paper on which it is printed.

**B. Plaintiffs are Likely to Succeed on the Merits of Their Claims.**

    **1. The Law is Subject to Strict Scrutiny.**

        **a. The Law is Facially Content Based and Discriminates on the Basis of Viewpoint.**

Plaintiffs are likely to succeed on the merits of their claims.  Here, unlike in most cases, Plaintiffs are *presumed* to be likely to prevail. In particular, plaintiffs in First Amendment

challenges to content-based restrictions upon speech "must be deemed likely to prevail unless the Government has shown that respondents' proposed less restrictive alternatives are less effective than [the challenged statute]." *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004).

"A regulation of speech is facially content-based under the First Amendment if it 'targets speech based on its communicative content' - that is, if it 'applies to particular speech because of the topic discussed or the idea or message expressed.'" *City of Austin v. Reagan Nat'l Adver. Of Austin, LLC.*, 142 S. Ct. 1464, 1471 (2022) (quoting *Reed v. Town of Gilbert*, 576 U.S.155, 163 (2015)). Content-based restrictions are "presumptively unconstitutional" and "can stand only if they survive strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed*, 576 U.S. at 163.

T.C.A. § 7-51-1407 is a facially content-based speech restriction. It regulates speech and expression "in whatever form, of nudity, sexual excitement, sexual conduct, excess violence or sadomasochistic abuse." The statute plainly "defin[es] regulated speech by subject matter," and is therefore subject to strict scrutiny. But the statute goes beyond mere content-based restriction.

The Act also discriminates on the basis of viewpoint. "Government discrimination among viewpoints – or the regulation of speech based on the specific motivating ideology or the opinion or perspective of the speaker – is a more blatant and egregious form of content discrimination." *Id*. at 169. The State's viewpoint discrimination is evident in the Act's definition of "adult cabaret entertainment," which reads in part, "adult-oriented performances that are harmful to minors, as that term is defined in § 39-17-901, and that feature topless dancers, go-go dancers, exotic dancers, strippers, male or female impersonators, or similar entertainers . . ." This definition does not merely address specific subject matter. Rather, the restricted speech is defined in part by the identity of the messenger and "the specific motivating ideology . . . or perspective of the speaker." *Id.* at 168.

There are two possible readings of the Act's definition of "adult cabaret entertainment." The most natural reading requires that a performance be **both** 1) harmful to minors **and** 2) include a performer of the type listed. Under this reading, the content of a performance could be "harmful to minors" without violating the law, as long as the performer is not, for instance, a "male or female impersonator" or any other prohibited performer. Under this reading, whether or not speech violates the Act is dependent on the identity – and thus the viewpoint - of the speaker.

Alternatively, the Act's definition of "adult cabaret entertainment" can be read to mean that "adult oriented performances" include 1) performances that are harmful to minors, **or** 2) performances that feature the enumerated entertainers. While this reading would include within its scope anyone who performs material that meets the Act's "harmful to minors" standard, it would also penalize performances by the specified performers *regardless of whether their conduct is harmful to minors.* For example, the law would prohibit a drag performer wearing a crop top and mini skirt from dancing where minors might see them, but it would not prohibit a Tennessee Titans cheerleader wearing an identical outfit from performing the exact same dance in front of children.

Whichever way the definition of "adult oriented performance" is construed, the statute restricts protected speech of a particular subject matter, and from a particular set of people. The prohibited conduct cannot be defined without referencing both the content of the speech and the perspective of the speaker. It is thus both content-based viewpoint discriminatory, even if conduct that harms minors could be prohibited on its own. *Cf. R.A.V. v. City of St. Paul*, 505 U.S. 377, 384, 112 S. Ct. 2538, 2543, 120 L. Ed. 2d 305 (1992) ("the government may proscribe libel; but it may not make the further content discrimination of proscribing only libel critical of the

government."). T.C.A. § 7-51-1407 is thus presumptively unconstitutional and can only survive if it satisfies strict scrutiny.

### b. The Act Was Adopted For An Impermissible Purpose

"Because strict scrutiny applies either when a law is content based on its face or when the purpose and justification for the law are content based, a court must evaluate each question before it concludes that the law is content neutral and thus subject to a lower level of scrutiny." *Reed*, 576 U.S. at 167 (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). However, if the Court finds that the Act is facially content-neutral but that "an impermissible purpose or justification" underpins the law, then the law is still subject to strict scrutiny. *See City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1475, 212 L. Ed. 2d 418 (2022) ("This Court's determination that the City's ordinance is facially content neutral does not end the First Amendment inquiry. If there is evidence that an impermissible purpose or justification underpins a facially content-neutral restriction, for instance, that restriction may be content based.").

There is substantial evidence that T.C.A. § 7-51-1407 was "adopted by the government because of disagreement with the message the speech conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). The text of the Act is "the best indicator of intent." *Nixon v. United States*, 506 U.S. 224, 232 (1993). While the State has repeatedly claimed that the legislators' sole purpose in passing this law was to protect minors, the text of the Act demonstrates otherwise.

Plaintiffs agree that the State has a compelling interest in protecting children from harmful content. But the State does not have a compelling interest in protecting children from harmful content *only from specific speakers*. *See R.A.V.*, 505 U.S. at 384; *see also Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010) ("Prohibited, too, are restrictions distinguishing among different speakers, allowing speech by some but not others."); *Thomas v. Chicago Park*

-13-

*Dist.*, 534 U.S. 316, 325, 122 S. Ct. 775, 781, 151 L. Ed. 2d 783 (2002); ("Granting waivers to favored speakers (or, more precisely, denying them to disfavored speakers) would of course be unconstitutional"); *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 96 (1972) ("we have frequently condemned such discrimination among different users of the same medium for expression.").

Put another way: A performance is either harmful to children, or it is not. The identity of the speaker is irrelevant to the State's interest, yet the State has chosen to specifically target only certain speakers – including "male and female impersonators." Such speaker-based discrimination is impermissible and furthers no compelling governmental interest. *See, e.g,, Juzwick v. Borough of Dormont, Pennsylvania*, No. CIV.A. 01-310, 2001 WL 34369467, at *3 (W.D. Pa. Dec. 12, 2001) ("'Speaker' discrimination lies at the intersection of the First and Fourteenth Amendments. The Supreme Court, on numerous occasions, has condemned government actions that have discriminated based upon the identity of the speaker.") (internal citation omitted).

This impermissible targeting of disfavored speakers is reflected in the Act's legislative history. Representative Chris Todd, who sponsored the Act in the House, filed suit against the City of Jackson in 2022 to prevent Jackson Pride from hosting a family-friendly, fully vetted, non-sexual drag show, and been clear that this bill was motivated by his clash with Jackson Pride, explaining that after the incident, he "was asked to come up with legislation that would make this much more clear." *Friends of Georges, Inc*, 2023 WL 3790583, at *6. When asked why this law was necessary when Tennessee already has public indecency and obscenity laws, Rep. Todd explained that the bill was designed to cover conduct like that which he dealt with in my own community this past year. *Id.* He recounted how his lawsuit forced Jackson Pride to move their G-rated drag show indoors and apply age restrictions. Then he explained, "that's exactly how this

-14-

bill is structured. It doesn't prevent those performances, but it certainly says they must not be held in front of minors."[3] *Id.*

The Act was thus enacted in direct response to Jackson Pride's 2022 family-friendly drag show. The law targets the free speech and expression of drag performers solely because lawmakers disagree with the message drag communicates. That is reflected in the text of the Act, and it is evident from the Act's legislative history. Thus, the statute, even if facially content-neutral, is still subject to strict scrutiny.

### 2. The Statute is Void for Vagueness

Overly vague laws are unconstitutional for three reasons. First, due process requires that a law provide "persons of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." Second, the law must provide "explicit standards" to law enforcement officials, judges, and juries so as to avoid "arbitrary and discriminatory application." Third, a vague statute can "inhibit the exercise" of First Amendment freedoms and may cause speakers to "steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked." *Grayned v. City of Rockford*, 408 U.S. 104, 108-9 (1972). T.C.A. § 7-51-1407 fails on all three counts.

The statute prohibits in part adult-oriented performances that are "harmful to minors." The definition of "harmful to minors" is as follows:

**T.C.A § 39-17-901**

(6) "Harmful to minors" means that quality of any description or representation, in whatever form, of nudity, sexual excitement, sexual conduct, excess violence or sadomasochistic abuse when the matter or performance:

---

[3] 113th General Assembly, 9th Legislative Day, (February 23, 2023)

(A) Would be found by the average person applying contemporary community standards to appeal predominantly to the prurient, shameful or morbid interests of minors;

(B) Is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable for minors; and

(C) Taken as whole lacks serious literary, artistic, political or scientific values for minors[.]

This definition pulls much of its language from *Miller v. California*, 43 U.S. 15, 24 (1973). In *Miller*, the Supreme Court set forth a test to determine whether speech is legally "obscene," and thus unprotected under the First Amendment. The three-prong test controls to this day:

a) Whether the average person, applying contemporary community standards, would find that the work, taken as a whole, appeals to the prurient interest;

b) Whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and

c) Whether the work, taken as a whole, lacks serious literary, artistic, political or scientific value.

The third requirement is "particularly important because, unlike the 'patently offensive' and 'prurient interest' criteria, it is not judged by contemporary community standards." *Reno v. ACLU*, 521 U.S. 844, 873-74 (1997); *see also Ashcroft v. ACLU*, 535 U.S. at 576 ("[T]his Court has indicated that the 'patently offensive' prong of the test is also a question of fact to be decided by a jury applying contemporary community standards."). Whereas (a) and (b) are questions of fact for the jury to decide, prong (c) permits courts to determine, "as a matter of law, a national floor for socially redeeming value." *Reno*, 521 U.S. at 874. Crucially, the challenged statute does not regulate "obscenity" within the meaning of *Miller*. It regulates something more: content that is not obscene for adults but which the government contends has a harmful effect on children. Thus, the government bears the burden of proving that the regulated content restrictions satisfy strict scrutiny.

Precisely which contemporary community's standard applies varies. In *Miller*, the Court held that a jury instruction which defined "community standards" as the state-wide standards of California was not unconstitutional. *Miller*, 43 U.S. at 24. The Supreme Court in *Ashcroft v. ACLU,* 535 U.S. 564, 576 (2002), held that community standards need not be defined by reference to a precise geographic area and that "absent geographic specification, a juror applying community standards will inevitably draw upon personal knowledge of the community or vicinage from which he comes." In *Ashcroft*, as in the case before this Court, the statute restricted speech that was obscene for minors, but still protected speech for adults.

But the Supreme Court's decision in *Ashcroft* was "quite limited," holding only that the law's "reliance on community standards to identify 'material that is harmful to minors' does not *by itself* render the statute substantially overbroad for purposes of the First Amendment." *Id.* at 585 (emphasis original). Tennessee's definition of "community," by contrast, does not rely on either state-wide or nation-wide standards. Nor does it leave the juror to "draw on his personal knowledge." *Id.* Instead, § 39-17-90 defines the word "community" as, "the judicial district, as defined in § 16-2-506, in which a violation is alleged to have occurred." The State has created thirty-one (31) unique, imprecise, and likely conflicting definitions of what is "harmful to minors" – one for each judicial district in the state. Viewed in conjunction with the rest of the statute, this definition of "community" renders the law vague – even if 31 separate definitions of "harmful to minors" is insufficient to do so on its own.

Plaintiffs are aware of no similar definition of "community" that has survived First Amendment scrutiny. The Tennessee Supreme Court in *Davis-Kidd Booksellers v. McWherter*, 866 S.W.2d 520, addressed whether this balkanized definition of community violated the Commerce Clause where the state sought to regulate the open display of pornographic and overly

-17-

violent books, videotapes, magazines, and other commercially available media deemed "harmful to minors" anywhere minors are lawfully admitted. T.C.A. § 39-17-914. The Court held that the statute's prohibition on materials that portrayed "excess violence" violated the First Amendment and declined to pass on hypothetical challenges to other types of content, preferring to await future as-applied challenges. *Id.* at 531. Such challenges have not come in the intervening three decades, and subsequent Supreme Court First Amendment cases, specifically *Ashcroft* and *Reno*, have not been kind to the *Davis-Kidd* Court's analysis.

The statute in this case regulates the speech of individual citizens, many of whom move in and out of various judicial districts on a daily basis. Drag performers, including drag performers that intend to perform at the September 2, 2023 event often travel around Tennessee to perform in different venues and at different events. A brick-and-mortar bookstore, in comparison, has little cause to worry about violating the community standards of a judicial district other than the one in which it is located.

Additionally, the statute in *Davis-Kidd* provides extremely specific affirmative defenses that narrowed the scope of the restrictions:

**Tenn. Code Ann. § 39-17-914**

(**b**) The state has the burden of proving that the material is displayed. Material is not considered displayed under this section if:

(**1**) The material is:
(**A**) Placed in "binder racks" that cover the lower two thirds (⅔) of the material and the viewable one third (⅓) is not harmful to minors;

(**B**) Located at a height of not less than five and one-half feet (5½′) from the floor; and

(**C**) Reasonable steps are taken to prevent minors from perusing the material;

-18-

(**2**) The material is sealed, and, if it contains material on its cover that is harmful to minors, it must also be opaquely wrapped;

(**3**) The material is placed out of sight underneath the counter; or

(**4**) The material is located so that the material is not open to view by minors and is located in an area restricted to adults;

(**5**) Unless its cover contains material which is harmful to minors, a video cassette tape or film is not considered displayed if it is in a form that cannot be viewed without electrical or mechanical equipment and the equipment is not being used to produce a visual depiction; or

(**6**) In a situation if the minor is accompanied by the minor's parent or guardian, unless the area is restricted to adults as provided for in subdivision (b)(4).

If the sellers are unclear about the precise community standard for what is "harmful to minors" in their district, they are at least certain about precisely where the prohibited materials must be in order to abide by the law. More importantly, law enforcement officers have clear guidance to follow when they are enforcing the law.

The same cannot be said for the statute at issue in this case. This law broadly prohibits adult cabaret entertainment "in a location where the adult cabaret entertainment could be viewed by a person who is not an adult." Unlike the prohibition in *Davis-Kidd*, there are no affirmative defenses that clarify precisely how far "in a location" reaches. Under this law, a drag performer who performs at a family member's birthday party, held at that family member's own house, could be charged, so long as children *could* view the performance. If a restaurant hosts an age-restricted drag brunch on Saturday morning, and children outside see the show through the windows, nothing in this law prevents the drag performer from being criminally charged.

The law also contains no exception for parental consent—a defect with which the Supreme Court has repeatedly taken issue. In *Ginsburg v. New York*, 390 U.S. 629 (1968), the Court upheld a law prohibiting the sale of "girlie magazines" to minors under the age of 17, in part because "the

-19-

prohibition against sales to minors does not bar parents who so desire from purchasing the magazines for their children." *Id.* The Supreme Court specifically distinguished the contested statute in *Reno* from that in *Ginsburg*, finding that user-based software that parents could use to "prevent their children from accessing material which the *parents* believe is inappropriate" was a sufficient alternative to the criminal statute. *Reno*, 521 U.S. at 877 (emphasis original). Here, though, parental consent is no defense to the Act, nor is inadvertence on the part of the performer.

T.C.A. § 7-51-1407 does not provide Plaintiffs with a reasonable opportunity to know what conduct is prohibited. And the location restriction is apparently without limit, even extending into the private homes of citizens. More disturbingly, this law does not provide the "precision and guidance necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *FCC v. Fox Tv Stations, Inc.*, 567 U.S. 239, 253 (2012). This statute opens up any of Plaintiffs' drag performances to police surveillance and raids, so that law enforcement can be certain that no children are present or even *could* be present.

"The strictness of the vagueness scrutiny is proportionate to the burden that the law imposes on those whom it regulates. When speech is involved, rigorous adherence to the fair-notice requirements is necessary to ensure that ambiguity does not chill protected speech." *Libertarian Party of Ohio v. Husted*, 751 F.3d 403, 422 (6th Cir. 2014).

For Plaintiffs, the Act imposes a heavy burden: threat of prosecution and incarceration. For these reasons, the Court should grant Plaintiffs' request for injunctive relief.

**C.  If the Law Is Enforced, Plaintiffs Will Suffer Irreparable Harm**

In addition to having a high likelihood of success on the merits, Plaintiffs will suffer irreparable harm if the Defendants with authority to enforce the Act are not enjoined from doing so. Plaintiffs are barred by threat of criminal penalty from engaging in protected First Amendment

expression. "There can be no question that the challenged restrictions, if enforced, will cause irreparable harm. The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Catholic Diocese v. Cuomo*, 141 S. Ct. 63, 67 (2020).

A harm need not have already happened for it to be irreparable; rather, imminent harm is also cognizable harm that merits an injunction. *See Helling v. McKinney,* 509 U.S. 25, 33 (1993). Blount Pride begins September 2, 2023. The Defendant District Attorney has also clearly stated his intent to enforce the law specifically against Plaintiffs, and he has expressed his belief that Blount Pride's informational social media posts "raises concerns that the event may violate" the Act. If the law enforcement Defendants are not enjoined from enforcing the Act against them, Plaintiffs will either need to cancel their scheduled drag performances or risk arrest and potential criminal charges. Such censorship is "a harm that can be realized with actual prosecution." *Virginia v. American Bookseller's Ass'n Inc.*, 484 U.S. 383, 393 (1988).

Thus, Plaintiffs' harms are irreparable, and their rights can only be protected by injunctive relief.

### D. There is No Hardship to Defendant and the Public Interest Favors Plaintiffs.

"[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *G & V Lounge, Inc. v. Michigan Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994) (citing *Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 383, 99 S.Ct. 2898, 2907, 61 L.Ed.2d 608 (1979); *Planned Parenthood Association v. City of Cincinnati*, 822 F.2d 1390, 1400 (6th Cir.1987)). When the government opposes the issuance of a preliminary injunction, the final two factors—the balance of the equities and the public interest—merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

*Ashcroft* is also dispositive here. In that case, the Supreme Court upheld a preliminary injunction prohibiting the enforcement of a challenged content-based law regulating minors' access to pornographic material via the internet because "the Government in the interim can enforce obscenity laws already on the books" and "[n]o prosecutions have yet been undertaken under the law, so none will be disrupted if the injunction stands." *Ashcroft v. ACLU*, 542 U.S. at 671. Likewise, in this instance, the Defendants may continue to enforce existing, constitutionally firm obscenity laws that do not target disfavored speakers. Because the Act has already been declared unconstitutional on a statewide basis, no existing prosecutions have taken place that could be jeopardized, either. Furthermore, the public interest is served by preventing a facially unconstitutional law from being enforced – a law which has already been declared unconstitutional in federal court and would inhibit the First Amendment rights of the citizens of Blount County.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs move this Court to:

1.  Immediately grant a Temporary Restraining Order:

    a.  Enjoining Defendants Ryan K. Desmond, James Berrong, Tony Crisp, and David Carswell, in their official capacities, from enforcing, detaining, arresting, or seeking warrants or taking any other action to enforce or threaten to enforce T.C.A. § 7-51-1407 pending further orders of this Court; and

    b.  Enjoining Defendants Ryan K. Desmond, James Berrong, Tony Crisp, and David Carswell, in their official capacities, from interfering with the September 2, 2023 Blount Pride event by any means, including but not limited to, discouraging third parties including but not limited to the event venue, Maryville College, from hosting the event or making modifications to the event;

-22-

2. Upon hearing, find that Tenn. Code Ann. § 7-51-1407 violates the First Amendment and issue a Preliminary Injunction pending final adjudication of this litigation; and

3. Award any other relief that the Court may deem just and proper to vindicate the rights of Plaintiffs.

Respectfully submitted,

/s *Justin S. Gilbert*
Justin S. Gilbert, # 017079
100 W. Martin Luther King Blvd, Suite 501
Chattanooga, TN 37402
Telephone: 423.756.8203
justin@schoolandworklaw.com

Brice M. Timmons, # 029582 (*pro hac vice pending*)
Melissa J. Stewart, # 040638 (*pro hac vice pending*)
Craig A. Edgington, # 038205 (*pro hac vice pending*)
Donati Law, PLLC
1545 Union Ave.
Memphis, Tennessee 38104
(901) 278-1004 (Office)
(901) 278-3111 (Fax)
brice@donatilaw.com
melissa@donatilaw.com
craig@donatilaw.com

Stella Yarbrough, BPR # 033637 (*pro hac vice pending*)
Lucas Cameron-Vaughn, # 038451 (*pro hac vice pending*)
Jeff Preptit, # 038451 (*pro hac vice pending*)
ACLU Foundation of Tennessee
P.O. Box 120160
Nashville, TN 37212
(615) 320-7142
syarbrough@aclu-tn.org
lucas@aclu-tn.org
jpreptit@aclu-tn.org

Daniel A. Horwitz, # 032176 (*pro hac vice pending*)
Lindsay B. Smith, # 035937 (*pro hac vice pending*)
Melissa K. Dix, # 038535 (*pro hac vice pending*)
HORWITZ LAW, PLLC
4016 Westlawn Dr.
Nashville, TN 37209
daniel@horwitz.law

-23-

[lindsay@horwitz.law](mailto:lindsay@horwitz.law)
[melissa@horwitz.law](mailto:melissa@horwitz.law)
(615) 739-2888

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Justin Gilbert, hereby certify that on August 30, 2023, counsel for Plaintiffs attempted to notify Defendants of the filing of the Verified Complaint and this Motion for Temporary Restraining Order by taking the following actions:

1. To Defendant Skrmetti, by emailing notice and copies of the pleadings to Special Counsel James Newsom at [Jim.Newsom@ag.tn.gov](mailto:Jim.Newsom@ag.tn.gov) and Assistant Solicitor General Matthew Rice at [Matt.Rice@ag.tn.gov](mailto:Matt.Rice@ag.tn.gov).

2. To Defendant Desmond by faxing notice and copies of the pleadings at (865) 273-5600

3. To Defendant Berrong by calling the Blount County Sheriff's main office at (865) 273-5000, requesting an email or fax number by which to notify the Sheriff, and stating the following:

   > "My name is Melissa Stewart, I'm an attorney representing Blount County Pride. I am contacting your office as I am required to by the Federal Rules of Civil Procedure to notify Sheriff Berrong that we are filing a lawsuit tonight seeking a temporary restraining order barring him from enforcement of the Adult Entertainment Act, along with a number of other defendants. I know it isn't normal business hours, but this is an urgent matter, and it is possible the judge will act on it as quickly as tomorrow morning. If you cannot provide an email or fax number by which I can send Sheriff Berrong these documents please notify Sheriff Berrong verbally. He may obtain copies from District Attorney Desmond, or reach out to Plaintiff's counsel at [melissa@donatilaw.com](mailto:melissa@donatilaw.com) and we will be happy to forward him the pleadings."

   Additionally, since Plaintiff was unable to obtain contact information for Defendant Berrong, and since a suit against Defendant Berrong in his official capacity is functionally a suit against the municipality itself, Plaintiff emailed notice to Mayor Ed Mitchell at [emitchell@blounttn.org](mailto:emitchell@blounttn.org).

4. To Defendant Crisp by emailing notice and copies of the pleadings to his published email address a [tjcrisp@maryville-tn.gov](mailto:tjcrisp@maryville-tn.gov)

5. To Defendant Carswell by emailing notice and copies of the pleadings to the City of Alcoa general police email at [police@cityofalcoa-tn.gov](mailto:police@cityofalcoa-tn.gov)

*/s/ Justin S. Gilbert*
Justin S. Gilbert

-25-