# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE

BLOUNT PRIDE, INC., and )
MATTHEW LOVEGOOD )
  )
             *Plaintiffs*, )
v. )           Hon. J. Ronnie Greer
  )           Civil No. 3:23-cv-00316-JRG-JEM
RYAN K. DESMOND, *in his* )
*individual and official capacity as* )
*District Attorney General of Blount* )
*County, Tennessee*, JAMES )
BERRONG, *in his official capacity as* )
*Blount County Sheriff*, TONY CRISP, )
*in his official capacity as Maryville* )
*Police Chief*, DAVID CARSWELL, *in* )
*his official capacity as Alcoa Police* )
*Chief*, and JONATHAN SKRMETTI, )
*in his official capacity as Attorney* )
*General of Tennessee.* )
  )
             *Defendants.* )


## DISTRICT ATTORNEY RYAN DESMOND'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................ 2

ARGUMENT ...................................................................................................................... 5

I. Plaintiffs Have No Likelihood of Success on the Merits. ......................................... 5

    A. The declaratory relief issued in Friends of George's v. Mulroy governs only the rights of the parties to that suit.......................................................................................... 5

    B. Plaintiffs lack standing. ........................................................................................... 7

        1. Plaintiffs have not alleged an intention to stage performances that are "harmful to minors.". .................................................................................................. 7

        2. Plaintiffs have not alleged a certain threat of prosecution under the Act ............ 9

    C. The Adult Entertainment Act is not unconstitutionally vague. .................................. 10

        1. The U.S. Supreme Court has rejected vagueness challenges to obscenity standards modified to apply to minors. .................................................. 11

        2. The "community" standard in the "harmful to minors" definition causes no vagueness problem. ................................................................................................ 12

    D. The Adult Entertainment Act does not run afoul of the First Amendment's Overbreadth Doctrine.................................................................................................... 13

        1. The Act allows "Adult Cabaret Entertainment" in private, age restricted venues ............................................................................................................... 14

        2. The Act poses no First Amendment problem. .................................................. 16

        3. In any event, Plaintiffs fail to establish a substantial number of unconstitutional applications. ................................................................................ 22

II. The Other Equitable Factors Favor the State. ......................................................... 22

III. Any Relief Should Be Limited to the Proper Scope of This Lawsuit...................... 25

CONCLUSION.................................................................................................................. 25

Case 3:23-cv-00316-JRG-JEM   Document 10   Filed 08/31/23   Page 2 of 29   PageID #: 183

## INTRODUCTION

The Court should deny Plaintiffs' request for a temporary restraining order. The law allows that extraordinary remedy only upon a *clear showing* of an entitlement to equitable relief. That is the opposite of what is presented here. "[E]quity [does] not aid those who have slept upon their rights." *Cont'l Can Co. v. Graham*, 220 F.2d 420, 422 (6th Cir. 1955). And this case involves improper plaintiffs asserting undeveloped (and previously rejected) constitutional theories based on a mischaracterization of the challenged law.

The General Assembly passed the Adult Entertainment Act to shield children from sexually explicit performances, and it took effect *April 1, 2023*. The Act requires adult cabaret entertainment to occur in adult-only zones and prohibits such entertainment on public property. Contrary to public portrayal, the Act does not ban drag shows—or any type of performance for that matter. It places location restrictions on performances that contain "nudity, sexual excitement, sexual conduct, excess violence or sadomasochistic abuse" "appeal[ing] predominantly to the prurient, shameful or morbid interests of minors," in a "patently offensive" way that "lacks serious literary, artistic, political or scientific value[] for minors." Tenn. Code Ann. § 39-17-901(6).

Plaintiffs have alleged no intention to stage a such a performance. That should end the matter. This Court sits "to resolve not questions and issues but 'Cases' or 'Controversies.'" *Arizona Christian School Tuition Organization v. Winn*, 563 U. S. 125, 132 (2011).

And even if Plaintiffs had standing, the Act poses no constitutional problem. The obscenity standard Plaintiffs challenge as unconstitutionally vague has already been blessed by the Supreme Court. And the First Amendment surely allows Tennessee to restrict adult entertainment to adult-only zones. A long line of cases has upheld statutes that require adult-only zones for content that is obscene as to minors, but not adults. Nothing about this case calls for a different result or supports the drastic relief requested.

This Court should not reward Plaintiffs' inexcusable delay in filing this action. The Act has been on the books for months; the show at issue has been scheduled for months; and the single-county relief provided by the Western District of Tennessee says on its face it did not shield Plaintiffs. Their failure to understand that order is no excuse. The Court should deny the motion.

## BACKGROUND

***Legal Background.*** Like all States, Tennessee has long regulated obscenity and adult entertainment. Tennessee law makes it a crime to knowingly produce, sell, or distribute "obscene matter" or "direct, present or produce any obscene . . . live performance." Tenn. Code Ann. § 39-17-902(a). And it provides heightened protections for minors. For example, § 39-17-911(b) prohibits the admission of minors to "premises . . . exhibit[ing] a motion picture, show or other presentation which . . . depicts nudity, sexual conduct, excess violence, or sado-masochistic abuse, and which is harmful to minors." This statute uses a definition of "harmful to minors" that adapts for minors the three-factor obscenity standard from *Miller v. California*, 413 U.S. 15 (1973): "any description or representation . . . of nudity, sexual excitement, sexual conduct, excess violence or sadomasochistic abuse" that (1) "[w]ould be found by the average person applying contemporary community standards to appeal predominantly to the prurient, shameful or morbid interests *of minors*;" (2) "[i]s patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable *for minors*;" and (3) "[t]aken as whole lacks serious literary, artistic, political or scientific values *for minors*." Tenn. Code Ann § 39-17-901(6) (emphasis added).

Tennessee law separately regulates adult entertainment. *Id.* §§ 7-51-1401, *et seq.* Adult-oriented establishments and adult cabarets that feature "topless dancers, go-go dancers, exotic dancers, strippers, male or female impersonators, or similar entertainers" cannot be located "within one thousand feet (1,000') of a child care facility, a private, public, or charter school, a public park,

family recreation center, a residence, or a place of worship." *Id.* §§ 7-51-1401(2), -1407(a)(1). And minors cannot be admitted. *Id.* §§ 7-51-1109(a)(7), -1113(e).

***The Act.*** The Act builds on and operates in tandem with these other statutes. In recent years, videos have emerged of events "where entertainers or performers simulated anal sex, oral sex, [and] other graphic activities with children sitting a few feet away" in various "places across the state." Ex. 1 at 566; *see id.* at 520.[1] And a drag show occurred "where an adult performer . . . talk[ed] about their tits and rubb[ed] their genitalia, grinding on the ground and spreading their legs in front of children." *Id.* at 530. These reports prompted "hundreds, if not thousands, of . . . constituents" to call their representatives "wanting to know why . . . overtly sexual entertainment could be taking place in a public area where kids are present." *Id.* at 547; *see id.* at 520.

Presented with those concerns, Tennessee's legislators investigated whether additional legislation was needed to protect minors, *Id.* at 521, and determined that the law needed to more clearly restrict sexual performances in publicly accessible spaces. *Id.* at 567.

The Act adds provisions to Tennessee's longstanding statutory framework governing adult establishments, Tenn. Code Ann. § 7-51-1407, to provide that the "type of [adult] entertainment that is already defined in [existing] statute[s] cannot take place on public property, nor can it take place in a private venue where children are present." Ex. 1 at 517; *see id.* at 547, 579-80. The new provisions clarify that it is unlawful "for a person to perform adult cabaret entertainment: (A) [o]n public property; or (B) [i]n a location where the adult cabaret entertainment could be viewed by a person who is not an adult." Tenn. Code Ann. § 7-51-1407(c)(1).

Drawing on existing law, the Act defines "adult cabaret entertainment" to have two components: [1] "adult-oriented performances that are harmful to minors, as that term is defined

---

[1] All record pincites and Exhibit 1 pincites refer to the "Page ID" numbers in the ECF file stamps.

in § 39-17-901, and [2] that feature topless dancers, go-go dancers, exotic dancers, strippers, male or female impersonators, or similar entertainers." *Id.* § 7-51-1401(12). The first component defines "harmful to minors" by cross-referencing an existing obscenity law, § 39-17-901. That definition "has been in [the Tennessee Code] for many years." Ex. 1 at 546; *see id.* at 516-17; Ex. 3 (1990 Tenn. Pub. Acts 938, ch. 1092, §§ 1-3). The second component (referencing "topless dancers, go-go dancers, exotic dancers, strippers, male or female impersonators, or similar entertainers") mirrors the longstanding definition of regulated "adult cabaret." Tenn. Code Ann. § 7-51-1401(2). For this component, the Act again pulls "word-for-word out of the current law" that "has been on the books for many, many decades." Ex. 1 at 538, 588; Ex. 4 (1987 Tenn. Pub. Acts 841, ch. 432, § 2).

*Litigation History.* Shortly before the Act's effective date, a drag-centric group in Memphis sued under 42 U.S.C. § 1983 seeking injunctive and declaratory relief. On June 2, 2023, the district court declared the Act unconstitutional under the First Amendment and the void-for-vagueness doctrine and permanently enjoined D.A. Mulroy from enforcing the Act in Shelby County. *Friends of George's, Inc. v. Mulroy*, 2023 WL 3790583, at *33 (W.D. Tenn. June 2, 2023). That erroneous decision has been appealed. Opening Br., Dkt Entry 26, No. 23-5611 (CA6).

Plaintiffs, Blount Pride, Inc. and Matthew Lovegood, intend to stage a drag performance at Blount Pride—a festival hosted at Maryville College. Earlier this week, D.A. Desmond sent a letter to Blount County, Maryville, and Blount Pride officials in response to communications from the community. Dkt. 1-3. This letter confirmed that the Act applied in Blount County, explaining that the relief provided in the *Friends of George's* opinion was limited to Shelby County. This had been the publicly stated position of the State for *months*. Ex. 7.

Nonetheless, just before midnight last night (days from the Blount Pride event), Plaintiffs

filed suit challenging the constitutionality of the Adult Entertainment Act and seeking a temporary restraining order. As the basis for a TRO, Plaintiffs contend that (1) the declaration from *Friends of George's* applies to defendants here, (2) the Act violates the First Amendment, and (3) the Act violates the void-for-vagueness doctrine of the Fourteenth Amendment. Dkt. 2.

## ARGUMENT

The Court has no basis for granting emergency relief. The issuance of preliminary relief is an "extraordinary and drastic remedy." *Enchant Christmas Light Maze & Mkt. Ltd. v. Glowco, LLC*, 958 F.3d 532, 539 (6th Cir. 2020) (quotations omitted). It "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Id.* To do so, "[a] plaintiff . . . *must* establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, *and* [4] that an injunction is in the public interest." *Id.* at 535-36 (quotations omitted) (emphases added); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (clarifying that the plaintiff must establish all four factors). Even then, the Court retains discretion to deny or limit relief as it deems appropriate. *See Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 102 (6th Cir. 1982). Plaintiffs have not carried the burden of persuasion at any step of the analysis.

## I. Plaintiffs Have No Likelihood of Success on the Merits

### A. *Friends of George's v. Mulroy* does not bind these parties of this Court.

The Declaratory Judgment Act states that "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations *of any interested party* seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201 (emphasis added). This language makes clear that "a declaratory judgment binds the parties, *but only the parties*." *Skyworks, Ltd. v. CDC*, 542 F. Supp. 3d 719, 728 (N.D. Ohio 2021), *appeal dismissed*, 2021 WL 4305879 (6th Cir. Sept. 21, 2021) (emphasis added). In fact, the Supreme

5

Court has explicitly held that "neither declaratory nor injunctive relief can directly interfere with enforcement of contested statutes or ordinances except with respect to the particular federal plaintiffs[;] the State is free to prosecute others who may violate the statute." *Doran v. Salem Inn*, 422 U.S. 922, 931 (1975).

The same principle holds for defendants. Indeed, "no court may 'lawfully enjoin the world at large,' or purport to enjoin challenged 'laws themselves,'" *Whole Woman's Health v. Jackson,* 142 S. Ct. 522, 535 (2021) (citation omitted), so no declaration against the world at large could be a "milder alternative" to injunction, *Perez v. Ledesma*, 401 U.S. 82, 1 11 (1971) (Brennan, J., concurring in part and dissenting in part). Instead, a declaratory judgment can only "resol[ve] . . . a 'case or controversy'" by "settling of some dispute *which affects the behavior of the defendant towards the plaintiff.*" *Hewitt v. Helms*, 482 U.S. 755, 761 (1987). To bind the defendant more broadly would be to issue "an advisory opinion" not allowed by Article III. *Id.*; *see Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1032 (6th Cir. 2022); *Safety Specialty Ins. Co. v. Genesee Cnty. Bd. of Commissioners*, 53 F.4th 1014, 1021 (6th Cir. 2022).

Thus, to state what should be obvious, the court's declaration in *Friends of Georges* fixed the rights of Friends of George's in relation to Steven Mulroy, the District Attorney for Shelby County, Tennessee. *See* 2023 WL 3790583, at *12, *31-33. It binds no one in Blount County, *see id.*, nor does it restrain the Tennessee Attorney General, *see id.* *1 n.7, who cannot enforce the Adult Entertainment Act anyway, Dkt. 2 at 136 n.1.

Plaintiffs try to evade that foregone conclusion by raising a novel argument that declaratory judgment operates statewide because suits against D.A.s are suits against the State and by contending that the privity doctrine applies. Dkt. 2 at 141-44. But the Supreme Court resolved this issue decades ago in *Doran*. *See* 422 U.S. at 931. That ends the matter.

6

Regardless, Plaintiffs cite no authority for their expansive view of declaratory relief. Plaintiffs misplace reliance on *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989), which makes clear that official-capacity actions for prospective relief, like the one brought by *Friends of George's*, "are *not* treated as actions against the State," 491 U.S. at 71 n.10 (quotations omitted) (emphasis added). And to the extent Plaintiffs mean to argue that relief against Mr. Mulroy binds *other* officials *through* the State, their failure to cite a single supporting precedent "suggests the case law is not in [their] favor." *Green Genie, Inc. v. City of Detroit*, 63 F.4th 521, 527 (6th Cir. 2023). Indeed, it is a hornbook axiom that no agent "'control[s] the principal,'" so no "district court . . . ha[s] the power to bind [the principal] through an order directed against her servant." *Havens v. James*, 2023 WL 4982318, at *11 (2d Cir. 2023) (quotations omitted).

The declaration in *Friends of George's* binds no party to this suit.

## B. Plaintiffs lack standing.

To invoke federal jurisdiction, a plaintiff must prove "an injury in fact . . . fairly traceable to the challenged conduct of the defendant . . . that is likely to be redressed by the requested relief." *FEC v. Cruz*, 142 S. Ct. 1638, 1646 (2022). An Article III injury can be established before enforcement of a statute. But to do so, a plaintiff must prove "an intention to engage in a course of conduct arguably affected with a constitutional interest[] but proscribed by" some provision of the Act. *Crawford v. Dep't of Treasury*, 868 F.3d 438, 454 (6th Cir. 2017) (quotations omitted). And it must then prove "a certain threat of prosecution if the plaintiff does indeed engage in that conduct." *Id.* at 455. Plaintiffs proved neither.

**1. *Plaintiffs have not alleged an intention to stage performances that are "harmful to minors."*** Standing in a pre-enforcement challenge turns on whether the statute "prevents" a plaintiff's desired conduct, *Republican Party v. Klobuchar*, 381 F.3d 785, 793 (8th Cir. 2004),

based on a proper "construction" of the restriction imposed, even in cases alleging a "chilling effect" on speech, *Fieger v. Mich. Sup. Ct.*, 553 F.3d 955, 964 (6th Cir. 2009).

By its terms, the Act regulates *only* "adult cabaret entertainment," Tenn Code Ann. § 7-51-1407(c)(1), which includes *only* "performances" deemed "harmful to minors, as that term is defined in § 39-17-901," *id.* § 7-51-1401(12). To qualify as "harmful to minors" under § 39-17-901(6), a performance must, among other things, "lack[] serious literary, artistic, political or scientific values for minors" when "[t]aken as a whole."

And the Tennessee Supreme Court has read that language to include "only . . . those materials which lack serious literary, artistic, political, or scientific value *for a reasonable 17-year-old minor.*" *Davis-Kidd Booksellers, Inc. v. McWherter*, 866 S.W.2d 520, 528 (Tenn. 1993) (emphasis added). In *Davis-Kidd*, the court considered whether restrictions on the display of printed materials deemed "harmful to minors" could withstand constitutional scrutiny. *Id.* at 522. To avoid constitutional issues, the court "narrowly construed" the "third prong" of § 39-17-901's "harmful to minors" definition to be limited to materials lacking value "*for a reasonable 17-year-old minor.*" *Id.* at 527-28 (emphasis added). And the text of § 39-17-901 must have the same meaning here as it did in *Davis-Kidd*. *See Clark v. Martinez*, 543 U.S. 371, 378-80 (2005).

Standing here thus turns on irony: Plaintiffs must allege that their own shows lack value to those on the cusp of adulthood. Unsurprisingly, Plaintiffs have been unable to allege as much. Indeed, they did not even try. Plaintiffs did not "articulate, with *any* amount of specificity," the "speech or conduct" to be included in its future shows. *Fieger v. Mich. Sup. Ct.*, 553 F.3d 955, 964 (6th Cir. 2009). All the complaint asserts is that Blount Pride will have "live entertainment, including drag performances." Dkt. 1 at 14. That is it. And when Plaintiffs talked generally about drag performances, they stressed that drag is an important "art form" that "is now definitively a

8

part of mainstream culture." *Id.* at 5.  They even drew parallels between drag and ancient Greek drama or Shakespeare.  *Id.* at 4.  These allegations provide absolutely no basis for concluding that Plaintiffs intend to stage shows that lack value to a reasonable 17-year-old.

Plaintiffs fear that D.A. Desmond's letter suggests there could be some false prosecution. *Id.* at 14-16.  But the Sixth Circuit has repeatedly held that a "fear" of "wrongful prosecution and conviction under the Act" is "inadequate to generate a case or controversy the federal courts can hear."  *Glenn v. Holder*, 690 F.3d 417, 422 (6th Cir. 2012); *see White v. United States*, 601 F.3d 545, 553 (6th Cir. 2010).  Plaintiffs simply have not alleged an intention to violate the Act and, thus, cannot establish standing.

**2. *Plaintiffs have not alleged a certain threat of prosecution under the Act.*** Even if the Act did "proscribe[] [Plaintiffs'] intended conduct," the Sixth Circuit does not assume that every breach of the law will be prosecuted.  *McKay v. Federspiel*, 823 F.3d 862, 868 (6th Cir. 2016). Instead, it assesses the imminence of enforcement through a holistic, four-part framework—the "*McKay* factors."  *Online Merchs. Guild v. Cameron*, 995 F.3d 540, 550 (6th Cir. 2021). Specifically, the Sixth Circuit requires "some combination" of the following factors: "(1) 'a history of past enforcement against the plaintiffs or others'; (2) 'enforcement warning letters sent to the plaintiffs regarding their specific conduct'; (3) 'an attribute of the challenged statute that makes enforcement easier or more likely, such as a provision allowing any member of the public to initiate an enforcement action'; and (4) the 'defendant's refusal to disavow enforcement of the challenged statute against a particular plaintiff.'"  *Id.* (quoting *McKay*, 823 F.3d at 869).  Each of those factors cuts against Plaintiffs' assertion of standing.

No History of Past Enforcement.  "A threat of future enforcement may be 'credible' when the same conduct has drawn enforcement actions or threats of enforcement in the past."  *Kiser v.*

*Reitz*, 765 F.3d 601, 609 (6th Cir. 2014).  But Plaintiffs cannot point to any prior enforcement.

No Warning Letters.  General Desmond's letter did not threaten to enforce the law against Plaintiffs' "specific conduct."  *Online Merchs.*, 995 F.3d at 550 (quotations omitted).  Quite the contrary, the letter specifically states that "[i]t is certainly possible that [Plaintiffs' shows] will not violate any of the criminal statutes."  Dkt. 1-3 at 100.

No Attributes Making Enforcement Easy.  Nor does the Act "allow[] any member of the public to initiate an enforcement action."  *Online Merchs.*, 995 F.3d at 550 (quotations omitted). The "universe of potential" enforcers is limited to "state officials who are constrained by . . . ethical obligations."  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014).

Disavowal of Enforcement.  Plaintiffs have not identified their future intended speech with any specificity, so there is no future action to disavow enforcement against.

In short, Plaintiffs did not prove any—much less, "some combination"—of the *McKay* factors, 823 F.3d at 869, and therefore did not prove a certain threat of prosecution for standing.

## C.     The Adult Entertainment Act is not unconstitutionally vague.

The Due Process Clause's "void for vagueness" doctrine ensures that a "person of ordinary intelligence" has "a reasonable opportunity to know what is prohibited" by the law.  *Grayned v. Rockford*, 408 U.S. 104, 108 (1972).  But "perfect clarity and precise guidance have never been required," even for laws "that restrict expressive activity."  *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989).  The law is full of "flexible" "standards," *id.*, and "[c]lose cases can be imagined under virtually any statute," *United States v. Williams*, 553 U.S. 285, 306 (2008).  The vagueness doctrine only protects against laws that altogether fail "to give ordinary people fair notice of the criminalized conduct" or are "so standardless as to invite arbitrary enforcement." *United States v. Parrish*, 942 F.3d 289, 295 (6th Cir. 2019) (cleaned up).

Plaintiffs' vagueness argument is puzzling. The Complaint challenges the definition of "harmful to minors" as unconstitutionally vague because "[w]hat is 'harmful' to a five-year-old may not be harmful to a 15-year-old." Dkt. 1 at 21-22. But the TRO motion contains a different, scattershot argument that focuses on the definition's reference to the "community." Dkt. 2 at 149-154. Either way, the decades-old definition of "harmful to minors" survives review.

**1. *The U.S. Supreme Court has rejected vagueness challenges to obscenity standards modified to apply to minors.*** Section 39-17-901(6)'s "harmful to minors" definition has two defining features: (1) It incorporates the three-part *Miller* obscenity standard, and (2) it modifies that standard for application to "minors." Nearly thirty States have adopted almost identical variable obscenity standards. And for good reason: The Supreme Court has approved both features of § 39-17-901(6)'s definition.

*First*, § 39-17-901(6)'s incorporation of the three-part *Miller* obscenity standard causes no vagueness problem. The Supreme Court has treated vagueness challenges to *Miller*'s standard as "nothing less than an invitation to overturn *Miller*." *Fort Wayne Books v. Indiana*, 489 U.S. 46, 57 (1989). And it has rejected that invitation, holding that the *Miller* obscenity standard is not unconstitutionally vague. *Id.*

*Second*, § 39-17-901(6)'s modification of the obscenity standard for "minors" does not somehow render it unconstitutionally vague—as the Supreme Court explained in *Ginsberg*. There, distributors challenged New York's definition of "harmful to minors" as unconstitutionally vague. 390 U.S. at 643. The appellant "challenge[d]" that definition as "void for vagueness," *id.*, claiming that "the definition of obscenity 'harmful to minors' is so vague that an honest distributor of publications cannot know when he might be held to have violated" the statute. *Id.* The Court, however, held that a "harmful to minors" definition with a variable obscenity standard "gives . . .

11

adequate notice of what is prohibited and does not offend the requirements of due process." *Id.*

That holding governs here. The definition in § 39-17-901(6) "alters the *Miller* test so that it can be used for determining what material is harmful to minors." *M.S. News Co. v. Casado*, 721 F.2d 1281, 1286-87 (10th Cir. 1983). "[T]his is precisely what the ordinance in *Ginsberg* did with the old [obscenity] test," and *Ginsberg* found no vagueness. *Id.* That is, "*Ginsberg* approved the use of a variable obscenity standard—an adaptation of the general standard for determining adult obscenity to reflect the prevailing standards . . . with respect to what is suitable material for minors." *Am. Booksellers v. Webb*, 919 F.2d 1493, 1496 (11th Cir. 1990) (cleaned up). A host of courts have applied *Ginsberg* to reject vagueness challenges to nearly identical definitions of "harmful to minors." *Webb*, 919 F.2d at 1505-06; *M.S. News*, 721 F.2d at 1286-87; *Simmons v. State*, 944 So. 2d 317, 329 (Fla. 2006).

In any event, the Tennessee Supreme Court's construction of Tenn. Code Ann. § 39-17-901(6) negates Plaintiffs' vagueness argument. Plaintiffs' theory depends on the notion that the "harmful to minors" standard can apply to minors from age five to seventeen. Dkt. 1 at 21-22. But that notion has been nullified by the Tennessee Supreme Court's construction of § 39-17-901(6) in *Davis-Kidd*, which limits "harmful to minors" to content that lacks value for reasonable 17-year-olds. 866 S.W.2d at 528. That controlling interpretation dispels any possible vagueness argument. *Am. Booksellers Ass'n v. Virginia*, 882 F.2d 125, 127, n.2 (4th Cir. 1989).

In short, *Ginsberg* governs, and *Davis-Kidd* removes any doubt.

**2.** ***The "community" standard in the "harmful to minors" definition causes no vagueness problem.*** Plaintiffs suggest that the Act is vague because it defines the prohibited obscenity based on community standards in "*the judicial district.*" Dkt. 2 at 151-52; *see also* Tenn. Code Ann. § 39-17-901(2), (6)(A)-(B). But the Supreme Court has explicitly stated that "[a] State

may choose to define an obscenity offense in terms of 'contemporary community standards' as defined in *Miller* without further specification . . . *or it may choose to define the standards in more precise geographic terms*." *Jenkins v. Georgia*, 418 U.S. 153, 157 (1974) (emphasis added).

The Act does just that. And there is no constitutional problem with defining the relevant "community" for a *Miller* standard as the judicial district. *Hamling v. United States*, 418 U.S. 87, 106 (1974) ("The fact that distributors of allegedly obscene materials may be subjected to varying community standards *in the various federal judicial districts* into which they transmit the materials does not render a . . . statute unconstitutional."); *United States v. Little*, 365 F. App'x 159, 164 (11th Cir. 2010) (no error in defining the community standard as "the Middle District of Florida"). In fact, defining the relevant community as the judicial district mirrors the default rule—that "obscenity is determined by the standards of the community where the trial takes place." *United States v. Thomas*, 74 F.3d 701, 711 (6th Cir. 1996); *see also Ashcroft*, 535 U.S. at 576-77.

Put simply, even assuming that the Act creates "31 separate" obscenity standards (which, as a practical matter, seems hyperbolic), Dkt. 2 at 151, that creates no vagueness problem. "If a [performer] chooses to [perform] in[] a particular community, . . . it is the [performer's] responsibility to abide by that community's standards." *Ashcroft*, 535 U.S. at 583.

**D.    The Adult Entertainment Act does not run afoul of the First Amendment's Overbreadth Doctrine.**

Plaintiffs also come up short on their First Amendment overbreadth claim. The overbreadth doctrine allows courts to "invalidate[] [a statute] as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quotations omitted). Invalidation for overbreadth is "strong medicine" that courts dispense "with hesitation, and . . . only as a last resort." *New York v. Ferber*, 458 U.S. 747, 769 (1982) (quotations omitted). The doctrine is

openly "disfavored." *Connection Distrib.*, 557 F.3d at 336. The Supreme Court has, therefore, "vigorously enforced" the requirement that a challenger prove a *substantial* number of unconstitutional applications. *Williams*, 553 U.S. at 292. Plaintiffs do not do so.

1. ***The Act allows "Adult Cabaret Entertainment" in private, age-restricted venues.*** "To judge whether a statute is overbroad," this Court "must first determine what it covers." *Hansen*, 143 S. Ct. at 1940. Here, the Court must determine how far to extend Tenn. Code Ann. § 7-51-1407(c)(1)(B)'s reference to "a location where the adult cabaret entertainment could be viewed by a person who is not adult." *Friends of George's* believed that this language means "virtually anywhere," because minors *could* sneak into locations where they are not permitted to be. 2023 WL 3790583, at \*28; *id.* at \*25 ("Plaintiff could build a card-checking fortress around its theatre and a child *could* still be present."). That is, the court read the adults-only provision to apply to any location where the adult cabaret entertainment could *permissibly or impermissibly* be viewed by a person who is not an adult. But the statute is more naturally read to only apply to a location where the adult cabaret entertainment could *permissibly* be viewed by a person who is not an adult.

*First*, "any interpretation of the [Act] that makes one [o]f its provisions irrelevant is presumptively incorrect," and the district court's broad interpretation "has exactly this effect." *United States v. Perry*, 360 F.3d 519, 537 (6th Cir. 2004). If the law could apply to locations that minors impermissibly access, then it could be applied "virtually anywhere," 2023 WL 3790583, at \*28, as clever minors could theoretically sneak into any location. But if the law could apply anywhere, *the Act would not need any location provisions*. It could have stopped after "It is an offense for a person to perform adult cabaret entertainment." Tenn. Code Ann. § 7-51-1407(c)(1). The Act certainly would not need the "on public property" provision.

*Second*, the Court must "read [the Act's] language in its context and in the context of the

14

. . . statutory scheme." *Knoxville v. Netflix, Inc.*, 656 S.W.3d 106, 110 (Tenn. 2022) (quotations omitted). "Context . . . includes common sense," *Biden v. Nebraska*, 143 S. Ct. 2355, 2379 (2023) (Barrett, J., concurring), and "certain assumptions . . . that an ordinary reader would bring to her understanding of the statutory text." *McLemore v. Gumucio*, No. 22-5458, 2023 WL 4080102, at *1 (6th Cir. June 20, 2023). Here, an ordinary reader would read the Act's provisions assuming that existing laws would be followed. That is, common sense dictates that the Act was not drafted to include locations that minors *impermissibly* access. And the context of the "overall statutory scheme" confirms as much. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (quotations omitted). If the Act applied everywhere, it would conflict with the reticulated statutes addressing adult-oriented establishments by criminalizing strip clubs, as minors could sneak into these establishments. That cannot be right. The "statutory scheme should be read so as to avoid creating internal conflicts" by adopting the State's internally "consistent interpretation." *Mich. Dep't of Educ. v. U.S. Dep't of Educ.*, 875 F.2d 1196, 1202 (6th Cir. 1989).

   *Third,* "[t]he legislative history (for those who consider it) confirms, with unusual clarity," the State's narrower interpretation. *Sturgeon v. Frost*, 139 S. Ct. 1066, 1085 (2019). Both the Senate and House Sponsors described the Act as "clarify[ing] current law by requiring that adult-oriented performances may *only be held in age-restricted venues*." Ex. 1 at 515 (Johnson) (emphasis added); *see id.* at 575 (Todd) (same). And the legislative discussion of the bill is replete with references to requiring age-restricted venues. *Id.* at 515-16, 521, 544-45, 547, 575-76, 579.

   *Fourth,* the Court must "construe the statute to avoid constitutional [overbreadth] problems." *Ferber*, 458 U.S. at 769 n.24. "[E]very reasonable construction must be resorted to in order to save a [legislative act] from unconstitutionality." *Hooper v. California*, 155 U.S. 648, 657 (1895). "This canon [of constitutional avoidance] is normally a valuable ally for criminal

defendants," but with the "odd incentives created by the overbreadth doctrine," Plaintiffs brush it aside, erroneously "press[ing] the [the adults-only provision] toward the most expansive reading possible." *Hansen*, 143 S. Ct. at 1946.

Given these principles, the best reading of the adults-only provision is clear: It prevents adult cabaret entertainment in locations that minors can permissibly access. If this Court remains uncertain, it should abstain. *Harris Cnty. Comm'rs Ct. v. Moore*, 420 U.S. 77, 83 (1975).

**2. *The Act poses no First Amendment problem.*** The Act does not call for heightened scrutiny. And, even under strict scrutiny, the Act passes constitutional review.

<u>Heightened scrutiny is not warranted.</u> The Act should be subjected to the lesser scrutiny applied to content-neutral restrictions. While the Act references the content of certain performances—"adult cabaret entertainment," Tenn. Code Ann. § 7-51-1401(12)—not all statutes that "reference . . . the content of speech . . . rise to the level of a presumptively impermissible content-based regulation of speech." *Connection Distrib.*, 557 F.3d at 329. In certain situations, even if a law's text is "plainly content-based" in a technical sense, courts apply "the standard applicable to content-neutral regulations"—i.e., a standard akin to intermediate scrutiny requiring an important interest and alternative avenues of communication. *Richland Bookmart, Inc. v. Nichols*, 137 F.3d 435, 440 (6th Cir. 1998). For two independent reasons, the Act should be "treat[ed] . . . as content-neutral" and subjected to this "less[er] scrutiny." *Big Dipper Ent., LLC v. Warren*, 641 F.3d 715, 717 (6th Cir. 2011).

*Adult-Only Zones*. Strict scrutiny does not apply when a statute prohibits minors from accessing content that is obscene as to minors, but not as to adults, if adults can still access the regulated speech. "First Amendment jurisprudence has acknowledged limitations on the otherwise absolute interest of the speaker in reaching an unlimited audience where the speech is sexually

explicit and the audience may include children." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 684 (1986). Of course, "speech within the rights of adults to hear may not be *silenced completely* in an attempt to shield children from it." *Ashcroft*, 535 U.S. at 252 (emphasis added); *see Reno v. ACLU*, 521 U.S. 844 (1997). But when analyzing the "regulation of speech unprotected as to minors that indirectly affects speech protected as to adults," courts have routinely declined to apply strict scrutiny; instead, they "have evaluated . . . restrictions on the display of material 'harmful to minors' in light of the constitutional standards for a reasonable time, place, and manner regulation" or a similar balancing test. *Webb*, 919 F.2d at 1501-02; *see Upper Midwest Booksellers v. Minneapolis*, 780 F.2d 1389, 1394 (8th Cir. 1985); *M.S. News*, 721 F.2d at 1288.

This Court should take the same approach here. The Act does not bar adults' access to the performances at issue; it merely requires these performances to take place in adult-only zones.

*Secondary-Effects Doctrine*. The Supreme Court's secondary-effects doctrine also cuts against strict scrutiny. Under that doctrine, "the government [can] accord differential treatment to a content-defined subclass of speech [if] that subclass [i]s associated with specific 'secondary effects' of the speech." *Daunt v. Benson*, 956 F.3d 396, 420 (6th Cir. 2020). And, here, by protecting children from obscene content, the Act inherently addresses the secondary effects associated with exposure to such content—namely, an increase in "sexual exploitation crimes." Ex. 1 at 526-28. The prevention of this type of "sexual assault" qualifies as a secondary effect. *See Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 583 (1991) (Souter, J., concurring in judgment). The Court thus has another basis for analyzing the Act as a content-neutral regulation.

*Plaintiffs' Arguments for Heightened Review Lack Merit*: Plaintiffs argue that the Act (1) involves viewpoint discrimination and (2) furthers an impermissible purpose.

*First*, Plaintiffs claim viewpoint discrimination because the Act mentions specific

performers. But not "all regulations distinguishing between speakers warrant strict scrutiny." *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 657 (1994). "[S]peaker distinctions . . . are not presumed invalid under the First Amendment" or subjected to "strict scrutiny" unless "they reflect the Government's preference for[,] . . . or aversion to[,] what the disfavored speakers have to say." *Id.* at 645, 658. The Act does no such thing.

The Act places limits on adult-oriented performances (1) that are "harmful to minors" and (2) "that feature topless dancers, go-go dancers, exotic dancers, strippers, male or female impersonators, or similar entertainers." Tenn. Code Ann. § 7-51-1401(12). The first component imposes a constitutional subject-matter restriction that is treated as content-neutral. *Supra* 16-17. And the second component merely identifies performers who may engage in that type of performance. The reference to categories of performers clarifies the "adult-oriented performances" that are "harmful to minors" *without* narrowing the covered speech. And since it does not narrow the speech covered by the Act, it cannot possibly impose a viewpoint-based restriction.

An example illustrates the lack of viewpoint discrimination. If the list of performers included *only* "male or female impersonators," then an argument could be made that the State was using an identity-based restriction as a "means of exercising a content preference." *Turner*, 512 U.S. at 645. In that example, the Act would be singling out performances "harmful to minors" given by a particular group that engages in a specific type of speech. But the Act does just the opposite. It lists types of performers that might engage in sexual speech "harmful to minors" and then includes a catchall—"*or similar entertainers.*" That catchall covers anyone—regardless of viewpoint—who engages in a "adulted-oriented performance" that is "harmful to minors." Tenn. Code Ann. § 39-17-901(6); *id* § 7-51-1401(12). So the list of performers in the Act imposes no viewpoint-based restriction.

*Second*, Plaintiffs argue that the Act's supposed purpose—the suppression of drag performers' speech—to justify the application of heightened scrutiny. But this argument rests on a misunderstanding of *Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015). Plaintiffs misread *Reed*'s purpose-or-justification inquiry as allowing courts to speculate as to legislative motives. Op., R.91 at 1438-44. *Reed* does no such thing. "[T]he law forecloses this kind of adventure." *Bailey v. Callaghan*, 715 F.3d 956, 960 (6th Cir. 2013).

"It is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *United States v. O'Brien*, 391 U.S. 367, 383 (1968). "Inquiries into congressional motives or purposes are a hazardous matter," *id.*, and "the search for the 'actual' or 'primary' purpose of a statute is likely to be elusive," *Michael M. v. Superior Ct.*, 450 U.S. 464, 469-70 (1981). "[I]ndividual legislators may have voted for the statute for a variety of reasons," *id.* at 470. Accordingly, even in the First Amendment context, the Court has "eschew[ed]" the "guesswork" associated with determining a statute's "real" purpose. *O'Brien*, 391 U.S. at 384; *see Renton*, 475 U.S. at 47-48; *Turner*, 512 U.S. at 652. It, instead, "presume[s] that a legislature acts . . . in good faith." *United States v. Des Moines Nav. & Ry. Co.*, 142 U.S. 510, 544 (1892).

To be sure, in analyzing content-neutrality, courts have considered whether the law can be "'justified without reference to the content of the regulated speech,'" or whether the law was "adopted by the government 'because of disagreement with the message' [the speech] conveyed." *Reed*, 576 U.S. at 164 (quoting *Ward,* 491 U.S. at 791). But this inquiry—stemming from the Supreme Court's decision in *Ward*—does not give courts free rein to divine legislative motives. Courts look to the law's *stated* "justification for the government regulation," not isolated "statements" by legislators purportedly showing "an illicit motive in enacting" the law. *Erie v.*

*Pap's A.M.*, 529 U.S. 277, 292-95 (2000); *see also Reed*, 576 U.S. at 166 (citing *United States v. Eichman*, 496 U.S. 310, 314-15 (1990) (looking to the government's "asserted interest")). In decisions after *Ward*, the Supreme Court and this Court have declined to engage in speculation as to legislative motive. *Erie*, 529 U.S. at 292; *Turner*, 512 U.S. at 652; *Bailey*, 715 F.3d at 960.

Here, the objective indicators of the legislature's purpose demonstrate no discriminatory purpose. The text—"the best indicator of intent," *Nixon v. United States*, 506 U.S. 224, 232 (1993)—affirmatively precludes the contention that the Act targets drag. The Act copies verbatim from existing laws governing adult establishments and adult cabaret—laws that existed decades before any recent controversy over drag and prohibits only highly-sexualized performances.

The legislative history likewise proves no improper purpose. The stated purpose of the Act was to protect minors from exposure to sexually explicit performances. Ex. 1 at 516-17, 520-21, 547, 549, 567-68, 602, 606. The legislature was not attempting to ban all drag performances. *Id.* at 523, 537-38, 567, 593, 602, 605. Indeed, the legislative history contains repeated references to the goal of requiring performances that contain content harmful to minors to occur in age-restricted venues. *Id.* at 515-516, 521, 544-45, 547, 575-76, 579. Plaintiffs' discussion of statements from Representative Chris Todd departs from the well-established principle that "[w]hat motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2256 (2022).

Without viewpoint discrimination or an impermissible purpose, strict scrutiny does not apply.

The Act passes any tier of constitutional review. The Act easily satisfies the applicable time-place-manner standard. It furthers a government interest of the utmost importance (protecting children), and it leaves open "alternative avenues of communication" (any location that complies with existing laws and excludes minors). *Renton*, 475 U.S. at 46-47.

Even if Plaintiffs' First Amendment claim warranted strict scrutiny, the Act would be constitutional because it "is narrowly tailored to serve a compelling interest." *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 444 (2015). "It is evident beyond the need for elaboration that a State's interest in safeguarding the physical and psychological well-being of a minor is compelling." *Ferber*, 458 U.S. at 756-57 (quotations omitted). And this "compelling interest . . . extends to shielding minors from the influence" of speech "that is not obscene by adult standards." *Sable Commc'ns v. FCC*, 492 U.S. 115, 126 (1989); *Ginsberg*, 390 U.S. at 639-40.

The Act is also narrowly tailored. It applies only to "a narrow slice of speech"—sexual speech that is obscene to minors under a variable obscenity standard. *Williams-Yulee*, 575 U.S. at 452. And it does not ban that speech; it merely requires the performances to occur in adult-only zones. The Act thus "tightly fits the State's compelling interest" by "limiting children's exposure," while "still allow[ing] adults to" view the performances. *Crawford v. Lungren*, 96 F.3d 380, 387 (9th Cir. 1996) (holding that a restriction on adult-oriented publications satisfied strict scrutiny). It "targets and eliminates no more than the exact source of the 'evil' it seeks to remedy": exposure of children to obscene speech. *Frisby v. Schultz*, 487 U.S. 474, 485 (1988).

Plaintiffs suggest that the Act needs more tailoring in the form of a parental consent exception. But the State has its own "*independent* interest in the well-being of its youth." *Ginsberg*, 390 U.S. at 639-40 (emphasis added). That interest does not disappear because of parental consent. And allowing a minor to access sexualized performances with parental consent would impair the State's interest. That is why, for example, children are not allowed in strip clubs, even with their parents' consent. Tenn. Code Ann. § 7-51-1113(e). And it is why children cannot participate in pornography, even if their parents would allow it. *Connection Distrib.*, 557 F.3d at 328-29. Plaintiffs err in suggesting that laws without parental-consent exceptions categorically

raise constitutional problems.

Plaintiffs also claim the statute is not tailored because there is no explicit scienter requirement. Dkt. 2 at 137. "But there is a simple explanation for [that]: There is no need for it." *Hansen*, 143 S. Ct. at 1945. Courts presume that there is a *mens rea* requirement in criminal statutes even when a statute is "silent," unless there is "some indication of [legislative] intent" overcoming this "presumption." *Staples v. United States*, 511 U.S. 600, 605-19 (1994); *Elonis v. United States*, 575 U.S. 723, 734 (2015). And the Tennessee Supreme Court has inferred scienter for all "criminal statutes regulating obscenity," holding that "the State must establish that the defendant had knowledge of the contents and character of the" speech at issue. *Davis-Kidd*, 866 S.W.2d at 528. The Act thus "implicitly incorporates the traditional state of mind required for" all obscenity offenses. *Hansen*, 143 S. Ct. at 1945.

**3. *In any event, Plaintiffs fail to establish a substantial number of unconstitutional applications.*** Finally, even assuming some unconstitutional applications of the Act exist, Plaintiffs nowhere demonstrated that "the ratio of unlawful-to-lawful applications" is "lopsided enough to justify the strong medicine of facial invalidation." *Hansen*, 143 S. Ct. at 1948 (quotations omitted). The Act "complies with the First Amendment in most settings." *Connection Distrib.*, 557 F.3d at 336. It can be constitutionally applied to prevent strip performances at a shopping mall or topless dancing at a food hall. It can be constitutionally applied to prevent highly sexualized performances by exotic dancers at a water park or a sports facility. The list goes on. Plaintiffs do nothing to show that any of these applications are unconstitutional.

## II.    The Other Equitable Factors Favor the State.

Equity also cuts against emergency relief. The doctrine of laches bars Plaintiffs' request for a temporary restraining order. And the remaining equitable factors weigh further against relief.

*Plaintiffs' delay in suing should foreclose preliminary relief.* Plaintiffs' dilatory tactics alone justifies denial of the pending motion under the laches doctrine. This Court's power to issue injunctions is bounded by the principles of equity, *see Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311-13 (1982), and "equity will not aid those who have slept upon their rights," *Cont'l Can*, 220 F.2d at 422. "A district court thus enjoys considerable discretion to apply . . . laches to a particular equitable remedy," such as a preliminary injunction or temporary restraining order. *See A.S. v. Lee*, 2021 WL 3421182, at *2 (M.D. Tenn. Aug. 5, 2021). The laches doctrine generally kicks in when a "lack of diligence" has "prejudice[d]" a defendant. *Memphis A. Phillip Randolph Inst. v. Hargett*, 473 F. Supp. 3d 789, 793 (M.D. Tenn. 2020) (quotations omitted).

Here, Plaintiffs showed an extreme lack of diligence. Plaintiffs had "everything [they] needed to file the present lawsuit" months before they initiated litigation. *See Corizon, v. Wainwright*, 2020 WL 6323134, at *7 (M.D. Tenn. Oct. 28, 2020). The Act has been in effect since April 1, 2023. *See* Ex. 2. And Blount Pride unquestionably knew about the law, Ex. 5, and knew that it intended to put on an event with live performances. *See* Ex. 6. Yet, it waited until 2 days before the planned show to sue. Waiting months before "asking for a preliminary [relief] was far too long." *Jones v. Markiewicz-Qualkinbush*, 842 F.3d 1053, 1057, 1062 n.27 (7th Cir. 2016) (two month delay); *Corizon*, 2020 WL 6323134 at *7 (three-month delay).

The recent letter from D.A. Desmond does not excuse this delay. That letter simply "confirm[s]" that the Act applies in Blount County. *Hargett*, 473 F. Supp. 3d at 796. That should have been news to no one. The *Friends of George*'s opinion specifically stated—in its standing analysis, when analyzing the merits, and when crafting injunctive relief—that its power was limited to analyzing the constitutionality of the Act in Shelby County. 2023 WL 3790583, at *12, *31-33. And General Skrmetti openly stated that "[t]he Adult Entertainment Act remains in effect

outside of Shelby County." Ex. 7. Plaintiffs' failure to understand how declaratory relief works provides no excuse. *See supra* 7.

"[N]ot much prejudice is required given the substantial delay." *Hargett*, 473 F. Supp. 3d at 800. And the prejudice is evident here: Defendants are evidentiarily hamstrung in their ability to defend themselves. *Vineberg v. Bissonnette*, 548 F.3d 50, 57 (1st Cir. 2008) (noting that "the kind of prejudice that will support a laches defense" includes inability to obtain "evidence" and "the unavailability of important witnesses"). Given the timeline forced on Defendants (and this Court), Defendants have little ability to gather basic evidence to support their standing challenge and limited ability to craft their legal arguments. On laches alone, this Court should deny relief.

***Plaintiffs have not demonstrated irreparable harm***. Plaintiffs establish no constitutional violation and thus establish no irreparable harm.

***The balance of equities favors the State***. The remaining factors—harm to the opposing party and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). And, here, they tip sharply against preliminary relief. "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Thompson v. DeWine*, 976 F.3d 610, 619 (6th Cir. 2020) (cleaned up). And, here, the State has a well-recognized, compelling interest "in safeguarding the physical and psychological well-being of . . . minor[s]." *Ferber*, 458 U.S. at 756-57 (quotations omitted); see supra at 23. An injunction reaching beyond the Plaintiffs would thwart the State's "independent interest in [protecting] the well-being of its youth"—a matter of utmost importance. *Ginsberg*, 390 U.S at 636. With matters involving the children of this State, this Court "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction," *Winter v. Nat. Res. Def. Counsil*, 555 U.S. 7, 24 (2008), and hesitate before setting

aside duly enacted legislation. The State and public interests in enforcement of the Act vastly outweigh Plaintiffs' illusory harm.

## III. Any Relief Should Be Limited to the Proper Scope of This Lawsuit.

If the Court issues an injunction, it must be limited to providing Plaintiffs relief. A valid remedy "ordinarily operate[s] with respect to specific parties,'" not on "legal rules in the abstract.'" *California v. Texas*, 141 S. Ct. 2104, 2115 (2021) (cleaned up). And any remedy "must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018). Here, if the threatened enforcement of the Act against Plaintiffs gives rise to an injury, then an injunction preventing enforcement against Plaintiffs would redress that injury. *Id.*; *L.W.*, 73 F.4th at 414.

Any injunction here must also be limited to the constitutional problem. Under well-established remedial principles, the courts aim to "enjoin only the unconstitutional applications of a statute" or "sever its problematic portions while leaving the remainder intact." *Ayotte v. Planned Parenthood*, 546 U.S. 320, 329 (2006); Tenn. Code Ann. § 1-3-110. Here, to the extent the Act's reference to "male or female impersonators" in Tenn. Code Ann. § 7-51-1401(12)(A) causes a constitutional violation, it can and should be severed. And to the extent the supposed constitutional violation turns on the (erroneous) view that the law can be applied in situations where minors impermissibly access a forum by evading an age-restriction, the Court should "enjoin" only those allegedly "unconstitutional applications of the law while preserving the other valid applications of the law." *Connection Distrib.*, 557 F.3d at 342.

## CONCLUSION

The Court should deny Plaintiffs' motion for a temporary restraining order.

25

Respectfully submitted,

Adam K. Mortara** (BPR #40089)          JONATHAN SKRMETTI
                                        Attorney General and Reporter
Lawfair, LLC
40 Burton Hills Blvd, Suite 200         ANDRÉE SOPHIA BLUMSTEIN
Nashville, TN 37215                     Solicitor General
(773) 750- 7154
mortara@lawfairllc.com                  /s/ J. Matthew Rice
                                        J. MATTHEW RICE (BPR #040032)
                                        Associate Solicitor General &
                                        Special Assistant to the Solicitor General

                                        Miranda H. Jones (BPR # 036070)
                                        Senior Assistant Attorney General

                                        Alicia Gilbert* (BPR #041055)
                                        Honors Fellow, Office of the Solicitor General

                                        Office of the Tennessee
                                        Attorney General and Reporter
                                        P. O. Box 20207
                                        Nashville, TN 37202
                                        (615) 532-6026
                                        matt.rice@ag.tn.gov
                                        miranda.jones@ag.tn.gov
                                        alicia.gilbert@ag.tn.gov

                                        *Counsel for Defendants*

                                        *Pro Hac Vice Forthcoming

                                        **Pro Hac Vice and Application for Admission
                                        Forthcoming

**CERTIFICATE OF SERVICE**

I certify that I filed the above document using the Court's CM/ECF system on August 31, 2023, which electronically served a copy to all counsel of record:

/s/ J. Matthew Rice
J. MATTHEW RICE
Associate Solicitor General &
Special Assistant to the Solicitor General