No. 23-5611

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

_____

FRIENDS OF GEORGE'S, INC.,

*Plaintiff-Appellee*,

v.

STEVEN JOHN MULROY,

*Defendant-Appellant*.

_____

On Appeal from the Judgment of the United States
District Court for the Western District of Tennessee
(No. 2:23-cv-02163-TLP-tmp)

_____

## APPELLANT'S OPENING BRIEF

_____

Jonathan Skrmetti
  *Attorney General & Reporter*

Andrée Sophia Blumstein
  *Solicitor General*

James R. Newsom III
  *Special Counsel*

J. Matthew Rice
  *Associate Solicitor General &*
  *Special Assistant to the Solicitor General*

Robert W. Wilson
  *Senior Assistant Attorney General*

Office of Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee
(615) 532-6026
matt.rice@ag.tn.gov

# TABLE OF CONTENTS

ORAL ARGUMENT REQUEST ........................................................ xiv

JURISDICTIONAL STATEMENT ........................................................ xv

ISSUES ................................................................................ xvi

INTRODUCTION ........................................................................1

BACKGROUND ..........................................................................3

    A. Legal Background ..............................................................3

    B. The Adult Entertainment Act ..............................................4

    C. Factual and Procedural Background ......................................6

SUMMARY OF THE ARGUMENT ......................................................9

STANDARD OF REVIEW ..............................................................10

ARGUMENT ............................................................................11

    I.   FOG Lacks Article III Standing ............................................11

       A. FOG faces no injury from the Act because of the content of its
          shows. ......................................................................12

          1.  FOG presented no evidence establishing that it intends to stage
              performances that are "harmful to minors." ..............................12

          2.  FOG presented no evidence establishing a certain threat of
              prosecution under the Act. ................................................15

          3.  The district court improperly analyzed standing. ......................19

       B. FOG faces no injury from the Act's public-property provision
          because it never performs on public property. ........................23

    II.  The Adult Entertainment Act Is Not Unconstitutionally Vague ...............26

       A. The U.S. Supreme Court has rejected vagueness challenges to
          obscenity standards modified to apply to minors.................................27

       B. In any event, the Tennessee Supreme Court's construction of Tenn.
          Code Ann. § 39-17-901(6) negates FOG's vagueness argument.........31

       C. FOG failed to establish facial invalidity. ..............................31

i

III.   The Adult Entertainment Act Does Not Run Afoul of the First
       Amendment's Overbreadth Doctrine. ........................................33

       A. The Act allows "Adult Cabaret Entertainment" in private,
          age-restricted venues. ..................................................33

       B. The Act poses no First Amendment problem. .....................38

          1.  Heightened scrutiny is not warranted. ........................38

          2.  The Act passes any tier of constitutional review. ......................47

       C. In any event, FOG fails to establish a substantial number of
          unconstitutional applications. ...............................................51

  IV.   The District Court Granted Improper Injunctive Relief ..........................52

CONCLUSION ........................................................................................55

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU v. Gonzales*,
478 F. Supp. 2d 775 (E.D. Pa. 2007) ...................................................30

*ACLU v. Mukasey*,
534 F.3d 181 (3d Cir. 2008) ...............................................................30

*Am. Booksellers Ass'n v. Virginia*,
882 F.2d 125 (4th Cir. 1989) ..............................................................31

*Am. Booksellers v. Webb*,
919 F.2d 1493 (11th Cir. 1990) .......................................... 29, 30, 39, 51

*Armstrong v. Asselin*,
734 F.3d 984 (9th Cir. 2013) ........................................................ 14, 21

*Ashcroft v. Free Speech Coal.*,
535 U.S. 234 (2002) ..................................................................... 14, 39

*Ass'n of Am. Physicians & Surgeons v. FDA*,
13 F.4th 531(6th Cir. 2021) .......................................................... 19, 20

*Athenaco v. Cox*,
335 F. Supp. 2d 773 (E.D. Mich. 2004) ..............................................39

*Ayotte v. Planned Parenthood*,
546 U.S. 320 (2006).........................................................................54

*Bailey v. Callaghan*,
715 F.3d 956 (6th Cir. 2013) ....................................................... 44, 45

*Barnes v. Glen Theatre, Inc.*,
501 U.S. 560 (1991).........................................................................40

*Bethel Sch. Dist. No. 403 v. Fraser*,
478 U.S. 675 (1986).........................................................................39

*Biden v. Nebraska*,
   143 S. Ct. 2355 (2023) ........................................................................35

*Big Dipper Ent., LLC v. Warren*,
   641 F.3d 715 (6th Cir. 2011) ..............................................................38

*Bose Corp. v. Consumers Union*,
   466 U.S. 485 (1984).............................................................................11

*Brandywine, Inc. v. Richmond*,
   359 F.3d 830 (6th Cir. 2004) ..............................................................24

*Broadrick v. Oklahoma*,
   413 U.S. 601 (1973)...............................................................................1

*Brockett v. Spokane Arcades, Inc.*,
   472 U.S. 491 (1985).............................................................................55

*Brown v. Tidwell*,
   169 F.3d 330 (6th Cir. 1999) ..............................................................37

*Butts v. New York*,
   779 F.2d 141 (2d Cir. 1985) ...............................................................47

*Califano v. Yamasaki*,
   442 U.S. 682 (1979).............................................................................52

*California v. Texas*,
   141 S. Ct. 2104 (2021).........................................................................25

*Clark v. Martinez*,
   543 U.S. 371 (2005).............................................................................13

*Commonwealth v. Biden*,
   57 F.4th 545 (6th Cir. 2023) ...............................................................53

*Connection Distrib. Co. v. Holder*,
   557 F.3d 321 (6th Cir. 2009) ..................................................... *passim*

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
   473 U.S. 788 (1985).............................................................................25

iv

*Crawford v. Dep't of Treasury*,
868 F.3d 438 (6th Cir. 2017) .................................................. 11, 12, 15

*Crawford v. Lungren*,
96 F.3d 380 (9th Cir. 1996) ....................................................48

*Daunt v. Benson*,
956 F.3d 396 (6th Cir. 2020) .................................................40

*Davis v. Colerain Twp.*,
51 F.4th 164 (6th Cir. 2022) ........................................ 14, 18, 24, 26

*Davis-Kidd Booksellers, Inc. v. McWherter*,
866 S.W.2d 520 (Tenn. 1993)......................................... *passim*

*DHS v. New York*,
140 S. Ct. 599 (2020)...........................................................53

*Digital Media Sols., LLC v. S. Univ. of Ohio*,
59 F.4th 772 (6th Cir. 2023) .................................................11

*Dobbs v. Jackson Women's Health Org.*,
142 S. Ct. 2228 (2022)..........................................................47

*Doran v. Salem Inn*,
422 U.S. 922 (1975)..............................................................53

*Déjà Vu v. Union Twp. Bd. of Trs.*,
411 F.3d 777 (6th Cir. 2005) .................................................36

*Elonis v. United States*,
575 U.S. 723 (2015)..............................................................50

*EMW Women's Surgical Ctr. v. Friedlander*,
978 F.3d 418 (6th Cir. 2020) .................................................10

*Ent. Prods., Inc. v. Shelby Cnty.*,
721 F.3d 729 (6th Cir. 2013) .................................................11

*Erie v. Pap's A.M.*,
529 U.S. 277 (2000)..............................................................45

v

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000)...................................................................................35

*FEC v. Cruz*,
    142 S. Ct. 1638 (2022).............................................................................11

*Fieger v. Mich. Sup. Ct.*,
    553 F.3d 955 (6th Cir. 2009) ........................................................ 14, 19

*Fort Wayne Books v. Indiana*,
    489 U.S. 46 (1989)....................................................................................28

*Frisby v. Schultz*,
    487 U.S. 474 (1988)..................................................................................49

*FW/PBS, Inc. v. Dallas*,
    493 U.S. 215 (1990)........................................................................ 25, 26

*Gill v. Whitford*,
    138 S. Ct. 1916 (2018).............................................................................52

*Ginsberg v. New York*,
    390 U.S. 629 (1968)..................................................................... *passim*

*Glenn v. Holder*,
    690 F.3d 417 (6th Cir. 2012) ................................................................23

*Gottfried v. Med. Plan. Servs., Inc.*,
    142 F.3d 326 (6th Cir. 1998) ................................................................37

*Grayned v. Rockford*,
    408 U.S. 104 (1972)..................................................................................26

*Harris Cnty. Comm'rs Ct. v. Moore*,
    420 U.S. 77 (1975)....................................................................................37

*Hearring v. Sliwowski*,
    806 F.3d 864 (6th Cir. 2015) ...................................................................2

*Hill v. Snyder*,
    900 F.3d 260 (6th Cir. 2018) ................................................................37

vi

*Hooper v. California*,
    155 U.S. 648 (1895)................................................................................36

*Hutchison v. Marshall*,
    744 F.2d 44 (6th Cir. 1984) ...............................................................21

*Kanuszewski v. MDHHS*,
    927 F.3d 396 (6th Cir. 2019) ...................................................... 49, 50

*Kiser v. Reitz*,
    765 F.3d 601 (6th Cir. 2014) .............................................................16

*Knoxville v. Netflix, Inc.*,
    656 S.W.3d 106 (Tenn. 2022)............................................................35

*L.W. v. Skrmetti*,
    73 F.4th 408 (6th Cir. 2023) ..............................................................53

*M.S. News Co. v. Casado*,
    721 F.2d 1281 (10th Cir. 1983) ............................................. 29, 30, 39

*Maverick Media Grp. v. Hillsborough Cnty.*,
    528 F.3d 817 (11th Cir. 2008) ...........................................................26

*McKay v. Federspiel*,
    823 F.3d 862 (6th Cir. 2016) .................................................. 16, 18, 19

*McLemore v. Gumucio*,
    No. 22-5458, 2023 WL 4080102 (6th Cir. June 20, 2023) ..................35

*Memphis Planned Parenthood, Inc. v. Sundquist*,
    175 F.3d 456 (6th Cir. 1999) .............................................................54

*Mich. Dep't of Educ. v. U.S. Dep't of Educ.*,
    875 F.2d 1196 (6th Cir. 1989) ...................................................... 35, 36

*Michael M. v. Superior Ct.*,
    450 U.S. 464 (1981)............................................................................44

*Midwest Media Prop. v. Symmes Twp.*,
    503 F.3d 456 (6th Cir. 2007) ...................................................24, 25, 26

*Miller v. California*,
    413 U.S. 15 (1973) ........................................................................ *passim*

*Mullaney v. Wilbur*,
    421 U.S. 684 (1975) ................................................................................20

*New Orleans v. Dukes*,
    427 U.S. 297 (1976) ................................................................................50

*New York v. Ferber*,
    458 U.S. 747 (1982) ................................................................ 33, 36, 48

*Nixon v. United States*,
    506 U.S. 224 (1993) ................................................................................46

*NLRB v. Fruit Packers*,
    377 U.S. 58 (1964) ..................................................................................36

*Online Merchs. Guild v. Cameron*,
    995 F.3d 540 (6th Cir. 2021) ................................................ 16, 17, 18

*Phelps-Roper v. Strickland*,
    539 F.3d 356 (6th Cir. 2008) ................................................................46

*Plunderbund Media, LLC v. DeWine*,
    753 F. App'x 362 (6th Cir. 2018) ........................................ 16, 17, 18

*Prime Media v. Brentwood*,
    485 F.3d 343 (6th Cir. 2007) ........................................ 23, 24, 25, 26

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) ........................................................................ 44, 45

*Reno v. ACLU*,
    521 U.S. 844 (1997) ................................................................................39

*Renton v. Playtime Theatres, Inc.*,
    475 U.S. 41 (1986) ........................................................................ 41, 45, 48

*Republican Party v. Klobuchar*,
    381 F.3d 785 (8th Cir. 2004) ........................................................ 15, 19

viii

*Rhodes v. Brigano*,
 91 F.3d 803 (6th Cir. 1996) ...................................................................13

*Richland Bookmart, Inc. v. Nichols*,
 137 F.3d 435 (6th Cir. 1998) .................................................................38

*Rizzo v. Goode*,
 423 U.S. 362 (1976).................................................................................55

*Sable Commc'ns v. FCC*,
 492 U.S. 115 (1989).................................................................................48

*Salve Regina Coll. v. Russell*,
 499 U.S. 225 (1991).................................................................................11

*Schwegmann Bros. v. Calvert Distillers Corp.*,
 341 U.S. 384 (1951).................................................................................36

*Simmons v. State*,
 944 So. 2d 317 (Fla. 2006) .....................................................................30

*Staples v. United States*,
 511 U.S. 600 (1994).................................................................................50

*Sturgeon v. Frost*,
 139 S. Ct. 1066 (2019)............................................................................36

*Sullivan v. Benningfield*,
 920 F.3d 401 (6th Cir. 2019) .................................................................11

*Susan B. Anthony List v. Driehaus*,
 573 U.S. 149 (2014).................................................................................17

*Terminiello v. Chicago*,
 337 U.S. 1 (1949).....................................................................................20

*Triplett Grille, Inc. v. Akron*,
 40 F.3d 129 (6th Cir. 1994) ...................................................................40

*Turner Broad. Sys. v. FCC*,
 512 U.S. 622 (1994)................................................................... 41, 42, 45

*United States v. Des Moines Nav. & Ry. Co.*,
142 U.S. 510 (1892) ........................................................................45

*United States v. Eichman*,
496 U.S. 310 (1990) ........................................................................45

*United States v. Grace*,
461 U.S. 171 (1983) ........................................................................55

*United States v. Hansen*,
143 S. Ct. 1932 (2023) ................................................................. *passim*

*United States v. O'Brien*,
391 U.S. 367 (1968) ................................................................. 44, 45

*United States v. Parrish*,
942 F.3d 289 (6th Cir. 2019) ........................................................27

*United States v. Perry*,
360 F.3d 519 (6th Cir. 2004) ........................................................34

*United States v. Requena*,
980 F.3d 30 (2d Cir. 2020) ............................................................32

*United States v. Salerno*,
481 U.S. 739 (1987) ........................................................................31

*United States v. Sineneng-Smith*,
140 S. Ct. 1575 (2020) ...................................................................44

*United States v. Stevens*,
559 U.S. 460 (2010) ........................................................................33

*United States v. Williams*,
553 U.S. 285 (2008) ............................................................ 27, 32, 33

*United States v. Yung*,
37 F.4th 70 (3d Cir. 2022) ............................................................33

*Upper Midwest Booksellers Ass'n v. Minneapolis*,
780 F.2d 1389 (8th Cir. 1985) ......................................................39

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977) ........................................................................ 44, 45

*Vill. of Hoffman Ests. v. Flipside, Hoffman, Ests.*,
    455 U.S. 489 (1982) ........................................................................ 31, 32

*Virginia v. Black*,
    538 U.S. 343 (2003) ............................................................................51

*Virginia v. Hicks*,
    539 U.S. 113 (2003) ........................................................................ 32, 51

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989) .................................................................... 26, 27, 45

*White v. United States*,
    601 F.3d 545 (6th Cir. 2010) .............................................................23

*Willeford v. Klepper*,
    597 S.W.3d 454 (Tenn. 2020) ..........................................................54

*Williams-Yulee v. Fla. Bar*,
    575 U.S. 433 (2015) ..........................................................................48

*Winters v. New York*,
    333 U.S. 507 (1948) ..........................................................................13

*Younger v. Harris*,
    401 U.S. 37 (1971) ............................................................................19

**Statutes**

42 U.S.C. § 1983 ............................................................................. 7, 55

720 Ill. Comp. Stat. Ann. 5/11-21(a) ...........................................28

Ala. Code § 13A-12-200.1(11) .......................................................27

Alaska Stat. Ann. § 11.61.128(c) ...................................................27

Ariz. Rev. Stat. Ann. § 13-3501(1) ................................................27

Ark. Code Ann. § 5-68-501(2) ......................................................27

Colo. Rev. Stat. Ann. § 24-90-602(3) .......................................................27

Conn. Gen. Stat. Ann. § 53a-193(2) .........................................................28

Fla. Stat. Ann. § 847.001(7)......................................................................28

Ga. Code Ann. § 20-2-324.6(a) .................................................................28

Ind. Code Ann. § 35-49-2-2 .......................................................................28

Kan. Stat. Ann. § 21-6402(d)(2) ................................................................28

La. Stat. Ann. § 14:91.11(A)(2) .................................................................28

Mass. Gen. Laws Ann. ch. 272, § 31 .........................................................28

Mich. Comp. Laws § 722.674(a) ...............................................................28

Minn. Stat. Ann. § 617.292(7) ...................................................................28

N.C. Gen. Stat. Ann. § 19-12(2) ................................................................28

N.D. Cent. Code Ann. § 12.1-27.1-02(2) ..................................................28

N.H. Rev. Stat. Ann. § 571-B:1(I) .............................................................28

N.M. Stat. Ann. § 30-37-1(F) ....................................................................28

Neb. Rev. Stat. § 28-807(6) ........................................................................28

Nev. Rev. Stat. Ann. § 201.257 ..................................................................28

Okla. Stat. tit. 21, § 1040.75(2).................................................................28

S.C. Code Ann. § 16-15-375(1)..................................................................28

S.D. Codified Laws § 22-24A-2(7) ...........................................................28

Tenn. Code Ann. § 1-3-110 ........................................................................54

Tenn. Code Ann. § 7-51-1113(e).................................................................49

Tenn. Code Ann. § 7-51-1401 .....................................................................4

Tenn. Code Ann. § 7-51-1401(2)..................................................... 4, 6, 43

Tenn. Code Ann. § 7-51-1401(12) ...................................................... *passim*

Tenn. Code Ann. § 7-51-1401(12)(A) ........................................................54

Tenn. Code Ann. § 7-51-1407 ..................................................................5

Tenn. Code Ann. § 7-51-1407(c)(1) .......................................... 5, 12, 34, 35

Tenn. Code Ann. § 7-51-1407(c)(1)(A) ............................................. 23, 24

Tenn. Code Ann. § 7-51-1407(c)(1)(B) ............................................. 24, 33, 34

Tenn. Code Ann. § 39-17-901 ............................................... *passim*

Tenn. Code Ann. § 39-17-901(6) ............................................... *passim*

Tenn. Code Ann. § 39-17-901(10) ...........................................................3

Tenn. Code Ann. § 39-17-902(a) ..............................................................3

Tenn. Code Ann. § 39-17-911(b) ..................................................... 3, 17

Utah Code Ann. § 76-10-1201(5)(a) .......................................................28

Va. Code Ann. § 8.01-40.5 .....................................................................28

Vt. Stat. Ann. tit. 13, § 2801(6) ............................................................28

Wis. Stat. Ann. § 450.155(1)(c) .............................................................28

## ORAL ARGUMENT REQUEST

Defendant-Appellant Steven J. Mulroy, in his official capacity, respectfully requests oral argument.  The district court permanently enjoined and declared facially unconstitutional Tennessee's Adult Entertainment Act and its cross-referenced provisions (Public Chapter No. 2, 113th General Assembly (2023) (codified at Tenn. Code Ann. §§ 7-51-1401, -1407, and § 39-17-901)).  That extraordinary decision infringes on Tennessee's sovereign authority and thus warrants careful review.  This appeal also raises important questions regarding Article III jurisdiction, the First Amendment, the void-for-vagueness doctrine, and the remedial power wielded by district courts.  Oral argument will aid the Court's consideration of those issues.

## JURISDICTIONAL STATEMENT

The district court's subject matter jurisdiction rested on 28 U.S.C. § 1331. The court issued a final judgment on June 7, 2023.  Judgment, R.92 at 1464.[1] Mulroy, in his official capacity, filed a notice of appeal on June 30, 2023.  Notice, R.94 at 1527-29.  This Court has jurisdiction to review the district court's "final decisions."  28 U.S.C. § 1291.

---

[1] All record pincites refer to the "Page ID" numbers in the ECF file stamps for the consolidated docket, No. 2:23-cv-02163 (W.D. Tenn.).

## ISSUES

**I.**     Whether the district court exceeded its Article III jurisdiction.

**II.**    Whether Tennessee's Adult Entertainment Act is facially unconstitutional under the void-for-vagueness doctrine.

**III.**   Whether Tennessee's Adult Entertainment Act is facially unconstitutional under the First Amendment.

**IV.**    Whether the district court erred in the scope of relief provided.

xvi

# INTRODUCTION

Tennessee's elected representatives passed the Adult Entertainment Act to shield children from sexually explicit performances.  This law builds on Tennessee's existing statutes by requiring adult cabaret entertainment to occur in adult-only zones and on private, not public, property.  The Act does not ban any type of performance.  And it places location restrictions only on performances that contain "nudity, sexual excitement, sexual conduct, excess violence or sadomasochistic abuse" "appeal[ing] predominantly to the prurient, shameful or morbid interests of minors," in a "patently offensive" way that "lacks serious literary, artistic, political or scientific value[] for minors."  Tenn. Code Ann. § 39-17-901(6).  Common sense dictates that such performances should not occur in areas open to kids.

Yet, shortly before the Act took effect, a drag-centric theatre group, Friends of George's, Inc. (FOG), challenged the law as facially unconstitutional.  "A facial challenge to a law is no small matter."  *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 335 (6th Cir. 2009) (en banc).  And, here, FOG's facial challenge does not measure up.

For one, this case does not belong in federal court.  Federal courts "are not roving commissions assigned to pass judgment on the validity of the Nation's laws."  *Broadrick v. Oklahoma*, 413 U.S. 601, 610-11 (1973).  They resolve concrete disputes between plaintiffs with personalized injuries and defendants who can

1

provide relief.  But FOG invokes federal jurisdiction with no intention of putting on a performance covered by the Act and no certain threat of enforcement under the Act.  Not only that, FOG attempts to invalidate a provision of the Act—the public-property provision—that is not even arguably at issue.  By going along with FOG's flawed theories, the district court acted "beyond the scope of Article III" and "exercise[d] power over real people and real institutions . . . with no basis for doing so." *Hearring v. Sliwowski*, 806 F.3d 864, 868 (6th Cir. 2015).

Even if FOG had standing, the Act poses no constitutional problem.  The obscenity standard FOG challenges as unconstitutionally vague has already been blessed by the Supreme Court.  Were that not enough, the Tennessee Supreme Court has definitively construed the challenged language to avoid any vagueness issue.  And the First Amendment surely allows Tennessee to restrict adult entertainment to adult-only zones.  A long line of cases has upheld statutes that require adult-only zones for content that is obscene as to minors, but not adults.  Nothing about this case calls for a different result or supports the drastic remedy of facial invalidation.

The *text* of the statute—not an unsupported narrative attached to it—should guide this Court's inquiry, and that text comports with the Constitution.  The Court should reverse.

2

# BACKGROUND

## A. Legal Background

Like all States, Tennessee has long regulated obscenity and adult entertainment.  Tennessee law makes it a crime to knowingly produce, sell, or distribute "obscene matter."  Tenn. Code Ann. § 39-17-902(a).  And it is "unlawful to direct, present or produce any obscene . . . live performance."  *Id.*  These restrictions incorporate a definition of "obscene" that mirrors the three-factor obscenity standard from *Miller v. California*, 413 U.S. 15 (1973).  Tenn. Code Ann. § 39-17-901(10).

Tennessee law provides heightened protections for minors.  For example, § 39-17-911(b) prohibits the admission of minors to "premises . . . exhibit[ing] a motion picture, show or other presentation which . . . depicts nudity, sexual conduct, excess violence, or sado-masochistic abuse, and which is harmful to minors."  This statute uses a definition of "harmful to minors" that adapts the *Miller* obscenity standard to minors: "any description or representation . . . of nudity, sexual excitement, sexual conduct, excess violence or sadomasochistic abuse" that (1) "[w]ould be found by the average person applying contemporary community standards to appeal predominantly to the prurient, shameful or morbid interests *of minors*;" (2) "[i]s patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable *for minors*;" and (3) "[t]aken as whole lacks serious

3

literary, artistic, political or scientific values *for minors*." *Id.* § 39-17-901(6) (emphasis added).

Tennessee law separately regulates the location and accessibility of adult entertainment. *See* Tenn. Code Ann. §§ 7-51-1401, *et seq.* Adult-oriented establishments and adult cabarets that feature "topless dancers, go-go dancers, exotic dancers, strippers, male or female impersonators, or similar entertainers" cannot be located "within one thousand feet (1,000') of a child care facility, a private, public, or charter school, a public park, family recreation center, a residence, or a place of worship." *Id.* §§ 7-51-1401(2), -1407(a)(1). And minors cannot be admitted into any such establishment. *Id.* §§ 7-51-1109(a)(7), -1113(e).

## B. The Adult Entertainment Act

The Adult Entertainment Act builds on and operates in tandem with these longstanding statutes.

In recent years, videos have emerged of events "where entertainers or performers simulated anal sex, oral sex, [and] other graphic activities with children sitting a few feet away" in various "places across the state." Legisl. Transcript, R.35-1 at 566; *see id.* at 520. And a drag show occurred "where an adult performer . . . talk[ed] about their tits and rubb[ed] their genitalia, grinding on the ground and spreading their legs in front of children." *Id.* at 530. These events prompted "hundreds, if not thousands, of . . . constituents" to call their representatives "wanting to

4

know why . . . overtly sexual entertainment could be taking place in a public area where kids are present." *Id.* at 547; *see id.* at 520.

Presented with those concerns, Tennessee's legislators investigated whether additional legislation was needed to protect minors. *Id.* at 521. Through "conversations with district attorneys [and] law enforcement relative to the existing statute[s]," legislators gleaned that the law needed to more clearly restrict sexual performances in publicly accessible spaces. *Id.* at 567. To "clarify current law by requiring that adult-oriented performances may only be held in age-restricted venues," *id.* at 515, the General Assembly passed the Adult Entertainment Act.

The Act adds provisions to Tennessee's longstanding statutory framework governing adult establishments, Tenn. Code Ann. § 7-51-1407, to provide that the "type of [adult] entertainment that is already defined in [existing] statute[s] cannot take place on public property, nor can it take place in a private venue where children are present." Legisl. Transcript, R.35-1 at 517; *see id.* at 547, 579-80. The new provisions clarify that it is unlawful "for a person to perform adult cabaret entertainment: (A) [o]n public property; or (B) [i]n a location where the adult cabaret entertainment could be viewed by a person who is not an adult." *Id.* § 7-51-1407(c)(1).

And drawing on existing law, the Act defines "adult cabaret entertainment" to have two components: [1] "adult-oriented performances that are harmful to minors, as that term is defined in § 39-17-901, and [2] that feature topless dancers, go-go

5

dancers, exotic dancers, strippers, male or female impersonators, or similar enter-

tainers." *Id.* § 7-51-1401(12). The first component defines "harmful to minors" by

cross-referencing an existing obscenity law, § 39-17-901. That definition "has been

in [the Tennessee Code] for many years." Legisl. Transcript, R.35-1 at 546; *see id.*

at 516-17; 1990 Tenn. Pub. Acts 938, ch. 1092, §§ 1-3. The second component (ref-

erencing "topless dancers, go-go dancers, exotic dancers, strippers, male or female

impersonators, or similar entertainers") mirrors the longstanding definition of regu-

lated "adult cabaret." Tenn. Code Ann. § 7-51-1401(2). For this component, the

Act again pulls "word-for-word out of the current law" that "has been on the books

for many, many decades." Legisl. Transcript, R.35-1 at 538, 588; 1987 Tenn. Pub.

Acts 841, ch. 432, § 2.

### C.  Factual and Procedural Background

FOG is a Memphis-based organization that "produce[s] drag-centric perfor-

mances, comedy sketches, and plays." Compl., R.10 at 52, 62. Nearly all these

shows occur at the Evergreen Theater in Memphis—a private venue. Transcript,

R.81 at 1069, 1109; Depo., R.58-2 at 825, 827, 831. FOG never performs outdoors

or on public property. Transcript, R.81 at 1110. And it has never sought a license

to provide adult-oriented entertainment, *id.* at 1111, because "[e]verything [FOG]

do[es] is for comedy," Depo., R.58-2 at 847, not "sexual gratification," Transcript,

R.81 at 1101. Indeed, in "writing and curating a show," FOG "stick[s] around the

PG-13 area" and avoids "go[ing] over [a] too risqu[é] type of thing." *Id.* at 1071. Its drag shows are an "art form." *Id.* at 1064, 1095-96.

While some minors attend FOG's shows, it is no more than a "handful" over the course of a production. *Id.* at 1110. And neither FOG nor its performers has ever "been charged with violating Tennessee['s existing] obscenity laws" or even "threatened with violating Tennessee obscenity laws." *Id.* at 1100.

Nonetheless, on March 27, 2023, FOG sued under 42 U.S.C. § 1983 seeking an injunction prohibiting enforcement of the Adult Entertainment Act by the State of Tennessee, Governor Bill Lee, and Attorney General Jonathan Skrmetti. Compl., R.1. FOG simultaneously moved for a temporary restraining order. Motion, R.7.

The morning of the TRO hearing—"admittedly . . . in response to the state's briefing" on standing—FOG filed a *new* action against District Attorney General Steven Mulroy in his official and individual capacities. *See* Hearing, R.34 at 429; Compl., R.32-1 (No. 2:23-cv-02176). With a meager record and limited merits briefing, the court enjoined D.A. Mulroy, Governor Lee, and General Skrmetti from enforcing the Act. Order, R.26.

Following a status conference, the district court extended its TRO, consolidated FOG's suits, and set a joint preliminary-injunction hearing and merits trial for May 22, 2023—less than two months after the suit commenced. Extension, R.31. Defendants moved to dismiss, MTD, R.41, and in response, FOG filed notices of

voluntary dismissal of all defendants except Mulroy in his *individual* capacity, Notices, R.45; R.46.  Rather than effectuate those dismissals, the court called a second status conference, explained to FOG the distinction between "individual" and "official" capacity suits, and "granted [FOG] additional time to refine [its] stipulations as they relate to Steven Mulroy."  Conference, R.52, 54.  FOG then withdrew its notice of dismissal as to Mulroy in his official capacity.  Withdrawal, R.56.

At trial, FOG called one of its board members, Vanessa Rodley, as a witness.  During Rodley's examination, FOG presented short video clips taken from various scenes in FOG's shows.  It then submitted to the court a thumb drive containing (1) the clips shown at trial and (2) videos of the *scenes* from which the clips derived.  Trial Ex. 2.  FOG did not introduce videos of any entire *show*.  *Id.*

On June 2, 2023, the district court entered its Findings of Fact and Conclusions of Law.  After dismissing Mulroy in his individual capacity, the court declared the Act, in its entirety, facially unconstitutional under the First Amendment and the void-for-vagueness doctrine.  Op., R.91.  Then, "despite Tennessee's compelling interest in protecting the psychological and physical wellbeing of children," the court permanently enjoined Mulroy from enforcing the Act against anyone in Shelby County, Tennessee.  *Id.* at 1395, 1463.

8

## SUMMARY OF THE ARGUMENT

**I.** FOG lacks Article III standing to bring this pre-enforcement action because it faces no injury from the Adult Entertainment Act. FOG's drag performances do not fall within the Act's substantive purview, so FOG cannot show that it intends to violate (or would face prosecution under) *any* provision of the Act. And it certainly cannot establish an injury from the public-property provision because FOG never performs on public property.

**II.** The decades-old definition of "harmful to minors" is not facially unconstitutional under the Fourteenth Amendment's void-for-vagueness doctrine. The U.S. Supreme Court has rejected vagueness challenges to obscenity standards modified to apply to minors—like the definition at issue here. Moreover, a narrowing construction by the Tennessee Supreme Court eliminates any vagueness argument by limiting the definition to materials that lack value *for a reasonable 17-year-old*. And, regardless, the Act is not *facially* unconstitutional because a significant number of the Act's applications will not turn on any difference in the community standards for toddlers versus teenagers.

**III.** The Act is not facially unconstitutional under the First Amendment's overbreadth doctrine. Properly construed, the provision at issue merely limits adult cabaret entertainment to adult-only zones. These types of laws are treated as time-place-manner restrictions and routinely pass constitutional review.

9

FOG's arguments for heightened scrutiny lack merit.  The Act does not target the views of drag performers, nor was it enacted with an impermissible purpose.  It incorporates decades-old statutory language to protect children.  Speculation as to legislative motives cannot trigger the application of strict scrutiny.

Whatever tier of scrutiny applies, the Act passes constitutional review.  It is narrowly tailored to serve an indisputably compelling purpose—safeguarding the well-being of children.  And, even assuming some unconstitutional applications of the Act exist, FOG fails to establish a *substantial* number of unconstitutional applications, as required in a facial overbreadth challenge.

**IV.**  This case warrants no injunctive relief, but at a minimum, an injunction here must be limited to FOG and to the allegedly unconstitutional component of the provision at issue.

## STANDARD OF REVIEW

This Court "review[s] factual findings for clear error, legal conclusions de novo, and the scope of injunctive relief for abuse of discretion."  *EMW Women's Surgical Ctr. v. Friedlander*, 978 F.3d 418, 428 (6th Cir. 2020) (quotations omitted).

 "A finding of fact is clearly erroneous when, after reviewing the full record," the Court is "left with the definite and firm conviction that a mistake has been committed."  *Id*.  That standard "does not inhibit [the] court's power to correct errors of law, including those that may infect a so-called mixed finding of law and fact, or a

finding of fact that is predicated on a misunderstanding of the . . . law." *Bose Corp. v. Consumers Union*, 466 U.S. 485, 501 (1984).

The de novo standard applies to legal conclusions regarding Article III jurisdiction, *Sullivan v. Benningfield*, 920 F.3d 401, 407 (6th Cir. 2019), the interpretation of state law, *Salve Regina Coll. v. Russell*, 499 U.S. 225, 231 (1991), and the constitutionality of a state law, *Ent. Prods., Inc. v. Shelby Cnty.*, 721 F.3d 729, 733 (6th Cir. 2013).

Although injunctive relief is reviewed for abuse of discretion, "a district court unquestionably abuses its discretion if its decision rests on a legal mistake." *Digital Media Sols., LLC v. S. Univ. of Ohio*, 59 F.4th 772, 777 (6th Cir. 2023).

## ARGUMENT

## I.    FOG Lacks Article III Standing.

To invoke federal jurisdiction, a plaintiff must prove "an injury in fact . . . fairly traceable to the challenged conduct of the defendant . . . that is likely to be redressed by the requested relief." *FEC v. Cruz*, 142 S. Ct. 1638, 1646 (2022).  An Article III injury can be established *before* enforcement of a statute.  But to do so, a plaintiff must prove "an intention to engage in a course of conduct arguably affected with a constitutional interest[] but proscribed by" some provision of the Act.  *Crawford v. Dep't of Treasury*, 868 F.3d 438, 454 (6th Cir. 2017) (quotations omitted).

11

And it must then prove "a *certain* threat of prosecution if the plaintiff does indeed engage in that conduct."  *Id.* at 455.

FOG proved neither.  Given the content of its shows, FOG could not establish an injury from *any provision* of the Act.   And it unquestionably failed to establish an injury tied to the Act's public-property provision.

### A. FOG faces no injury from the Act because of the content of its shows.

FOG lacks standing to pursue *any* claim because it did not prove an intention to stage "adult cabaret entertainment" that is "harmful to minors," Tenn. Code Ann. § 7-51-1407(c)(1), -1401(12), and even if it had, FOG faces no certain threat of enforcement.

### 1.  FOG presented no evidence establishing that it intends to stage performances that are "harmful to minors."

FOG did not prove an intention to violate any provision of the Act.  By its terms, the Act regulates *only* "adult cabaret entertainment," *id.* § 7-51-1407(c)(1), which includes *only* "performances" deemed "harmful to minors, as that term is defined in § 39-17-901," *id.* § 7-51-1401(12).  To qualify as "harmful to minors" under § 39-17-901(6), a performance must, among other things, "lack[] serious literary, artistic, political or scientific values for minors" when "[t]aken as a whole."

And the Tennessee Supreme Court has read that language to include "only . . . those materials which lack serious literary, artistic, political, or scientific value *for a reasonable 17-year-old minor*."  *Davis-Kidd Booksellers, Inc. v. McWherter*, 866

12

S.W.2d 520, 528 (Tenn. 1993) (emphasis added). In *Davis-Kidd*, the court considered whether restrictions on the display of printed materials deemed "harmful to minors" could withstand constitutional scrutiny. *Id.* at 522. To avoid constitutional issues, the court "narrowly construed" § 39-17-901's "harmful to minors" definition to be limited to materials lacking value "*for a reasonable 17-year-old minor*." *Id.* at 528 (emphasis added).

That construction controls here. Federal courts are "bound by the state court's interpretation of its criminal laws," *Rhodes v. Brigano*, 91 F.3d 803, 806 (6th Cir. 1996), and the definition construed in *Davis-Kidd* is the same statutory definition at issue here. *Infra* 20-21. The text of § 39-17-901 must have the same meaning here as it did in *Davis-Kidd*. *See Clark v. Martinez*, 543 U.S. 371, 378-80 (2005). To hold otherwise "would render [the] statute a chameleon" and "establish . . . the dangerous principle that judges can give the same statutory text different meanings in different cases." *Id.* at 382, 386. *Davis-Kidd*'s construction "put[] . . . words in [§ 39-17-901(6)] as definitely as if it had been so amended by the legislature." *Winters v. New York*, 333 U.S. 507, 514 (1948).

Thus, to prove an imminent future injury, FOG had to establish that its own shows arguably lack value for a reasonable 17-year-old. Unsurprisingly, it failed to carry that burden.

To begin, FOG did not "articulate, with *any* amount of specificity," the "speech or conduct" to be included in its future shows. *Fieger v. Mich. Sup. Ct.*, 553 F.3d 955, 964 (6th Cir. 2009). The complaint said nothing on this subject. Compl., R.10. And FOG admitted, in discovery and at trial, that it does not "know the precise content of . . . future productions." Interrog. Resp., R.64-2 at 912-15; Transcript, R.81 at 1100. That should have ended the matter.

And "even assuming that [the Court] may take the content of [FOG's] past speech as evidence of the probable content of [its] future speech," *Davis v. Colerain Twp.*, 51 F.4th 164, 173 (6th Cir. 2022), FOG still failed to demonstrate its intent to violate the law because it failed to prove its *prior* shows lacked value "for a reasonable 17-year-old minor." *Davis-Kidd*, 866 S.W.2d at 528. At trial, FOG presented evidence of a few isolated scenes in past shows that contained sexual themes. Trial Ex. 2. But those cherry-picked scenes cannot help FOG: "The artistic merit of a work does not depend on the presence of a single explicit scene." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 248 (2002). "[T]he First Amendment requires that redeeming value be judged by considering the work as a whole," *id.*, and FOG did not introduce the entirety of any show of which those scenes were a part, Trial Ex. 2. Absent evidence of "the work as a whole"—meaning an *entire* show—"the [applicable] standard c[ould] not be applied," *Armstrong v. Asselin*, 734 F.3d 984, 990 (9th Cir. 2013), and FOG could not meet its burden.

14

Regardless, FOG cannot possibly claim that its shows lack value to a reasonable 17-year-old while likening those same performances to ancient Greek drama and Shakespeare.  FOG Brief, R.35 at 489.  FOG has stressed that its shows convey an important "art form," Transcript, R.81 at 1064, 1067, 1095, which is a valued "part of mainstream culture," Compl., R.10 at 54.  And FOG's own witness conceded that a 16- or 17-year-old would "absolutely" get value from the satire in FOG's performances.  Transcript, R.81 at 1114.  Taking FOG at its word, its performances fall outside the scope of the applicable "harmful to minors" definition.  *Davis-Kidd*, 866 S.W.2d at 527.

Put simply, FOG did not prove an intention to stage performances that even arguably violate § 39-17-901's "harmful to minors" standard.

### 2. FOG presented no evidence establishing a certain threat of prosecution under the Act.

FOG also failed to prove the "*certain* threat of prosecution" necessary to establish Article III standing.  *Crawford*, 868 F.3d at 455.

As a threshold matter, FOG failed to prove an intention to engage in conduct that the Act proscribes, *supra* 12-14, so it necessarily failed to show a certain threat of prosecution.  That is, the Act does not actually "prevent" the "conduct for which [FOG] invokes First Amendment protection," so FOG faces no "credible threat of prosecution"—let alone a certain threat.  *Republican Party v. Klobuchar*, 381 F.3d 785, 793 (8th Cir. 2004) (quotations omitted).

15

Even if the Act did "proscribe[] [FOG's] intended conduct," this Court does not assume that every breach of the law will be prosecuted. *McKay v. Federspiel*, 823 F.3d 862, 868 (6th Cir. 2016). Instead, it assesses the imminence of enforcement through a holistic, four-part framework—the "*McKay* factors." *Online Merchs. Guild v. Cameron*, 995 F.3d 540, 550 (6th Cir. 2021). Specifically, the Court requires "some combination" of the following factors: "(1) 'a history of past enforcement against the plaintiffs or others'; (2) 'enforcement warning letters sent to the plaintiffs regarding their specific conduct'; (3) 'an attribute of the challenged statute that makes enforcement easier or more likely, such as a provision allowing any member of the public to initiate an enforcement action'; and (4) the 'defendant's refusal to disavow enforcement of the challenged statute against a particular plaintiff.'" *Id.* (quoting *McKay*, 823 F.3d at 869). Each of those factors cuts against FOG's assertion of standing.

**No History of Past Enforcement**. "A threat of future enforcement may be 'credible' when the same conduct has drawn enforcement actions or threats of enforcement in the past." *Kiser v. Reitz*, 765 F.3d 601, 609 (6th Cir. 2014). But FOG sued before the Act even went into effect, so it cannot establish a history of prior enforcement.

And looking to other obscenity laws makes matters worse for FOG. Where two statutes "include[] the same prohibition," the "lack of prosecution under" one

16

will inform fears of prosecution under the other. *Plunderbund Media, LLC v. DeWine*, 753 F. App'x 362, 368 (6th Cir. 2018). And, recall, the Act extended *existing* standards to new locations. *Supra* 5-6. For decades, Tenn. Code Ann. § 39-17-911(b) has prohibited the "admi[ssion of] a minor to premises whereon there is . . . [a] show or other presentation which, in whole or in part, depicts nudity, sexual conduct, excess violence, or sado-masochistic abuse, and which is harmful to minors"—the same type of performances covered by the Act. *Compare id. with* Tenn. Code Ann. § 7-51-1401(12). Yet, neither FOG nor its performers has *ever* been threatened or charged with violating that statute. Transcript, R.81 at 1100. Because the Act and § 39-17-911(b) "include[] the same prohibition" on performances harmful to minors, *Plunderbund*, 753 F. App'x at 368, it is hard to credit FOG's claim of a *certain* threat of enforcement.

*No Warning Letters*. If "enforcement letters" had been "sent to" FOG "regarding [its] specific conduct," FOG might have had a stronger case for standing. *Online Merchs.*, 995 F.3d at 550 (quotations omitted). But no such letters were sent to FOG, so this factor cuts against standing.

*No Attributes Making Enforcement Easy*. Nor does the Act "allow[] any member of the public to initiate an enforcement action." *Id.* The "universe of potential" enforcers is limited to "state officials who are constrained by . . . ethical obligations." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014). Indeed,

"[o]nly law enforcement officials can investigate" potential violations of the Act, and "only prosecutors can bring charges." *Plunderbund*, 753 F. App'x at 371. That enforcement mechanism mirrors the standard approach for criminal laws and, therefore, poses no unique enforcement threat against FOG.

    ***Disavowal of Enforcement***. Nor is there any "refusal to disavow enforcement of the challenged statute against" FOG. *Online Merchs.*, 995 F.3d at 550 (quotations omitted). FOG has not identified its future intended speech with any specificity, so there is no future action to disavow enforcement against. And the State has maintained throughout this litigation that the proof presented regarding FOG's prior performances does *not* run afoul of the Act. So everything that can be disavowed, has been.

    That Mulroy has committed "to enforce all . . . Tennessee laws" does not change the analysis. Op., R.91 at 1398 (quotations omitted). The disavowal factor focuses on "a particular plaintiff." *Online Merchs.*, 995 F.3d at 550. A statement that "in the *abstract* [Mulroy] might . . . enforc[e] the rule" does not "suggest that he would enforce the rule against anything like [FOG's] *specific* speech." *Davis*, 51 F.4th at 174. This Court has rejected such generalizations of *McKay*'s fourth factor. *See id.*; *McKay*, 823 F.3d at 869-70.

In short, FOG did not prove any—much less, "some combination"—of the *McKay* factors, 823 F.3d at 869, and therefore did not prove a certain threat of prosecution.

### 3. The district court improperly analyzed standing.

Despite this deficient record, the district court asserted jurisdiction to address the constitutionality of the Act. The court's justifications for that assertion fail in every respect.

*First*, the district court declined to determine what the Act proscribes—insisting that "this juncture [of the analysis] is about standing to sue, not success on the merits." Op., R.91 at 1421. But, in a *pre-enforcement* challenge such as this one, whether a plaintiff's intended conduct arguably violates the statute is distinct from—and may not even bear on—the merits of the constitutional claim presented. *See, e.g.*, *infra* 33-52 (scope of § 39-17-901(6)(C) irrelevant to overbreadth claim).

Standing to preempt a prosecution turns on whether the statute "prevents" a plaintiff's desired conduct, *Republican Party*, 381 F.3d at 793, based on a proper "construction" of the restriction imposed, even in cases alleging a "purported 'chilling effect'" on speech, *Fieger*, 553 F.3d at 965. Only by determining what the statute proscribes can courts determine whether the asserted "fears of state prosecution . . . are imaginary or speculative." *Younger v. Harris*, 401 U.S. 37, 42 (1971). A plaintiff cannot prove standing by simply asserting an "injury" that "rests on a

misinterpretation of the [challenged law]." *Ass'n of Am. Physicians & Surgeons v. FDA*, 13 F.4th 531, 544 (6th Cir. 2021). The district court thus erred from the start in declining to determine the conduct proscribed by the Act.

*Second*, when the district court did finally analyze the scope of the Act, it defied the Tennessee Supreme Court's binding construction of the "harmful to minors" definition. Instead of "tak[ing] the statute as the state courts read it," *Terminiello v. Chicago*, 337 U.S. 1, 6 (1949), the district court criticized *Davis-Kidd*'s construction for "veer[ing] . . . from the [statute's] text" and pointed to a Third Circuit decision finding "[a] nearly identical" *federal* law to "appl[y] in a literal sense to an infant, a five-year old, or a person just shy of age seventeen," Op., R.91 at 1424, n.15 (quotations omitted). That's not how our federal system works. "[S]tate courts are the . . . expositors of state law," and federal courts are generally "bound by their constructions." *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975).

Perhaps realizing as much, the district court suggested that *Davis-Kidd* "applied its narrowing construction" to a provision setting out the offense (§ 39-17-914(a)), not the provision defining "harmful to minors" (§ 39-17-901). Op., R.91 at 1424 n.15, 1456. But *Davis-Kidd* clearly construed the "harmful to minors" definition in § 39-17-901: It qualified the statutory language "lacks serious literary, artistic, political or scientific values" with "*for a reasonable 17-year-old.*" 866 S.W.2d

at 528 (emphasis added). There is no equivalent language in § 39-17-914(a) that *Davis-Kidd* could have possibly "constru[ed]."

In fact, *Davis-Kidd* explicitly stated that it was construing the "harmful to minors" definition. Immediately before its narrowing construction, the court proclaimed that the best "approach to th[e] constitutional dilemma" was to adopt "the narrow statutory interpretation adopted by the Eleventh Circuit." *Id.* And, as it explained, "the Eleventh Circuit [had] ruled that in determining what was 'harmful to minors' under a Georgia display statute, the third prong of the test (whether the material, taken as a whole, has serious literary, artistic, political or scientific value for a minor) must be analyzed by determining whether the material had such value for a reasonable 17-year-old minor." *Id.* at 527. There is thus no doubt about the language *Davis-Kidd* construed. The district court erred in "set[ting] aside the state court's interpretation of [a] state statute[]." *Hutchison v. Marshall*, 744 F.2d 44, 46 (6th Cir. 1984).

*Third*, the district court erred in assessing the "value" of FOG's shows "[w]ithout examining the work as a whole." *Armstrong*, 734 F.3d at 990; *supra* 14. The court stated that it "watched the *full videos* for the first and second performances" FOG proffered at trial. Op., R.91 at 1418 n.12 (emphasis added). But the "full videos" in the record do not equal the "full shows." FOG only introduced into evidence video clips *from scenes* of a show and "full videos" of those *entire scenes*—

not videos of entire *shows*. Trial Ex. 2; *see* Transcript, R.81 at 1082, 1098 (referencing "The Dragnificient 70s" show); *id.* at 1049 (referencing the "George's Reunion" show). Without full shows before it, the court could not possibly evaluate their value—whether for a 17-year-old or anyone else.

*Fourth*, the district court claimed that *Ginsberg v. New York*, 390 U.S. 629 (1968), deemed certain "girlie" magazines to be harmful to a reasonable 17-year-old and that FOG's shows are just as "obscene." Op., R.91 at 1425. But there is a reason FOG never pressed that argument below: *Ginsberg* did not analyze whether content was harmful to a reasonable 17-year-old minor.

The New York law at issue in *Ginsberg* prohibited the sale of certain content deemed "harmful to minors." 390 U.S. at 646-47. But far from limiting the "harmful to minors" definition to material that lacked value to a 17-year-old, the definition included "*any person under the age of seventeen years*"—which, to state the obvious, includes those younger than seventeen. *Id.* at 645 (emphasis added). What is more, *Ginsberg* did not even apply that standard because the challenger "ma[de] no argument that the magazines [at issue] are not 'harmful to minors.'" *Id.* at 635. In fact, *Ginsberg* stated that "no issue is presented concerning the obscenity of the material involved." *Id.* at 635 (quotations omitted). The district court here thus drew a parallel to a case involving a different standard (one including those "*under* the age of seventeen years") that was never even applied.

22

*Fifth*, the district court ignored the *McKay* factors in analyzing whether a certain threat of enforcement exists.  Instead, the court found a "certainly-impending threat that a Shelby County law enforcement officer will determine that [FOG's] performances violate the [Act]" based on a risk of false arrest.  Op., R.91 at 1424. Focusing on the fact that the *Davis-Kidd* opinion is not "attached [to] the [Adult Entertainment Act]," the court worried that officers might "arrest Plaintiff's performers" on the assumption that the Act's "harmful to minors" standard turns on "five- or eight-year old" children.  *Id.*  But even assuming a false *arrest* would lead to a false *prosecution* (a significant leap), this Court has repeatedly held that a "fear" of "wrongful prosecution and conviction under the Act" is "inadequate to generate a case or controversy the federal courts can hear."  *Glenn v. Holder*, 690 F.3d 417, 422 (6th Cir. 2012); *see White v. United States*, 601 F.3d 545, 553 (6th Cir. 2010).

Bottom line:  FOG lacked standing to challenge any aspect of the Act.

## B. FOG faces no injury from the Act's public-property provision because it never performs on public property.

Even assuming FOG intends to perform shows "harmful to minors," the district court still lacked jurisdiction to consider the Act's regulation of shows on "public property."  Tenn. Code Ann. § 7-51-1407(c)(1)(A).

Federal courts "address[] the injury in fact question on a *provision-specific basis.*"  *Prime Media v. Brentwood*, 485 F.3d 343, 351 (6th Cir. 2007) (emphasis added).  That means that "a plaintiff must establish . . . standing to challenge each

provision" of a law separately "by showing that he was [or will be] injured by application of" each separate provision. *Midwest Media Prop. v. Symmes Twp.*, 503 F.3d 456, 464 (6th Cir. 2007) (quotations omitted). Binding precedent explicitly "reject[s] the idea that an injury in fact under one provision creates standing to challenge other distinct provisions," *Prime Media*, 485 F.3d at 351, because "the plaintiff's injury in th[at] situation is not 'fairly traceable' to the . . . parts of the law that did not cause any injury," *Davis*, 51 F.4th at 171.

Here, the Act contains two separate provisions that govern "adult cabaret entertainment" in two distinct settings. *First*, the adults-only provision makes it "an offense for a person to perform adult cabaret entertainment . . . [i]n a location where the adult cabaret entertainment could be viewed by a person who is not an adult." Tenn. Code Ann. § 7-51-1407(c)(1)(B). *Second*, the public-property provision makes it "an offense for a person to perform adult cabaret entertainment . . . [o]n public property." *Id.* § 7-51-1407(c)(1)(A). Proof of intent to perform in one setting "does not magically . . . allow [FOG] to litigate" application of the law to the other. *Prime Media*, 485 F.3d at 350. FOG must show a separate injury for each.

And the record is devoid of evidence that the public-property provision would cause FOG to suffer an injury. FOG "never alleged any intention to" perform on public property—let alone introduce evidence establishing as much. *Brandywine, Inc. v. Richmond*, 359 F.3d 830, 835 (6th Cir. 2004); *see* Compl., R.10. To the

contrary, it conceded that it has *never* presented a play or production on public property. Transcript, R.81 at 1110. FOG's only connection to public property is its "participat[ion] in the Pride Festival" in Memphis, where its performers "passed out flowers" on "floats" in a parade and "dress[ed] up as the Statute of Liberty." *Id.* at 1112-13. Such activities do not qualify as "adult cabaret entertainment." Tenn. Code Ann. § 7-51-1401(12).

Those facts placed limits on the district court's jurisdiction—limits the court failed to recognize. The district court failed to distinguish the separate provisions of the Act, failed to make findings for each provision, and failed to analyze "whether [FOG] had standing to challenge any particular provision." *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 230 (1990).[2]

Instead, the court contended that "a pre-enforcement review of a statute based on substantial overbreadth . . . allows a Plaintiff to challenge *an entire statute's constitutionality*." Op., R.91 at 1411 (emphasis added). But invoking "the overbreadth doctrine does not solve th[e] problem." *Midwest Media*, 503 F.3d at 463. An overbreadth argument only "allows plaintiffs to bring a facial challenge to the provisions

---

[2] The district court (Op., R.91 at 1463) also declared the public-property provision unconstitutional without explaining why that provision—as opposed to the "other provision[]"—"violate[s] the Constitution." *California v. Texas*, 141 S. Ct. 2104, 2120 (2021); *see Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799-800 (1985) (analyzing speech restrictions in government-controlled forums under the "forum analysis").

under which the plaintiff suffered an injury in fact." *Prime Media*, 485 F.3d at 350 (quotations omitted).  It does not "grant a plaintiff carte blanche to challenge an entire" statute. *Maverick Media Grp. v. Hillsborough Cnty.*, 528 F.3d 817, 822 (11th Cir. 2008).  "[E]ven under the overbreadth doctrine," a plaintiff must "establish injury in fact as to each provision challenged." *Prime Media*, 485 F.3d at 350.  A mountain of precedent forecloses the district court's gross dispensation of standing. *See, e.g.*, *id.* at 350-51; *Midwest Media*, 503 F.3d at 463; *Davis*, 51 F.4th at 171.

 "Even though [FOG] advances an overbreadth challenge," it cannot litigate the Act's public-property provision "without a separate showing of an actual injury under th[at] provision[]." *Prime Media*, 485 F.3d at 350.  Because FOG made no such showing, the Court should "vacate the judgment of the [district court] with respect to [the public-property] provision[]." *FW/PBS*, 493 U.S. at 235.

## II.    The Adult Entertainment Act Is Not Unconstitutionally Vague.

The decades-old definition of "harmful to minors" cross-referenced in the Act is not unconstitutionally vague.

The Due Process Clause's "void for vagueness" doctrine ensures that a "person of ordinary intelligence" has "a reasonable opportunity to know what is prohibited" by the law.  *Grayned v. Rockford*, 408 U.S. 104, 108 (1972).  But "perfect clarity and precise guidance have never been required," even for laws "that restrict expressive activity."  *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989).  The

law is full of "flexible" "standards," *id.*, and "[c]lose cases can be imagined under virtually any statute," *United States v. Williams*, 553 U.S. 285, 306 (2008).  The vagueness doctrine only protects against laws that altogether fail "to give ordinary people fair notice of the criminalized conduct" or are "so standardless as to invite arbitrary enforcement."  *United States v. Parrish*, 942 F.3d 289, 295 (6th Cir. 2019) (cleaned up).

Relying on this doctrine, FOG contends "that the 'harmful to minors' standard incorporated in the A[ct] is unconstitutionally vague in that it can apply to minors from age five to seventeen years."  Op., R.91 at 1453.  But the U.S. Supreme Court disagreed in *Ginsberg*; the Tennessee Supreme Court's narrowing construction of § 39-17-901(6) eliminates any vagueness concern; and FOG failed to carry its heavy burden of supporting a *facial* vagueness challenge.

### A. The U.S. Supreme Court has rejected vagueness challenges to obscenity standards modified to apply to minors.

Section 39-17-901(6)'s "harmful to minors" definition has two defining features: (1) It incorporates the three-part *Miller* obscenity standard, and (2) it modifies that standard for application to "minors."  Nearly thirty States have adopted almost identical variable obscenity standards.[3]  And for good reason:  The Supreme Court has approved both features of § 39-17-901(6)'s definition.

---

[3] Ala. Code § 13A-12-200.1(11); Alaska Stat. Ann. § 11.61.128(c); Ariz. Rev. Stat. Ann. § 13-3501(1); Ark. Code Ann. § 5-68-501(2); Colo. Rev. Stat. Ann. § 24-90-

*First*, § 39-17-901(6)'s incorporation of the three-part *Miller* obscenity standard causes no vagueness problem. The Supreme Court has treated vagueness challenges to *Miller*'s standard as "nothing less than an invitation to overturn *Miller*." *Fort Wayne Books v. Indiana*, 489 U.S. 46, 57 (1989). And it has rejected that invitation, holding that the *Miller* obscenity standard is not unconstitutionally vague. *Id.*

*Second*, § 39-17-901(6)'s modification of the obscenity standard for "minors" does not somehow render it unconstitutionally vague—as the Supreme Court explained in *Ginsberg*. There, distributors challenged New York's definition of "harmful to minors" as unconstitutionally vague. 390 U.S. at 643. That definition modified the then-governing obscenity standard (the *Memoirs* standard) for application to minors, *id.* at 632-33, 638—a concept the Court labeled "variable obscenity," *id.* at 635 n.4. The appellant "challenge[d]" that definition as "void for vagueness," *id.* at 643, claiming that "the definition of obscenity 'harmful to minors' is so vague that an honest distributor of publications cannot know when he might be held to have

---

602(3); Conn. Gen. Stat. Ann. § 53a-193(2); Fla. Stat. Ann. § 847.001(7); Ga. Code Ann. § 20-2-324.6(a); 720 Ill. Comp. Stat. Ann. 5/11-21(a); Ind. Code Ann. § 35-49-2-2; Kan. Stat. Ann. § 21-6402(d)(2); La. Stat. Ann. § 14:91.11(A)(2); Mass. Gen. Laws Ann. ch. 272, § 31; Mich. Comp. Laws § 722.674(a); Minn. Stat. Ann. § 617.292(7); Neb. Rev. Stat. § 28-807(6); Nev. Rev. Stat. Ann. § 201.257; N.H. Rev. Stat. Ann. § 571-B:1(I); N.M. Stat. Ann. § 30-37-1(F); N.C. Gen. Stat. Ann. § 19-12(2); N.D. Cent. Code Ann. § 12.1-27.1-02(2); Okla. Stat. tit. 21, § 1040.75(2); 18 Pa. Stat. and Const. Stat. Ann. § 5903(e)(6); S.C. Code Ann. § 16-15-375(1); S.D. Codified Laws § 22-24A-2(7); Utah Code Ann. § 76-10-1201(5)(a); Va. Code Ann. § 8.01-40.5; Vt. Stat. Ann. tit. 13, § 2801(6); Wis. Stat. Ann. § 450.155(1)(c).

28

violated" the statute. *Id.* at 643. The Court, however, held that a "harmful to minors"

definition that uses a variable obscenity standard "gives . . . adequate notice of what

is prohibited and does not offend the requirements of due process." *Id.* (quotations

omitted).

That holding governs here. The definition in § 39-17-901(6) "alters the *Miller*

test so that it can be used for determining what material is harmful to minors." *M.S.*

*News Co. v. Casado*, 721 F.2d 1281, 1286-87 (10th Cir. 1983). "[T]his is precisely

what the ordinance in *Ginsberg* did with the old *Memoirs* test," and *Ginsberg* found

no vagueness problem. *Id.* That is, "*Ginsberg* approved the use of a variable ob-

scenity standard—an adaptation of the general standard for determining adult ob-

scenity to reflect the prevailing standards . . . with respect to what is suitable material

for minors." *Am. Booksellers v. Webb*, 919 F.2d 1493, 1496 (11th Cir. 1990)

(cleaned up).

The fact that *Ginsberg* involved a statute modifying the *Memoirs* obscenity

standard, rather than the *Miller* obscenity standard, makes no difference. *Miller*

simply tweaked the obscenity test developed in *Memoirs* from a standard requiring

that material be "utterly without redeeming social value" to a standard mandating

that the work "lack[] serious literary, artistic, political, or scientific value." *Miller*,

413 U.S. at 24-25. "Nothing in *Miller* casts any doubt on the constitutional viability

of a variable standard of obscenity for minors based upon a *Ginsberg*-like adaptation

of the current Supreme Court standard for determining adult obscenity." *Webb*, 919 F.2d at 1503; *M.S. News*, 721 F.2d at 1286-87.

A host of courts have faithfully applied *Ginsberg* to reject vagueness challenges to nearly identical definitions of "harmful to minors." *Webb*, 919 F.2d at 1503, 1505-06; *M.S. News*, 721 F.2d at 1286-87; *Simmons v. State*, 944 So. 2d 317, 329 (Fla. 2006). This Court should follow the same course.

The district court departed from this overwhelming precedent by hitching its analysis to *ACLU v. Mukasey*, 534 F.3d 181 (3d Cir. 2008). Op., R.91 at 1453-54. But, for one, *Mukasey*'s vagueness analysis contains *no discussion* of *Ginsberg* or cases from other circuits rejecting a vagueness challenge to the "harmful to minors" definition. *See Mukasey*, 534 F.3d at 205. Second, *Mukasey*'s vagueness analysis pulled heavily from the lower court's decision, *id.*, which *did* recognize *Ginsberg*'s binding effect and distinguished "face-to-face transactions" (like those in bookstores or live performances) from the "radically" different context of regulating the "Internet." *ACLU v. Gonzales*, 478 F. Supp. 2d 775, 818 (E.D. Pa. 2007). Third, *Mukasey*'s vagueness analysis is irrelevant given that Tennessee's "harmful to minors" definition covers only materials which lack value "for a reasonable 17-year-old minor." *Davis-Kidd*, 866 S.W.2d at 528.

Put simply, *Ginsberg* governs. The Act is not unconstitutionally vague.

30

**B. In any event, the Tennessee Supreme Court's construction of Tenn. Code Ann. § 39-17-901(6) negates FOG's vagueness argument.**

FOG's vagueness argument is also untenable under Tennessee law. FOG's theory depends on the notion that the "harmful to minors" standard "can apply to minors from age five to seventeen years." Op., R.91 at 1453. But that notion has been nullified by the Tennessee Supreme Court's construction of § 39-17-901(6) in *Davis-Kidd*, which limits the definition of "harmful to minors" to content that lacks value for reasonable 17-year-olds. 866 S.W.2d at 528. That controlling interpretation dispels any possible vagueness argument. *Am. Booksellers Ass'n v. Virginia*, 882 F.2d 125, 127, n.2 (4th Cir. 1989) (rejecting vagueness challenge to variable obscenity standard construed to apply to "normal, older adolescents").

**C. FOG failed to establish facial invalidity.**

A final point on vagueness: Even if the "harmful to minors" definition could be considered impermissibly vague in certain applications, FOG failed to carry its burden of establishing *facial* invalidity.

Normally, "litigants mounting a facial challenge to a statute . . . 'must establish that *no set of circumstances* exists under which the [statute] would be valid.'" *United States v. Hansen*, 143 S. Ct. 1932, 1939 (2023) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). In the context of a facial vagueness challenge, that generally means "the complainant must demonstrate that the law is impermissibly vague in all of its applications." *Vill. of Hoffman Ests. v. Flipside, Hoffman*

*Ests.*, 455 U.S. 489, 497 (1982). That rule has been relaxed in vagueness challenges implicating First Amendment rights and other narrow circumstances. *United States v. Requena*, 980 F.3d 30, 41 (2d Cir. 2020). But the Supreme Court has never clearly stated that facial vagueness challenges require courts to compare constitutional applications to unconstitutional applications, as they do in First Amendment overbreadth challenges. And even assuming an overbreadth-like comparison is required, courts "vigorously enforce[] the requirement that a statute's" unconstitutional applications "be *substantial* . . . relative to the statute's plainly legitimate sweep," *Williams*, 553 U.S. at 292, and place the burden of making that showing squarely on the challenger, *Virginia v. Hicks*, 539 U.S. 113, 122 (2003).

But, here, FOG did not prove any vague applications—much less establish that "the ratio of unlawful-to-lawful applications" is "lopsided enough to justify the strong medicine of facial invalidation." *Hansen*, 143 S. Ct. at 1948 (quotations omitted). Indeed, many of the performances covered by the Act will satisfy the "harmful to minors" standard regardless of whether § 39-17-901(6)'s reference to "minors" turns on the community standards for a toddler or a teenager—for example, performances involving stripping or topless dancing. At a minimum, this Court should not *facially* invalidate the Act's "harmful to minors" definition.

## III. The Adult Entertainment Act Does Not Run Afoul of the First Amendment's Overbreadth Doctrine.

FOG also comes up short on its claim that the Act violates the First Amendment's overbreadth doctrine. That doctrine allows courts to "invalidate[] [a statute] as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quotations omitted). Invalidation for overbreadth is "strong medicine" that courts dispense "with hesitation, and . . . only as a last resort." *New York v. Ferber*, 458 U.S. 747, 769 (1982) (quotations omitted). Indeed, the doctrine is openly "disfavored." *Connection Distrib.*, 557 F.3d at 336.[4] The Supreme Court has, therefore, "vigorously enforced" the requirement that the challenger prove a *substantial* number of unconstitutional applications. *Williams*, 553 U.S. at 292. FOG does not come close to carrying that burden here.

### A. The Act allows "Adult Cabaret Entertainment" in private, age-restricted venues.

"To judge whether a statute is overbroad," this Court "must first determine what it covers." *Hansen*, 143 S. Ct. at 1940. Here, the Court must determine how far to extend Tenn. Code Ann. § 7-51-1407(c)(1)(B)'s reference to "a location where

---

[4] The overbreadth doctrine should be reconsidered. *United States v. Hansen*, 143 S. Ct. 1932, 1952 (2023) (Thomas, J., concurring). And given the "cogent[] critici[sm]" of the doctrine, this Court should decline to "expand it." *United States v. Yung*, 37 F.4th 70, 76 (3d Cir. 2022).

33

the adult cabaret entertainment could be viewed by a person who is not adult." The district court believed that this language means "virtually anywhere," Op., R.91 at 1457, because minors *could* theoretically sneak into locations where they are not permitted to be, *id.* at 1444 ("Plaintiff could build a card-checking fortress around its theatre and a child *could* still be present."); Transcript, R.81 at 1192 (asking counsel whether he ever "snuck into a place that was carding").[5] The court essentially read the adults-only provision to apply to any location where the adult cabaret entertainment could *permissibly or impermissibly* be viewed by a person who is not an adult. But the statute is more naturally read to only apply to a location where the adult cabaret entertainment could *permissibly* be viewed by a person who is not an adult. At least four different interpretive principles favor this narrower reading.

*First*, "any interpretation of the [Act] that makes one [o]f its provisions irrelevant is presumptively incorrect," and the district court's broad interpretation "has exactly this effect." *United States v. Perry*, 360 F.3d 519, 537 (6th Cir. 2004). If the law could apply to locations that minors impermissibly access, then it could be applied "virtually anywhere," Op., R.91 at 1457, as clever minors could theoretically sneak into any location. But if the law could apply anywhere, *the Act would not need any location provisions*. It could have stopped after "It is an offense for a

---

[5] FOG never made this argument below, at least not clearly. And its own witness understood the law to apply only to areas where shows could permissibly be viewed by minors. Transcript, R.81 at 1069.

person to perform adult cabaret entertainment." Tenn. Code Ann. § 7-51-1407(c)(1). The Act certainly would not need the "on public property" provision. The district court's broad reading thus renders both location provisions in the Act entirely meaningless.

*Second*, the Court must "read [the Act's] language in its context and in the context of the . . . statutory scheme." *Knoxville v. Netflix, Inc.*, 656 S.W.3d 106, 110 (Tenn. 2022) (quotations omitted). "Context . . . includes common sense," *Biden v. Nebraska*, 143 S. Ct. 2355, 2379 (2023) (Barrett, J., concurring), and "certain assumptions . . . that an ordinary reader would bring to her understanding of the statutory text." *McLemore v. Gumucio*, No. 22-5458, 2023 WL 4080102, at *1 (6th Cir. June 20, 2023). Here, an ordinary reader would read the Act's provisions assuming that existing laws would be followed. That is, common sense dictates that the Act was not drafted to include locations that minors *impermissibly* access. And the context of the "overall statutory scheme" confirms as much. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (quotations omitted). If the Act applied everywhere, it would conflict with the reticulated statutes addressing adult-oriented establishments by criminalizing strip clubs, as minors could sneak into these establishments. That cannot be right. The "statutory scheme should be read so as to avoid creating internal conflicts" by adopting the State's internally "consistent

35

interpretation." *Mich. Dep't of Educ. v. U.S. Dep't of Educ.*, 875 F.2d 1196, 1202 (6th Cir. 1989).

  *Third,* "[t]he legislative history (for those who consider it) confirms, with unusual clarity," the State's narrower interpretation. *Sturgeon v. Frost*, 139 S. Ct. 1066, 1085 (2019). Both the Senate Sponsor and the House Sponsor described the Act as "clarify[ing] current law by requiring that adult-oriented performances may *only be held in age-restricted venues*." Legisl. Transcript, R.35-1 at 515 (Johnson) (emphasis added); *see id.* at 575 (Todd) (same). And the legislative discussion of the bill is replete with references to requiring age-restricted venues. *Id.* at 515-16, 521, 544-45, 547, 575-76, 579. A single legislator—who opposed the bill—argued that the language swept more broadly. *Id.* at 558-59. But "[t]he fears and doubts of the opposition are no authoritative guide to the construction of legislation." *Schwegmann Bros. v. Calvert Distillers Corp.*, 341 U.S. 384, 394 (1951). "In their zeal to defeat a bill, they understandably tend to overstate its reach." *NLRB v. Fruit Packers*, 377 U.S. 58, 66 (1964).

  *Fourth,* the Court must "construe the statute to avoid constitutional [over-breadth] problems." *Ferber*, 458 U.S. at 769 n.24; *Déjà Vu v. Union Twp. Bd. of Trs.*, 411 F.3d 777, 786 (6th Cir. 2005). "[E]very reasonable construction must be resorted to in order to save a [legislative act] from unconstitutionality." *Hooper v. California*, 155 U.S. 648, 657 (1895). "This canon [of constitutional avoidance] is

normally a valuable ally for criminal defendants," but with the "odd incentives created by the overbreadth doctrine," the district court brushed it aside, erroneously "press[ing] the [the adults-only provision] toward the most expansive reading possible." *Hansen*, 143 S. Ct. at 1946.

Given these interpretive principles, the best reading of the adults-only provision is clear: It prevents adult cabaret entertainment in locations that minors can permissibly access.

To the extent this Court remains uncertain, it should abstain or seek guidance from Tennessee's judiciary. "[W]hen a federal constitutional claim is premised on an unsettled question of state law, the federal court should stay its hand in order to provide the state courts an opportunity to settle the underlying state-law question." *Harris Cnty. Comm'rs Ct. v. Moore*, 420 U.S. 77, 83 (1975). Doing so "affords the [Tennessee] courts the respect they are due as . . . equals in a federalist judicial system." *Gottfried v. Med. Plan. Servs., Inc.*, 142 F.3d 326, 332 (6th Cir. 1998). That is why abstention "has been applied [so] regularly" in federal civil rights actions. *Brown v. Tidwell*, 169 F.3d 330, 332 (6th Cir. 1999). And if the Court wants to avoid abstention, it could "rely on [the Tennessee] Supreme Court['s] certification procedures." *Hill v. Snyder*, 900 F.3d 260, 265 (6th Cir. 2018)—though, if the Court seeks certification, it should stay or dramatically limit the injunctive relief, *see infra* 52-55, during the process.

The scope of the Act is a "central legal question in this case," Op., R.91 at 1406, and properly construed, the Act does not violate the First Amendment.

**B. The Act poses no First Amendment problem.**

FOG failed to prove *any* First Amendment violation. The Act does not call for heightened scrutiny. And, even under strict scrutiny, the Act passes constitutional review.

### 1. Heightened scrutiny is not warranted.

The Act should be subjected to the lesser scrutiny applied to content-neutral restrictions. While the Act references the content of certain performances—"adult cabaret entertainment," Tenn. Code Ann. § 7-51-1401(12)—not all statutes that "reference . . . the content of speech . . . rise to the level of a presumptively impermissible content-based regulation of speech." *Connection Distrib.*, 557 F.3d at 329. In certain situations, even if a law's text is "plainly content-based" in a technical sense, courts apply "the standard applicable to content-neutral regulations"—i.e., a standard akin to intermediate scrutiny requiring an important interest and alternative avenues of communication. *Richland Bookmart, Inc. v. Nichols*, 137 F.3d 435, 440 (6th Cir. 1998). For two independent reasons, the Act should be "treat[ed] . . . as content-neutral" and subjected to this "less[er] scrutiny." *Big Dipper Ent., LLC v. Warren*, 641 F.3d 715, 717 (6th Cir. 2011).

***Adult-Only Zones***.  *First*, strict scrutiny does not apply when a statute prohibits minors from accessing content that is obscene as to minors, but not as to adults, if adults can still obtain the regulated speech.  "First Amendment jurisprudence has acknowledged limitations on the otherwise absolute interest of the speaker in reaching an unlimited audience where the speech is sexually explicit and the audience may include children."  *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 684 (1986).  Of course, "speech within the rights of adults to hear may not be *silenced completely* in an attempt to shield children from it."  *Ashcroft*, 535 U.S. at 252 (emphasis added); *see Reno v. ACLU*, 521 U.S. 844 (1997).  But when analyzing the "regulation of speech unprotected as to minors that indirectly affects speech protected as to adults," courts have routinely declined to apply strict scrutiny; instead, they "have evaluated . . . restrictions on the display of material 'harmful to minors' in light of the constitutional standards for a reasonable time, place, and manner regulation" or a similar balancing test.  *Webb*, 919 F.2d at 1501-02; *see Upper Midwest Booksellers Ass'n v. Minneapolis*, 780 F.2d 1389, 1394 (8th Cir. 1985); *M.S. News*, 721 F.2d at 1288; *Athenaco v. Cox*, 335 F. Supp. 2d 773, 782 (E.D. Mich. 2004).

This Court should take the same approach.  The Act does not bar adults' access to the performances at issue; it merely requires these performances to take place in adult-only zones. Accordingly, the lesser standard applied to time-place-manner restrictions should govern.

***Secondary-Effects Doctrine***.  *Second*, the Supreme Court's secondary-effects doctrine cuts against strict scrutiny.  Under that doctrine, "the government [can] accord differential treatment to a content-defined subclass of speech [if] that subclass [i]s associated with specific 'secondary effects' of the speech."  *Daunt v. Benson*, 956 F.3d 396, 420 (6th Cir. 2020).  And, here, by protecting children from obscene content, the Act inherently addresses the secondary effects associated with exposure to such content—namely, an increase in "sexual exploitation crimes."  Legisl. Transcript, R.35-1 at 528.  During legislative proceedings, a witness testified that obscene performances "sexual[ly] desensitiz[e] [children,] . . . render[ing] them more vulnerable to sexual predation," "empower[ing] child predators and increas[ing] the demand to exploit and sexually abuse children."  *Id.* at 525-26.  The prevention of this type of "sexual assault" qualifies as a secondary effect.  *See Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 583 (1991) (Souter, J., concurring in judgment); *see Triplett Grille, Inc. v. Akron*, 40 F.3d 129, 134 (6th Cir. 1994) (noting Justice Souter's *Barnes* concurrence is controlling).  Because the Act curbs secondary effects, the Court has yet another basis for analyzing it as a content-neutral regulation.

***District Court's Analysis***.  The district court nevertheless declined to apply the lesser standard governing time-place-manner restrictions.  The court's rejection of the State's arguments, though, rests largely on (1) its incorrect interpretation of the adults-only provision, Op., R.91 at 1447-49, and (2) an ill-founded quest to find

40

an improper purpose underlying the Act, *id.* at 1446; *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47-48 (1986) (holding that secondary-effects doctrine applied regardless of allegedly illicit legislative motive).  The district court also suggested that the secondary effects doctrine cannot be invoked because the protection of children is a direct, not a secondary, effect.  Op., R.91 at 1446-47.  But that fails to acknowledge that the prevention of the "primary effects"—the harm to children from viewing the content—and the secondary effects—an increase in sexual exploitation crimes—are intertwined.  Legisl. Transcript, R.35-1 at 525-28.

To justify heightened review, the district court relied on the dual misconceptions that the Act (1) involves viewpoint discrimination and (2) furthers an impermissible purpose.

*First*, the district court concluded that the Act "target[s] speakers" and "discriminates against the viewpoint of gender identity" by referencing "male or female impersonators" in the Act.  Op., R.91 at 1436-37.  But not "all regulations distinguishing between speakers warrant strict scrutiny." *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 657 (1994).  "[S]peaker distinctions . . . are not presumed invalid under the First Amendment" or subjected to "strict scrutiny" unless "they reflect the Government's preference for[,] . . . or aversion to[,] what the disfavored speakers have to say." *Id.* at 645, 658.  The Act does no such thing.

41

The Act places limits on adult-oriented performances (1) that are "harmful to minors" and (2) "that feature topless dancers, go-go dancers, exotic dancers, strippers, male or female impersonators, or similar entertainers." Tenn. Code Ann. § 7-51-1401(12). The first component imposes a constitutionally permissible subject-matter restriction that is treated as content-neutral. *Supra* 38-40. And the second component merely identifies performers who engage in that type of performance. The reference to specific categories of performers clarifies the type of "adult-oriented performances" that are "harmful to minors" *without* narrowing the covered speech. And since it does not narrow the speech covered by the Act, it cannot possibly impose a viewpoint-based restriction.

An example illustrates the lack of viewpoint discrimination. If the list of performers included *only* "male or female impersonators," then an argument could be made that the State was using an identity-based restriction as a "means of exercising a content preference." *Turner*, 512 U.S. at 645. In that example, the Act would be singling out performances "harmful to minors" given by a particular group that engages in a specific type of speech. But the Act does just the opposite. It lists types of performers that might engage in sexual speech "harmful to minors" and then includes a catchall—"*or similar entertainers.*" That catchall covers anyone—regardless of viewpoint—who engages in a "adulted-oriented performance" that is

"harmful to minors."   Tenn. Code Ann. § 39-17-901(6); *id* § 7-51-1401(12).  So the list of performers in the Act imposes no viewpoint-based restriction.

FOG did not identify any examples where a performer's identity dictated whether the performer could engage in "adult-oriented performances" that are "harmful to minors" under the Act.  Nor did the district court.  Transcript, R.81 at 1198-1202; Op., R.91 at 1436.  The court claimed that a hypothetical Elvis imper-sonator who "tell[s] jokes" of a sexual nature is not "a similar entertainer" because "[t]he similar entertainers' common thread . . . is that they are all dancers of a sort." R.91 at 1436.  But the Act's restriction on "adult cabaret entertainment" includes only "adult-oriented performances," Tenn. Code Ann. § 7-51-1401(12), and an Elvis impersonator telling jokes is not an "adult-oriented performance."  "Adult-oriented" is used throughout this statutory scheme to reference performances that incorporate display or dance.  *See id.* at § 7-51-1401(2)-(3).  Thus, in straining to find viewpoint discrimination, the court took its hypothetical outside the Act altogether.

Because of the "similar entertainers" catchall, the identity-based clause adds no viewpoint-based restriction to the constitutionally permissible "harmful to mi-nors" clause—certainly not in a *substantial* number of the applications.  The district court erred in focusing on the phrase "male or female impersonators" in isolation to find viewpoint discrimination.

43

*Second*, the district court turned to what it saw as the Act's real purpose—the suppression of drag performers' speech—to justify the application of heightened scrutiny.   At trial, though, FOG explicitly stated that it was no longer "maintaining the argument that the legislature specifically intended to target drag performers." Transcript, R. 81 at 1236.   That should have ended the inquiry.   *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020).

Undeterred, the district court pursued this issue under *Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015).   But the court misread *Reed*'s purpose-or-justification inquiry as requiring it to speculate as to legislative motives. Op., R.91 at 1438-44. *Reed* does no such thing.   "[T]he law forecloses this kind of adventure."  *Bailey v. Callaghan*, 715 F.3d 956, 960 (6th Cir. 2013).

"It is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive."  *United States v. O'Brien*, 391 U.S. 367, 383 (1968).  "Inquiries into congressional motives or purposes are a hazardous matter," *id.*, and "the search for the 'actual' or 'primary' purpose of a statute is likely to be elusive," *Michael M. v. Superior Ct.*, 450 U.S. 464, 469-70 (1981).  "[I]ndividual legislators may have voted for the statute for a variety of reasons," *id.* at 470, and attempts to ascertain these "motivation[s] represent a substantial intrusion into the workings of other branches of government," *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S.

44

252, 268 (1977).  Accordingly, even in the First Amendment context, the Court has "eschew[ed]" the "guesswork" associated with determining a statute's "real" purpose.  *O'Brien*, 391 U.S. at 384; *see Renton*, 475 U.S. at 47-48; *Turner*, 512 U.S. at 652.  It, instead, "presume[s] that a legislature acts . . . in good faith."  *United States v. Des Moines Nav. & Ry. Co.*, 142 U.S. 510, 544 (1892).

To be sure, in analyzing content-neutrality, courts have considered whether the law can be "'justified without reference to the content of the regulated speech,'" or whether the law was "adopted by the government 'because of disagreement with the message' [the speech] conveyed."  *Reed*, 576 U.S. at 164 (quoting *Ward,* 491 U.S. at 791).  But this inquiry—stemming from the Supreme Court's decision in *Ward*—does not give courts free rein to divine legislative motives.  Courts look to the law's *stated* "justification for the government regulation," not isolated "statements" by legislators purportedly showing "an illicit motive in enacting" the law.  *Erie v. Pap's A.M.*, 529 U.S. 277, 292-95 (2000); *see also Reed*, 576 U.S. at 166 (citing *United States v. Eichman*, 496 U.S. 310, 314-15 (1990) (finding the government's "asserted interest" of "protecting the flag's symbolic meaning" content-based because *that stated interest* "related to the suppression of free expression") (quotations omitted)).  In decisions after *Ward*, the Supreme Court and this Court have declined to engage in speculation as to legislative motive.  *Erie*, 529 U.S. at 292; *Turner*, 512 U.S. at 652; *Bailey*, 715 F.3d at 960.

Here, the objective indicators of the legislature's purpose demonstrate no discriminatory purpose. The text—"the best indicator of intent," *Nixon v. United States*, 506 U.S. 224, 232 (1993)—affirmatively precludes the contention that the Act targets drag. The Act copies verbatim from existing laws governing adult establishments and adult cabaret—laws that existed decades before any recent controversy over drag. *Supra* 5-6. The statute prohibits only highly-sexualized performances, Tenn. Code Ann. § 39-17-901(6), and imposes the same restrictions on drag performers that it imposes on other entertainers who may provide sexually-explicit performances. *Supra* 41-43; *Phelps-Roper v. Strickland*, 539 F.3d 356, 361 (6th Cir. 2008) (finding no "disagreement with the message" when statute "appl[ied] equally" (quotations omitted)).

The legislative history likewise proves no improper purpose. The stated purpose of the Act was to protect minors from exposure to sexually explicit performances. Legisl. Transcript, R.35-1 at 516-17, 520-21, 547, 549, 567-68, 602, 606. The legislature was clearly not attempting to ban all drag performances. *Id.* at 523, 537-38, 567, 593, 602, 605. Indeed, the legislative history contains repeated references to the limited goal of requiring performances that contain content harmful to minors to occur in age-restricted venues. *Id.* at 515-516, 521, 544-45, 547, 575-76, 579.

The district court's contrary analysis makes mountains out of mole hills. Op., R.91 at 1438-44. The court's review of the text draws tenuous inferences from what is *not* included, rather than what is. *Id.* at 1438-39. Its analysis of the legislative history claims "references to 'drag'" demonstrate an impermissible purpose, when the legislature was simply discussing events in the community that led to calls to clarify existing law. *Id.* at 1441. Its discussion of statements from Representative Chris Todd departs from the well-established principle that "[w]hat motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2256 (2022) (quotations omitted). And its reliance on statements of those who *opposed* the Act fails to recognize that "the speculations and accusations of [a] law's few opponents simply do not support an inference of . . . animus." *Butts v. New York*, 779 F.2d 141, 147 (2d Cir. 1985). This analysis presents the paradigmatic example of why the federal judiciary should not flyspeck legislative records in search of nefarious intent.

The Act does not engage in viewpoint discrimination or rest on an impermissible purpose, so strict scrutiny does not apply.

### 2. The Act passes any tier of constitutional review.

Whatever tier of scrutiny applies, the Act passes constitutional muster.

The Act easily satisfies the applicable time-place-manner standard. It furthers a government interest of the utmost importance (protecting the physical and psychological health of children), and it leaves open "alternative avenues of communication" (any location that complies with existing laws and excludes minors). *Renton*, 475 U.S. at 46-47.

Even if Plaintiff's First Amendment claim warranted strict scrutiny, the Act would be constitutional because it "is narrowly tailored to serve a compelling interest." *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 444 (2015).

***Compelling Interest***. "It is evident beyond the need for elaboration that a State's interest in safeguarding the physical and psychological well-being of a minor is compelling." *Ferber*, 458 U.S. at 756-57 (quotations omitted). And this "compelling interest . . . extends to shielding minors from the influence" of speech "that is not obscene by adult standards." *Sable Commc'ns v. FCC*, 492 U.S. 115, 126 (1989); *Ginsberg*, 390 U.S. at 639-40. Accordingly, "[t]he Parties do not dispute" that the Act furthers a compelling interest. Op., R.91 at 1450.

***Narrow Tailoring***. The Act is narrowly tailored. It applies only to "a narrow slice of speech"—sexual speech that is obscene to minors under a variable obscenity standard. *Williams-Yulee*, 575 U.S. at 452. And it does not ban that speech; it merely requires the performances to occur in adult-only zones. *Supra* 33-37. The Act thus "tightly fits the State's compelling interest" by "limiting children's exposure," while

"still allow[ing] adults to" view the performances. *Crawford v. Lungren*, 96 F.3d 380, 387 (9th Cir. 1996) (holding that a restriction on adult-oriented publications satisfied strict scrutiny). It "targets and eliminates no more than the exact source of the 'evil' it seeks to remedy": exposure of children to obscene speech. *Frisby v. Schultz*, 487 U.S. 474, 485 (1988).

The district court disagreed, mostly because it "refus[ed] to adopt Defendant's reading of [the Act's] Location Provision." Op., R.91 at 1450. That was a mistake. *Supra* 33-37.

The court also took issue with the Act's lack of a parental consent defense. Op., R.91 at 1451. But the State is not required to provide a parental-consent exception for every restriction related to minors. The State has its own "*independent* interest in the well-being of its youth." *Ginsberg*, 390 U.S. at 639-40 (emphasis added). That interest does not disappear because of parental consent. And allowing a minor to access sexualized performances with parental consent would impair the State's interest. That is why, for example, children are not allowed in strip clubs, even with their parents' consent. Tenn. Code Ann. § 7-51-1113(e). And it is why children cannot participate in pornography, even if their parents would allow it. *Connection Distrib.*, 557 F.3d at 328-29. The district court simply errs in suggesting that "parents' control over their children is without limit," *Kanuszewski v. MDHHS*,

49

927 F.3d 396, 419 (6th Cir. 2019), and that laws without parental-consent exceptions categorically fail the narrow-tailoring requirement.

The district court also erred in asserting that, even if the State has an independent interest, the Act lacks tailoring because it "inflicts no punishment to the parent who brings their minor child to view adult cabaret entertainment." Op., R.91 at 1451. This contention is nothing more than an assertion that the State could have gone further. But, of course, "a legislature need not strike at all evils at the same time." *New Orleans v. Dukes*, 427 U.S. 297, 305 (1976) (quotations omitted).

Lastly, the district court pointed to the absence of a "textual scienter requirement." Op., R. 91 at 1451. "But there is a simple explanation for [that]: There is no need for it." *Hansen*, 143 S. Ct. at 1945. Courts presume that there is a *mens rea* requirement in criminal statutes even when a statute is "silent," unless there is "some indication of [legislative] intent" overcoming this "presumption." *Staples v. United States*, 511 U.S. 600, 605-19 (1994); *Elonis v. United States*, 575 U.S. 723, 734 (2015). And the Tennessee Supreme Court has inferred scienter for all "criminal statutes regulating obscenity," holding that "the State must establish that the defendant had knowledge of the contents and character of the" speech at issue. *Davis-Kidd*, 866 S.W.2d at 528. The Act thus "implicitly incorporates the traditional state of mind required for" all obscenity offenses. *Hansen*, 143 S. Ct. at 1945.

The Act comports with the First Amendment.

### C. In any event, FOG fails to establish a substantial number of unconstitutional applications.

Finally, even assuming some unconstitutional applications of the Act exist, FOG nowhere demonstrated, "from the text of the law and from actual fact, that substantial overbreadth exists." *Hicks*, 539 U.S. at 122 (cleaned up).

The Act "complies with the First Amendment in most settings." *Connection Distrib.*, 557 F.3d at 336. It can be constitutionally applied to prevent strip performances at a shopping mall or topless dancing at a food hall. It can be constitutionally applied to prevent highly sexualized performances by exotic dancers at a water park or a sports facility. The list goes on. FOG does nothing to show that any of these applications are unconstitutional.

The Act can also be constitutionally applied to performances that rise to the level of being obscene to minors *and adults*. FOG does not dispute that material obscene to adults "is unprotected by the First Amendment," *Miller*, 413 U.S. at 23, that States "may regulate [unprotected speech] without infringing on the First Amendment," *id.* at 20, or that the Act "regulate[s] [a] subset" of speech that may be obscene to adults, *Virginia v. Black*, 538 U.S. 343, 363 (2003); *see* Brief, R.58 at 791-93. And "only a minimal number of [performances] will have serious value for reasonable adults but not for reasonable minors." *Webb*, 919 F.2d at 1506. Again, FOG never even addressed this category of applications.

51

Accordingly, even accepting the asserted merits arguments, FOG still did not carry its burden of showing a *substantial* number of unconstitutional applications.

## IV.    The District Court Granted Improper Injunctive Relief.

Even assuming some hypothetical constitutional violation, the district court erred in enjoining Mulroy from enforcing *the entirety* of the Adult Entertainment Act against *anyone* within his jurisdiction in Shelby County, Tennessee.  Op., R.91 at 1462.  That injunctive relief must be limited in at least three ways.

***Limited to the Adults-Only Provision at Issue***.  The district court lacked the power to enjoin the Act's public-property provision because it lacked Article III authority to even consider that provision.  *Supra* 23-26.

***Limited to FOG***.  "[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief *to the plaintiffs*."  *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (emphasis added).  And it "must . . . be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Gill v. Whitford*, 138 S. Ct. 1916, 1921 (2018) (quotations omitted).

Here, if the threatened enforcement of the Act's adult-only provision against FOG gives rise to an Article III injury, then an injunction preventing Mulroy from enforcing that provision *against FOG* would fully redress the injury.  *Id.*  By going "further than that, ordering the government to take (or not take) some action with respect to those who are strangers to the suit," the district court exceeded "the

judicial role of resolving cases and controversies." *DHS v. New York*, 140 S. Ct. 599, 599-601 (2020) (Gorsuch, J., concurring). "[N]either declaratory nor injunctive relief can directly interfere with enforcement of contested statutes or ordinances except with respect to the particular federal plaintiffs[;] the State is free to prosecute others who may violate the statute." *Doran v. Salem Inn*, 422 U.S. 922, 931 (1975).

That FOG raised a *facial* challenge to the Act changes nothing. This Court recently rejected a state-wide injunction premised on "a facial invalidation of the Act, as opposed to an as-applied invalidation of the Act." *L.W. v. Skrmetti*, 73 F.4th 408, 414 (6th Cir. 2023). It explained that "[d]istrict courts 'should not issue relief that extends further than necessary to remedy the plaintiff's injury,'" even in cases that raise facial challenges. *Id.* at 415 (quoting *Commonwealth v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023)). Instead, as with all other challenges, courts "must operate in a party-specific and injury-focused manner." *Id.*

There is no principled distinction between a state-wide injunction and a county-wide injunction, *see* Op., R.91 at 1462. Both "go[] beyond the injuries of a particular plaintiff to enjoin government action against nonparties" in a manner that "exceeds the norms of judicial power." *L.W.*, 73 F.4th at 415. Accordingly, any injunction here must be limited to FOG.

***Limited to the Allegedly Unconstitutional Component of the Challenged Provision***. The district court eschewed the well-established principle that courts

generally "enjoin only the unconstitutional applications of a statute" or "sever its problematic portions while leaving the remainder intact." *Ayotte v. Planned Parenthood*, 546 U.S. 320, 329 (2006). Tennessee law embraces that principle in its severability statute. Tenn. Code Ann. § 1-3-110. And the Tennessee Supreme Court has long effectuated the statute's directive by "eliding"—i.e., severing—the "objectionable features of [a challenged] statute" and leaving "the remainder . . . valid and enforceable." *Willeford v. Klepper*, 597 S.W.3d 454, 470-71 (Tenn. 2020) (quotations omitted).

Here, to the extent the Act's reference to "male or female impersonators" in Tenn. Code Ann. § 7-51-1401(12)(A) causes a constitutional problem, it can and should be severed. The Act would remain "capable of enforcement." *Memphis Planned Parenthood, Inc. v. Sundquist*, 175 F.3d 456, 466 (6th Cir. 1999) (quotations omitted). And severance of the "male or female impersonators" language—or even the entire "entertainers" clause—would in no way impair the "object" of the statute. *See id.*

And to the extent the supposed constitutional violation turns on the (erroneous) view that the law can be applied in situations where minors impermissibly access a forum by evading an age-restriction, *but see supra* 33-37, the Court should "enjoin" only those allegedly "unconstitutional applications of the law while preserving the other valid applications of the law." *Connection Distrib.*, 557 F.3d at

342.  The Supreme Court has repeatedly followed this course in First Amendment cases where the alleged unconstitutional application rests on a broad reading of a challenged statute.  *United States v. Grace*, 461 U.S. 171, 180-83 (1983); *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504 (1985).

In short, even if the Court finds injunctive relief appropriate, it must respect the federalism principles that "restrain a federal court" when "an injunction against a criminal proceeding is sought under § 1983." *Rizzo v. Goode*, 423 U.S. 362, 379-80 (1976).

## CONCLUSION

The Court should reverse the judgment of the district court.

Dated: August 22, 2023      Respectfully submitted,

Jonathan Skrmetti
  *Attorney General & Reporter*

Andrée Sophia Blumstein
  *Solicitor General*

James R. Newsom III
  *Special Counsel*

<u>/s/J. Matthew Rice</u>
J. Matthew Rice
  *Associate Solicitor General &*
  *Special Assistant to the Solicitor General*

Robert W. Wilson
  *Senior Assistant Attorney General*

Office of Tennessee Attorney General
P. O. Box 20207
Nashville, Tennessee 37202
(615) 532-6026
matt.rice@ag.tn.gov

*Counsel for Defendant-Appellant*

## CERTIFICATE OF COMPLIANCE

This brief complies with the Court's type-volume limitations of Fed. R. App. P. 32(a)(7)(b) because it contains 12,987 words, excluding portions exempted by Fed. R. App. P. 32(f) and 6 Cir. R. 32(b)(1).

This brief also complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5)-(6) because it has been prepared in proportionally spaced typeface using Times New Roman 14-point font in Microsoft Word.

/s/J. Matthew Rice
J. MATTHEW RICE
*Associate Solicitor General &*
*Special Assistant to the Solicitor General*

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. App. P. 25(d) and 6 Cir. R. 25(f), I certify that a true and exact copy of this brief has been filed via the Court's electronic filing system on August 22, 2023.  That system sends a Notice of Docket Activity to all registered attorneys in this case.  Under 6 Cir. R. 25(f)(1)(A), "[t]his constitutes service on them and no other service is necessary."

/s/J. Matthew Rice
J. MATTHEW RICE
*Associate Solicitor General &*
*Special Assistant to the Solicitor General*

## DESIGNATION OF RELEVANT DOCUMENTS

The following record documents are relevant to this appeal:

| Document | R. | Pages |
|---|---|---|
| Case No. 2:23-cv-02163 Complaint [Compl.] | 1 | 1-14 |
| Plaintiff's Motion for a TRO [Motion] | 7 | 29-46 |
| Case No. 2:23-cv-02163 Amended Complaint [Compl.] | 10 | 51-64 |
| Order Granting TRO [Order] | 26 | 177-91 |
| Order Extending TRO and Consolidating Cases [Extension] | 31 | 197-98 |
| Case No. No. 2:23-cv-02176 Complaint [Compl.] | 32-1 | 203-18 |
| TRO Hearing Transcript [Hearing] | 34 | 420-86 |
| Plaintiff's Brief [FOG Brief] | 35 | 487-509 |
| Exhibit A: Excerpts of Legislative History [Legisl. Transcript] | 35-1 | 510-633 |
| Defendants' Motion to Dismiss [MTD] | 41 | 699-702 |
| Plaintiff's Notice of Voluntary Dismissal of Governor Lee [Notice] | 45 | 738-39 |
| Plaintiff's Notice of Voluntary Dismissal of Tennessee [Notice] | 46 | 740-41 |
| Setting Letter for Status Conference [Conference] | 52 | N/A |
| Minute Entry for Status Conference [Conference] | 54 | N/A |
| Plaintiff's Notice of Withdrawal in Part of Previous Filing [Withdrawal] | 56 | 763-64 |
| Brief of Steven J. Mulroy in His Official Capacity [Brief] | 58 | 767-813 |
| Exhibit A: Excerpts of Deposition of Vanessa Rodley [Depo.] | 58-2 | 817-48 |
| Exhibit B: Excerpts of Plaintiff's Responses to Interrogatories, Requests for Production of Documents, and Requests for Admission [Interrog. Resp.] | 64-2 | 909-17 |
| May 22, 2023 Trial Transcript [Transcript] | 81 | 1042-1246 |

| Document | R. | Pages |
|---|---|---|
| District Court's Findings of Fact and Conclusions of Law [Op.] | 91 | 1394-1463 |
| Final Judgment of the District Court [Judgment] | 92 | 1464 |
| Notice of Appeal [Notice] | 94 | 1527-29 |
| Video Excerpts of Plaintiff's Performances Introduced at Trial (Submitted via Mail) [Trial Ex. 2] | N/A | N/A |

## ADDENDUM

For the Court's convenience, this addendum includes:

- Public Chapter No. 2, 113th General Assembly (2023) (the "Adult Entertainment Act")

- 1990 Tenn. Pub. Acts 938, ch. 1092, §§ 1-3

- 1987 Tenn. Pub. Acts 841, ch. 432, § 2

**Public Chapter No. 2, 113th General Assembly (2023)
(the "Adult Entertainment Act")**

# EXHIBIT A



# State of Tennessee

## PUBLIC CHAPTER NO. 2

### SENATE BILL NO. 3

**By Johnson, Crowe, Bowling, Haile, Hensley, Yager, Bailey, Jackson, Stevens, Niceley, Reeves, Taylor, Pody, Rose, Watson, Roberts**

Substituted for: House Bill No. 9

By Todd, Richey, McCalmon, Cepicky, Moon, Barrett, Bulso, Raper, Howell, Hawk, Vital, Moody, Davis, Sherrell, Gant, Fritts, Lynn, Sparks, Butler, Slater, Keisling, Leatherwood, Reedy, Haston, Warner, Campbell, Zachary, Capley, Williams, Ragan, Grills, Cochran, Powers, Eldridge, Baum

AN ACT to amend Tennessee Code Annotated, Title 7, Chapter 51, Part 14, relative to adult-oriented performances.

BE IT ENACTED BY THE GENERAL ASSEMBLY OF THE STATE OF TENNESSEE:

SECTION 1. Tennessee Code Annotated, Section 7-51-1401, is amended by adding the following language as new subdivisions:

( ) "Adult cabaret entertainment":

(A) Means adult-oriented performances that are harmful to minors, as that term is defined in § 39-17-901, and that feature topless dancers, go-go dancers, exotic dancers, strippers, male or female impersonators, or similar entertainers; and

(B) Includes a single performance or multiple performances by an entertainer;

( ) "Entertainer" means a person who provides:

(A) Entertainment within an adult-oriented establishment, regardless of whether a fee is charged or accepted for entertainment and regardless of whether entertainment is provided as an employee, escort as defined in § 7-51-1102, or an independent contractor; or

(B) A performance of actual or simulated specified sexual activities, including removal of articles of clothing or appearing unclothed, regardless of whether a fee is charged or accepted for the performance and regardless of whether the performance is provided as an employee or an independent contractor;

SECTION 2. Tennessee Code Annotated, Section 7-51-1407, is amended by adding the following language as a new subsection:

(c)(1) It is an offense for a person to perform adult cabaret entertainment:

(A) On public property; or

(B) In a location where the adult cabaret entertainment could be viewed by a person who is not an adult.

(2) Notwithstanding § 7-51-1406, this subsection (c) expressly:

(A) Preempts an ordinance, regulation, restriction, or license that was lawfully adopted or issued by a political subdivision prior to the effective date of this act that is in conflict with this subsection (c); and

# EXHIBIT A

(B) Prevents or preempts a political subdivision from enacting and enforcing in the future other ordinances, regulations, restrictions, or licenses that are in conflict with this subsection (c).

(3) A first offense for a violation of subdivision (c)(1) is a Class A misdemeanor, and a second or subsequent such offense is a Class E felony.

SECTION 3. This act takes effect April 1, 2023, the public welfare requiring it, and applies to prohibited conduct occurring on or after that date.

# EXHIBIT A

SENATE BILL NO. ___3___

PASSED: **March 2, 2023**

<br>

_____
**RANDY McNALLY**
*SPEAKER OF THE SENATE*

_____
**CAMERON SEXTON,** *SPEAKER*
*HOUSE OF REPRESENTATIVES*

APPROVED this 2nd day of _March_ 2023

_____
**BILL LEE,** *GOVERNOR*

**1990 Tenn. Pub. Acts 938, ch. 1092, §§ 1-3**

Case: 23-5611 Document: 26 Filed: 08/22/2023 Page: 84

PUBLIC ACTS and RESOLUTIONS

of the

STATE OF TENNESSEE

Passed by the

NINETY-SIXTH

GENERAL ASSEMBLY

Second Regular Session

1990

Published by Authority of
Tennessee Code Annotated, Title 12, Chapter 5
under the Direction of
BRYANT MILLSAPS
Secretary of State

Case: 23-5611    Document: 26    Filed: 08/22/2023    Page: 85

## CHAPTER NO. 1092

### HOUSE BILL NO. 2219

By Naifeh, Hassell, Bell, Moody, Davis (Gibson), Love, Moore (Lawrence), Williams, Cain, Ridgeway, DeBerry, Byrd, Burnett, Kernell, Rhinehart, Henry (Roane), Buck, Wix, Purcell, Herron, Holt, Givens, Turner (Hamilton), Pinion, Stallings, Collier, Severance, Kent, Burchfield, Peroulas, Hobbs, Jackson, Mr. Speaker Murray

### Substituted for: Senate Bill No. 2347

By Owen, Person, Darnell, Henry, Haynes

AN ACT to amend Tennessee Code Annotated, Title 39 and Title 29 relative to obscenity and pornography and abatement of nuisances resulting from obscenity and pornography.

BE IT ENACTED BY THE GENERAL ASSEMBLY OF THE STATE OF TENNESSEE:

SECTION 1. Tennessee Code Annotated, Section 39-17-901(2), is hereby amended by deleting the words "the state of Tennessee" and substituting instead the words "the judicial district, as defined by Section 16-2-506, in which a violation is alleged to have occurred".

SECTION 2. Tennessee Code Annotated, Section 39-17-901(6)(B), is amended by inserting at the beginning of that subdivision the words "The average person applying contemporary community standards would find that".

SECTION 3. Tennessee Code Annotated, Section 39-17-901 is amended by adding the following appropriately numbered subsections:

( ) "Excess violence" means the depiction of acts of violence in such a graphic and/or bloody manner as to exceed common limits of custom and candor, or in such a manner that it is apparent that the predominant appeal of the material is portrayal of violence for violence's sake.

( ) "Harmful to minors" means that quality of any description or representation, in whatever form, of nudity, sexual excitement, sexual conduct, excess violence, or sadomasochistic abuse when the matter or performance:

(A) Would be found by the average person applying contemporary community standards to appeal predominantly to the prurient, shameful or morbid interests of minors;

(B) Is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable for minors; and

(C) Taken as whole lacks serious literary, artistic, political or scientific values for minors.

( ) "Minor" means any person who has not reached the age of eighteen (18) and is not emancipated.

( ) "Nudity" means the showing of the human male or female genitals, pubic area, or buttocks with less than full opaque covering or the showing of the female breast with less than a fully opaque covering of any portion thereof below the top of the nipple, or the depiction of covered male genitals in a discernibly turgid state.

( ) "Sadomasochistic abuse" means flagellation or torture or physical restraint by or upon a person for the purpose of sexual gratification of either person.

( ) "Sexual excitement" means the condition of human male or female genitals when in a state of sexual stimulation or arousal.

SECTION 4. Tennessee Code Annotated, Section 39-17-902, is amended by adding the word and punctuation "produce," after the words "is unlawful to knowingly" but before the words "send or cause to be sent" in subsection (a);

AND IS FURTHER AMENDED by adding the following sentence at the end of subsection (b):

"However, this section shall not apply to those acts which are prohibited by Sections 39-17-1003 - 1005."

SECTION 5. Tennessee Code Annotated, 39-17-914, is amended by deleting it in its entirety and substituting instead the following:

### 39-17-914. Display for Sale or Rental of Material Harmful to Minors.

(a) It is unlawful for a person to display for sale or rental a visual depiction, including a video cassette tape or film, or a written representation, including a book, magazine, or pamphlet, which contains material harmful to minors anywhere minors are lawfully admitted.

(b) The state shall have the burden of proving that the material is displayed. Material is not considered displayed under this section if:

(1) The material is:

(A) Placed in "binder racks" that cover the lower two-thirds (2/3) of the material and the viewable one-third (1/3) is not harmful to minors; and

(B) Located at a height of not less than five and one-half (5 1/2) feet from the floor; and

(C) Reasonable steps are taken to prevent minors from perusing the material; or

(2) The material is sealed and if it contains material on its cover which is harmful to minors it must also be opaquely wrapped; or

(3) The material is placed out of sight underneath the counter; or

(4) The material is located so that the material is not open to view by minors and is located in an area restricted to adults.

(5) Unless its cover contains material which is harmful to minors, a video cassette tape or film is not considered displayed if it is in a form that cannot be viewed without electrical or mechanical equipment and such equipment is not being used to produce a visual depiction.

(6) In a situation if the minor is accompanied by their parent or guardian, unless the area is restricted to adults as provided for in 39-17-914 (b) (4).

(c) A violation of this section shall be a Class C misdemeanor for each day the person is in violation of this section.

SECTION 6. Tennessee Code Annotated, Title 39, Chapter 17, Part 9, is amended by deleting Sections 39-17-910, 39-17-912, 39-17-913, 39-17-915, 39-17-916 and 39-17-917 in their entirety and renumbering the remaining sections accordingly.

**1987 Tenn. Pub. Acts 841, ch. 432, § 2**

# PUBLIC ACTS and RESOLUTIONS

## of the

# STATE OF TENNESSEE

## Passed by the

# NINETY-FIFTH

# GENERAL ASSEMBLY

### First Regular Session, 1987

Published by Authority of
Tennessee Code Annotated, Title 12, Chapter 5
under the Direction of
GENTRY CROWELL
Secretary of State

AN ACT To enact "The Adult-Oriented Establishment Registration Act of 1987".

BE IT ENACTED BY THE GENERAL ASSEMBLY OF THE STATE OF TENNESSEE:

SECTION 1. The act shall be known and cited as "The Adult-Oriented Establishment Registration Act of 1987".

SECTION 2. As used in this act, unless the context otherwise requires:

(1) "Adult-Oriented Establishments", shall include, but not be limited to, "adult bookstores", "adult motion picture theaters", "adult mini-motion picture establishments", or "adult cabaret" and further means any premises to which the public patrons or members are invited or admitted and which are so physically arranged as to provide booths, cubicles, rooms, compartments or stalls separate from the common areas of the premises for the purpose of viewing adult-oriented motion pictures, or wherein an entertainer provides adult entertainment to a member of the public, a patron or a member, when such adult entertainment is held, conducted, operated or maintained for a profit, direct or indirect. An "adult-oriented establishment" further includes, without being limited to, any "adult entertainment studio" or any premises that is physically arranged and used as such, whether advertised or represented as an adult entertainment studio, rap studio, exotic dance studio, encounter studio, sensitivity studio, model-studio, escort services, escort or any other term of like import.

(2) "Adult bookstore" means an establishment having as a substantial or significant portion of its stock and trade in books, films, video cassettes, or magazines and other periodicals which are distinguished or characterized by their emphasis on matter depicting, describing or relating to "specific sexual activities" or "specific anatomical areas" as defined below, and in conjunction therewith have facilities for the presentation of adult entertainment, as defined below, and including adult-oriented films, movies, or live entertainment, for observation by patrons therein.

(3) "Adult motion picture theater" means an enclosed building with a capacity of fifty (50) or more persons regularly used for presenting material having as a dominant theme or presenting material distinguished or characterized by an emphasis on matter depicting, describing or relating to "specified sexual activities" or "specified anatomical areas", as defined below, for observation by patrons therein.

(4) "Adult mini-motion picture theater" means an enclosed building with a capacity of less than fifty (50) persons regularly used for presenting material distinguished or characterized by an emphasis on matter depicting, describing or relating to "specified sexual activities" or "specified anatomical areas", as defined below, for observation by patrons therein.

(5) "Adult cabaret" means a cabaret which features topless dancers, go-go dancers, exotic dancers, strippers, male or female impersonators, or similar entertainers.

(6) "Board" means the Adult-Oriented Establishment Board, or, if there is in existence in the county a Massage Registration Board appointed by the county executive, such board may be substituted for the board.

(7) "Employee" means any and all persons, including independent contractors, who work in or at or render any services directly related to the operation of an adult-oriented establishment.

(8) "Entertainer" means any person who provides entertainment within an

adult-oriented establishment as defined in this section, whether or not a fee is charged or accepted for entertainment and whether or not entertainment is provided as an employee, escort or an independent contractor.

(9) "Adult entertainment" means any exhibition of any adult-oriented motion pictures, live performance, display or dance of any type, which has as a significant or substantial portion of such performance any actual or simulated performance of specified sexual activities of exhibition and viewing of specified anatomical areas, removal of articles of clothing or appearing unclothed, pantomime, modeling, or any other personal service offered customers.

(10) "Operator" means any person, partnership, or corporation operating, conducting or maintaining an adult-oriented establishment.

(11) "Specified sexual activities" means:

(A) human genitals in a state of sexual stimulation or arousal; .

(B) acts of human masturbation, sexual intercourse or sodomy;

(C) fondling or erotic touching of human genitals, pubic region, buttocks or female breasts.

(12) "Escort service" means a person as defined herein, which, for a fee, commission, profit, payment or other monetary consideration, furnish or offers to furnish escorts or provides or offers to introduce patrons to escorts.

(13) "Person" means an individual, partnership, limited partnership, firm, corporation or association.

(14) An "escort" is a person who, for monetary consideration in the form of a fee, commission, salary or tip: dates, socializes, visits, consorts with, accompanies, or offers to date, consort, socialize, visit or accompany; social affairs, entertainment or places of amusement or within any place of public resort or within any private quarters of a place of public resort. .

(15) "Open office" means an office at the escort service from which the escort business is transacted and which is open to patrons or prospective patrons during all hours during which escorts are working which is managed or operated by an employee, officer, director or owner of the escort service having authority to bind the service to escort and patron contracts and adjust patron and consumer complaints.

(16) "Specified anatomical areas" means:

(A) less than completely and opaquely covered:

(i) human genitals, pubic region;

(ii) buttocks;

(iii) female breasts below a point immediately above the top of the areola; and

(B) human male genitals in a discernibly turgid state, even if completely opaquely covered.

(17) As applied to metropolitan forms of government, "county" shall mean that portion of the general services district which lies outside of the urban